# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:23-cr-13-KKM-CPT

MICHAEL LUCAS AMBROSE
_____/

## MOTION TO SUPPRESS

**NOW COMES** Defendant, Michael Lucas Ambrose, and moves this Court to suppress (1) any evidence of his receipt or distribution of child pornography provided by social media companies to the National Center for Missing and Exploited Children (NCMEC) and (2) any evidence derived from such evidence, including (a) admissions made by Mr. Ambrose and (b) evidence from Mr. Ambrose's electronic devices.

## MEMORANDUM OF LAW

An act of Congress requires social media companies to report to NCMEC when they learn that their users send purported child pornography in private messages. Sometimes the social media companies look at the child pornography before sending it to NCMEC and sometimes they rely on automated processes that purport to identify the material. Here, social media companies forwarded attachments to Mr. Ambrose's private messages to NCMEC, and NCMEC forwarded them to law enforcement. In some cases the social media company at issue may have viewed all or some of the file before forwarding it to NCMEC, in

others NCMEC reviewed the file before forwarding it to law enforcement, and in all cases law enforcement reviewed the files without a warrant. Law enforcement then used what it learned to identify, locate, and interview Mr. Ambrose, and then seize and search his devices.

Because people maintain a reasonable expectation of privacy in the content of their private social media messages, a Government review of those messages constitutes a "search" within the meaning of the Fourth Amendment. The social media companies act as agents of the Government, so the "private search doctrine" does not apply. NCMEC is either a governmental entity or an agent of the Government, and so the private search doctrine does not apply to any files reviewed by NCMEC without a warrant. Even if the social media companies are not Government agents, at least for any messages that the social media companies' employees did not review (relying instead only on automated processes), law enforcement's later review of the files exceeded the scope of any private search. The Government's review of the messages also constituted a "search" under trespass principles. Each search was unlawful because it was warrantless. Finally, what the Government learned from the unlawful searches allowed it to locate Mr. Ambrose, interrogate him, and seize his electronic devices, making his statements and any evidence on the devices the fruit of the poisonous tree. Accordingly, this Court should suppress the information sent by the companies to NCMEC, Mr. Ambrose's statements, and any evidence on the devices.

FACTS

On June 19, 2020, an Instagram user attached and sent a video file to another user through Instagram's "direct message" function. Instagram reported the exchange to NCMEC's "CyberTipline," forwarding the file and identifying information about the sender and intended recipient. In response, NCMEC generated a report. Exhibit 1. The report does not reveal how Instagram identified the file for reporting to NCMEC. The report's field for "Did reporting [electronic service provider] view entire contents of uploaded file?" reads, "(Information not provided by Company)," and nothing within the report indicates what, if any, automated process Instagram used to identify the file for reporting. However, Instagram labeled the file "apparent child pornography." NCMEC did not review the file. Instead, NCMEC sent the file and report to law enforcement in Florida, where the case was eventually assigned to Officer Alan Hogan of the Tampa Police Department. Without a warrant, Officer Hogan opened the video file and watched it, observing that it depicted sexual activity between an adult male and a female child. Officer Hogan and the Tampa Police Department attempted to identify and locate the sender of the file, but were unable to do so, and closed the case.

On May 3, 2022, a Facebook user uploaded two files by attaching them to one or more private messages. Facebook reported the uploads to NCMEC, and NCMEC generated a report. Exhibit 2. The report does not provide the process Facebook used to identify the files for reporting. The report does indicate, however,

that Facebook did not "view the entire contents of the uploaded file[s]." NCMEC also did not view the files. Facebook provided NCMEC with the files and provided industry-standard codes for the files, coding them as B1 and B2, indicating sex acts and the lascivious display of the genitals by a pubescent minor, respectively. Facebook also provided a variety of other information about the upload, including an IP address associated with the upload: 73.91.13.184.

On May 18, 2022, a Facebook user uploaded eight files through private messaging. Exhibit 3. Facebook flagged the files as A1 (sex act with a prepubescent minor), A2 (lascivious display of a prepubescent minor's genitals), B1 (sex act with a pubescent minor), and "unclothed minor." Once again, Facebook did not explain what process it used to identify the files for reporting to NCMEC, Facebook did not examine the files themselves, Facebook provided the files in a report to NCMEC, and NCMEC did not examine the files. Again, Facebook provided the IP address of 73.91.13.184 as being associated with the upload.

Next, on June 8, 2022, Facebook provided a third report to NCMEC. Exhibit 4. This report included eleven files coded with each of the four industry-standard codes. Facebook did not examine the files and did not explain the process through which it identified them for reporting, and NCMEC did not examine the files. The Government provided this report in discovery, though it is unclear how it relates to Mr. Ambrose's case.

On July 15, 2022, law enforcement in New Jersey learned that an adult (not Mr. Ambrose) had been having sex with a minor there. As part of that investigation, law enforcement reviewed the contents of the minor's phone, on which they found separate text conversations with someone labeled "Michael" and "Mixheal." Then, law enforcement served a search warrant on Snapchat for the contents of the minor's account. The minor's Snapchat account contained conversations between someone with the username massive_beats, whom the minor referred to as "Michael." At this point, law enforcement had not identified "Michael/Mixheal."

On November 9, 2022, Snapchat sent a report to NCMEC that a user uploaded a file, though Snapchat did not "code" or otherwise describe the file. Exhibit 5. NCMEC's report in response to this incident indicates that Snapchat *did* review the file, stating "Yes" in the field for "Did Reporting ESP view *entire* contents of uploaded file?" (emphasis added). However, when a company makes a report to NCMEC, it is asked to check a box that asks only whether it has viewed the file at all, not whether it had viewed the "entire" file. Exhibit 6. NCMEC changes the meaning of this box-check in its reports, and common sense rather strongly suggests that the unfortunate Snapchat employee tasked with watching a video file to see if it contains child pornography would only watch enough to answer the question. Thus, the evidence does not reveal how much of the file, if any, Snapchat really examined. In any event, Snapchat did not provide any description of the file it claimed it

reviewed.  Snapchat provided a username of "bastard_blob" for the uploader, and an IP address of 73.91.13.184.

The next day, on November 10, 2022, Snapchat made a second report to NCMEC, again reporting the upload of a single file.  Exhibit 7.  Snapchat again indicated that it had reviewed the file, but provided no code or other description of the file.  Snapchat provided a username of "joint_token" for the uploader and the same IP address of 73.91.13.184.

On November 18, 2022, the Government subpoenaed TextNow for the subscriber information associated with the "Mixheal" phone number used on the New Jersey minor's phone.  The subpoena return indicated that the phone number was frequently used from IP address 73.91.13.184.

On November 29, 2022, the Government queried NCMEC for information on a list of identifiers, including IP address 73.91.13.184.  NCMEC responded by providing the FBI with the five reports from Facebook and Snapchat described above.  The Government reviewed any file included with these reports without a warrant.

After receiving the NCMEC reports, the Government determined that IP address 73.91.13.184 was assigned to Comcast.  With a subpoena to Comcast, the Government learned that Mr. Ambrose was the subscriber for IP address 73.91.13.184, at his home in Bartow, Florida.  The Government commenced surveillance of the home and gathered records about it.  During the course of several

days' surveillance, on December 13, 2022, the FBI received the Tampa Police Department's report of its closed investigation of the Instagram CyberTipline report.

After confirming Mr. Ambrose's identity through surveillance, the FBI eventually confronted Mr. Ambrose. The interrogating agents confronted Mr. Ambrose about his specific phone numbers and screen names; accused him of uploading child pornography online, and told him that the activity came from his IP address so could not have been a hacker posing as him; and asked him specific questions about uploading child pornography on Snapchat. The agents learned this information from the NCMEC reports. In response to these accusations and questions, Mr. Ambrose made incriminating admissions. Further, Mr. Ambrose provided the FBI with several of his electronic devices and consented to a search of their contents. After Mr. Ambrose was arrested, he revoked that consent. Exhibit 8. The Government thereafter applied for and obtained warrants to search the devices, recounting in the search warrant applications the complete details of its investigation. Exhibits 9-15.

ARGUMENT

This Court should suppress the evidence because the Government searched the contents of Mr. Ambrose's private messages without a warrant and used the information it learned to obtain a confession from Mr. Ambrose and seize his devices.

**I. Mr. Ambrose had a reasonable expectation of privacy in the contents of his private social media messages.**

"A search occurs for the purposes of the Fourth Amendment 'when the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *United States v. Trader*, 981 F.3d 961, 967 (11th Cir. 2020) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)). And people have a reasonable expectation of privacy in the contents of their electronic messages. *See United States v. Warshak*, 631 F.3d 266, 285-86 (6th Cir. 2010) (holding that people have a reasonable expectation of privacy in the content of their emails, analogizing to letters); *see also United States v. Hasbajrami*, 945 F.3d 641, 666 (2d Cir. 2019) (citing *Warshak*, 632 F.3d at 285-86); *United States v. Muhtorov*, 20 F.4th 558, 603 (10th Cir. 2021) (citing *Hasbajrami*, 945 F.3d at 666); *United States v. Ackerman*, 831 F.3d 1292, 1305 (10th Cir. 2016) (Gorsuch, J.); *United States v. Wilson*, 13 F.4th 961, 967 (9th Cir. 2021) (citing *Ackerman*, 831 F.3d at 1308); *United States v. Miller*, 982 F.3d 412, 426-27 (6th Cir. 2020). Thus, Mr. Ambrose had a reasonable expectation of privacy in the contents of his private social media messages, and any invasion of that privacy was a Fourth Amendment "search."

This straightforward conclusion is not upset by the fact that Mr. Ambrose used the social media companies to send the messages or the "third-party" doctrine. *See Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018). In *Carpenter*, the Government obtained information from cellular telephone companies on which cell sites the

defendant's phone had used over a long time period. The Government argued that the third-party doctrine applied, because the information was in the hands of the companies, preventing the defendant from maintaining a reasonable expectation of privacy in it. *See id*. The Court rejected this argument and criticized the Government for "mechanically applying the third-party doctrine to this case," explaining that the doctrine requires considering "'the nature of the particular documents sought' to determine whether 'there is a legitimate expectation of privacy' concerning their contents." *Id*. (quoting *United States v. Miller*, 425 U.S. 435, 442 (1976)). On the one hand, the Court explained, there is little private information in checks held by banks or dialed phone numbers held by phone companies, but on the other hand, cell site information is highly "revealing" because of what it says about a person's whereabouts. *See id*. Surely, the contents of one's private communications are even more "revealing" than the locations of one's cell phone. *See Warshak*, 631 F.3d at 286 ("It follows that email requires strong protection under the Fourth Amendment; otherwise, the Fourth Amendment would prove an ineffective guardian of private communication, an essential purpose it has long been recognized to serve") (citations omitted).

Moreover, the contents of one's private social media messages have not been "voluntarily exposed" by the user to the social media company any more than one voluntarily exposes the contents of a letter to the postal service. *See Carpenter*, 138 S. Ct. at 2220 (noting that "voluntary exposure" is a second rationale for the third-party

9

doctrine); *cf. Warshak*, 631 F.3d at 286 ("[T]he police may not storm the post office and intercept a letter, and they are likewise forbidden from using the phone system to make a clandestine recording of a phone call–unless they get a warrant, that is. It only stands to reason that, if government agents compel an [internet service provider] to surrender the contents of a subscriber's emails, those agents have thereby conducted a Fourth Amendment search, which necessitates compliance with the warrant requirement absent some exception") (citation omitted). Accordingly, the examining of the contents of Mr. Ambrose's private social media messages violated his reasonable expectation of privacy, and so was a "search" within the meaning of the Fourth Amendment.

## II. The private search doctrine does not apply.

The Fourth Amendment does not protect against private actors. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Accordingly, the Supreme Court has held that, where a private person has provided contraband "of her own accord," "it was not incumbent on the police to stop her or avert their eyes." *Coolidge v. New Hampshire*, 403 U.S. 443, 489 (1971).

The evidence in this case fits into two categories: (1) the files identified by Instagram and Facebook through an unknown process, sent to NCMEC, and then first reviewed by law enforcement and (2) files possibly first viewed by Snapchat in whole or in part, then viewed by NCMEC, and later viewed by law enforcement. The private search doctrine does not apply to the first category of files for two

10

reasons.  First, Instagram and Facebook acted as agents of the Government, so any search is not "private."  Second, Instagram and Facebook only used some sort of automated screening process, so the Government's examination of the files exceeded the scope of any private search.

For the second category of files, the private search doctrine does not apply for three reasons.  First, Snapchat, like Instagram and Facebook, acts as an agent of the Government.  Second, if Snapchat did not examine the files or only partially examined the files, NCMEC, who did examine the files in full, is a government entity.  Third, even if NCMEC is not a government entity, it is a government agent.

Finally, applicable to all categories of evidence, and regardless of any prior private search, the Government's later search of the files constituted a trespass to chattels, and so was a Fourth Amendment search even if Mr. Ambrose's reasonable expectation of privacy had already been violated by a private party.

A.  Instagram, Facebook, and Snapchat were agents of the Government.

Instagram, Facebook, and Snapchat acted as agents of the Government because the Government encouraged, endorsed, and participated in their conduct.  A federal statute, 18 U.S.C. § 2258A, required and authorized the social media companies' reporting.  The statute imposes a duty on such companies "[i]n order to reduce the proliferation of online child sexual exploitation and to prevent the online sexual exploitation of children . . . ."  18 U.S.C. § 2258A(a)(1).  Under the statute, the company "shall, as soon as reasonably possible after obtaining actual knowledge

of any facts or circumstances" of "apparent" violations of federal laws involving child pornography, provide to NCMEC's "CyberTipline" the company's contact information, and make a report of those facts and circumstances to the CyberTipline. *See id*. § 2258A(a)(1), (a)(2). The company "may" make the same report upon learning of "imminent" violations of those same laws. *See id*. § 2258A(a)(1)(A)(ii), (a)(2)(B). The statute makes clear that the mandatory report must include the "facts and circumstances" of the apparent violation, *see id*. § 2258A(a)(1)(B)(ii), and that the purpose of the report is "an effort to prevent the future sexual victimization of children," *see id*. § 2258A(b). Otherwise, the precise contents of the required report are left to "the sole discretion of the provider . . . ." *Id*. § 2258A(b).

In the exercise of that discretion, the statute permits the company to provide information about the individual involved; information about how or when the illicit content was uploaded; geographic location information about the individual; the child pornography itself; and the complete communication that is the subject of the report, including any file attachments. *See id*. This freedom to disclose so much customer information and communications content stands in stark contrast to other federal laws restricting such disclosures. *See* 18 U.S.C. § 2701 *et seq*. And, of course, the freedom to transmit contraband child pornography stands in stark contrast to the myriad federal laws prohibiting such conduct. *See*, *e.g.*, 18 U.S.C. § 2252(a)(2).

While the statute does not require social media companies to actively monitor its users or affirmatively search for child pornography, *see* 18 U.S.C. § 2258A(f), a

12

failure to make a required report may be punished by "apparently criminal" penalties, *see id*. § 2258A(e); *Ackerman*, 831 F.3d at 1296. NCMEC is required to forward the report to law enforcement, and is authorized to disclose information from any such report to law enforcement. *See* 18 U.S.C. § 2258A(c), (g)(3). Law enforcement is permitted to disclose the report in aid of investigation and prosecution. *See id*. § 2258A(g)(2). Finally, a completed submission of a report by a company automatically constitutes a request to preserve the contents provided in the report for 90 days. *See id*. § 2258A(h)(1). The social media company must preserve the material in the report and any other material that "may provide context or additional information about the reported material or person." *See id*. § 2258A(h)(2).

Given these statutory duties and authorities, and the social media companies' conduct in this case, the companies acted as agents of the Government. "Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989) (citations omitted). "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *Id*. (citations and internal quotation omitted). "The fact that the Government has not *compelled* a private party to perform

such a search does not, by itself, establish that the search is a private one." *Id*. at 615 (emphasis added).

A private party is an agent of the Government for Fourth Amendment purposes when the Government has encouraged, endorsed, or participated in the search at issue. *See id.* at 615-16. In *Skinner*, the Court considered a drug and alcohol testing regime promulgated by the Federal Railroad Administration (FRA). One aspect of the regulation was mandatory for railroad companies. *Id*. at 609. The mandatory regulation required a railroad, after a serious accident, to transport all crewmembers directly involved to a medical facility and to obtain both blood and urine samples. *Id*. The railroad was then required to ship the samples to an FRA laboratory for analysis. *Id*. at 609-610. Employees who refused to take the test faced mandatory suspension under the regulation. *Id*. at 610.

Another part of the *Skinner* regulation was permissive. *Id*. at 611. That part of the regulation authorized blood and breath tests where the railroad had reasonable suspicion of impairment or upon certain rule violations, and an employee who refused the testing was presumed to be impaired. *Id*.

Considering whether the railroads acted as agents of the Government under the Fourth Amendment, the Supreme Court made quick work of the mandatory portion of the regulation. *See id*. at 614. Without further discussion, the Court held, "A railroad that complies with [the mandatory regulation] does so by compulsion of sovereign authority, and the lawfulness of its acts is controlled by the Fourth

Amendment." *Id*. Turning to the permissive regulation, the Court noted that the regulation "confer[red] upon the FRA the right to receive certain biological samples and test results procured by railroads"; that the railroads could not divest themselves of the authority to test, since it was conferred "for the purpose of promoting public safety"; and that railroad employees were not free to refuse the tests once ordered. *Id*. at 615. The Court therefore held that the railroads acted as agents of the Government even under the permissive regime: "The Government has removed all legal barriers to the testing authorized by Subpart D and indeed has made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions . . . . These are clear indices of the Government's encouragement, endorsement, and participation, and suffice to implicate the Fourth Amendment." *Id*. at 615-616.

In *Ackerman*, in an opinion by then-Judge Gorsuch, the Tenth Circuit concluded that NCMEC was an agent of the Government in light of § 2258A and other statutes dealing with the organization. 831 F.3d at 1301. Applying *Skinner*, the court explained that "the government surely 'encouraged and endorsed and participated' in NCMEC's putative search for the same reasons it 'knew of and acquiesced in' that activity: Congress funded the Center, required AOL to cooperate with it, allowed it to review Mr. Ackerman's email by excepting it from various federal criminal laws, and statutorily mandated or authorized every bit of its challenged conduct." *Id*. at 1302. Responding to the Government's argument that

15

NCMEC's actions were not all statutorily mandated, but rather permitted, Judge

Gorsuch wrote:

> Of course and as the government notes, Congress's statutes don't require NCMEC to open and view email and attachments like Mr. Ackerman's. But everyone accepts that Congress has authorized and funded NCMEC to do just that. And everyone accepts that Congress enabled NCMEC to review Mr. Ackerman's email by excepting the Center from the myriad laws banning the knowing receipt, possession, and viewing of child pornography. Nothing about NCMEC's actions could possibly have come as a surprise. Neither does anything in [*United States v. Souza*, 223 F.3d 1197 (10th Cir. 2001)] (or any other authority cited to us) suggest that the principal must mandate rather than merely consent to the agent's challenged conduct.

*Id*. at 1302.

Here, like the railroads in *Skinner* and NCMEC in *Ackerman*, the social media

companies were agents of the Government because the Government encouraged,

endorsed, and participated in their activity. Like the mandatory regulations in

*Skinner*, the social media companies' compliance with § 2258A's mandatory

provisions was through "compulsion of sovereign authority," and so "the lawfulness

of its acts is controlled by the Fourth Amendment." *See Skinner*, 489 U.S. at 614.

Once the companies became actually aware of Mr. Ambrose's apparent violation of

the law, they were required so make a report to the CyberTipline that contained the

"facts and circumstances" of the violation. *See* 18 U.S.C. § 2258A(1). Because they

were compelled to take these actions, the Fourth Amendment controls, and the

private search doctrine is inapplicable.

16

Moreover, although the companies took some actions that were not directly *compelled* by statute, like monitoring for child pornography and including specific details in the reports, they nonetheless acted as agents of the Government under *Skinner* and *Ackerman*. As the Court held in *Skinner*, "[t]he fact that the Government has not compelled a private party to perform such a search does not, by itself, establish that the search is a private one." 489 U.S. at 615. Further, as with the permissive regulation in *Skinner*, Congress made plain its statutory purpose and preference for social media companies to search their users' content by authorizing reports to NCMEC, so that the Government could "share in the fruits of such intrusions." *Id*. As with the FRA testing laboratory in *Skinner*, here Congress provided NCMEC, and encouraged robust reporting of the content of users' communications to it. Similarly, as with NCMEC's enabling statutes in *Ackerman*, everyone accepts that Congress authorized and enabled every bit of the social media companies' challenged conduct, and "[n]othing about [their] actions could have come as a surprise." *See Ackerman*, 831 F.3d at 1302. A social media company that exercises its discretion to not provide meticulous detail or the contents of the communications in its report is nonetheless mandated to preserve the communications and any other evidence that provides context for the Government's use, under § 2258A(h)(1). Because Congress encouraged, endorsed, and participated

in the social media companies' searches of Mr. Ambrose's communications, the

lawfulness of the searches is controlled by the Fourth Amendment.[1]

> B. The Government's searches exceeded the scope of Instagram's and Facebook's searches.

Even assuming Instagram and Facebook were private actors, the

Government's searches exceeded the scope of the companies' searches. While

generally the police need not seek a warrant to search seized evidence that has

already been subject to a private search, the police may not exceed the scope of the

prior private search. *Walter v. United States*, 447 U.S. 649, 658-59 (1980). In *Walter*, a

private company mistakenly received a shipment of films. The boxes containing the

films had suggestive drawings on one side, and explicit descriptions of the contents

on another side, which employees of the private company read. *Id*. at 651-52.

Without watching the films, the employees gave them to the FBI, and the FBI

screened them without a warrant, finding them to contain obscenity. *Id*. at 652. The

Government argued that the private search doctrine authorized the warrantless

screening of the films, but the Court rejected this argument, holding that the FBI's

screening of the films exceeded the private party's search, which had involved only

looking at the outside of the packages. *Id*. at 658-59. The Court explained that,

---

[1] Relatedly, the private search doctrine does not apply because the social media companies did not act voluntarily or on their own initiative. The social media companies are far more like the railroads in *Skinner* than, for example, the wife who turned over her husband's guns in *Coolidge*.

18

although the private party had violated the defendants' expectation of privacy insofar as it had viewed the descriptive labels on the boxes, the Government's further action of viewing the films constituted a new and greater invasion of the defendants' expectation of privacy. *See id*. Although the labels may have provided probable cause for a warrant, they did not provide proof for a conviction, and the FBI obtained no warrant, so its search was unreasonable. *See id*. at 654; *see also United States v. Jacobsen*, 466 U.S. 109, 115-117 (1984) (explaining that the separate opinions in *Walter* constitute a majority holding on this point).

However, the Supreme Court has also held that police action that exceeds a private party's action need not be authorized by a warrant if the only information the police could learn from the additional action is whether an item is contraband. *Jacobsen*, 466 U.S. at 123. In *Jacobsen*, FedEx employees opened and examined a package that had been damaged in transit, finding inside a white powder. After notifying the DEA, an agent arrived and opened the package again, testing the white powder with a field test that could only determine whether the substance was cocaine, and destroying a small amount of the powder in the process, all without a warrant. *Id*. at 111-112 & n.1. Relying on *Walter*, the Court first held that the agent's opening and examination of the package did not exceed the scope of FedEx's private search. *Id*. at 118-122. Next, the Court held that the agent's use of the field test was not an unlawful search or seizure because what the government learned beyond what it learned from the private search was only whether the substance was

cocaine, and any expectation of privacy the defendants held in that information was not legitimate. *See id*. at 122-26.

Here, under *Walter* and *Jacobsen*, the Government learned new information necessary to obtain a conviction by conducting a human review of the files. In the case of the file forwarded from Instagram, the precise process by which Instagram flagged the file for reporting to NCMEC is unknown. But whatever Instagram did to decide to forward the file to NCMEC, it said nothing more than that the file contained "apparent child pornography." It took Officer Hogan's opening and viewing of the file for the Government to learn that the video depicted particular sexual activity with a minor, and so did, in fact, contain child pornography. Like the films in *Walter*, the Government learned new information to aid its prosecution of Mr. Ambrose, beyond what it learned from the private party. And, unlike the cocaine field test in *Jacobsen*, Officer Hogan's review of the video was not limited to a determination of whether the file contained contraband. At its inception, his review could have resulted in a determination that the video was child pornography (as it did), or it could have revealed that the video contained any number of non-contraband depictions, like licit "child erotica," adult pornography, or a mundane family video. Unlike *Jacobsen*'s cocaine field test, which was only capable of telling the agents whether the substance was cocaine and nothing more, Officer Hogan's human review could have led to anything.

For the files forwarded from Facebook, for which Facebook again did not explain its automated process for identifying files to be reported, the Government likewise learned the specific content of the videos depicted, beyond the general industry codes provided by Facebook. Further, the Government's human review of the files was not limited at its inception to a determination of whether the files were contraband, but rather could have revealed anything. As before, like in *Walter*, the Government learned new information from reviewing the files, and, unlike in *Jacobsen*, the Government was not limited to a binary determination of whether the files were or were not contraband. The Government's warrantless search therefore exceeded the scope of any private search.

C.  NCMEC is a government entity.[2]

For purposes of determining constitutional protections for individuals, "the calling card of a governmental entity is whether it is 'invested with any portion of

_____

[2] This issue is necessary to resolve only as it relates to the two reports provided by Snapchat, and then only if the Court makes certain findings and conclusions of law. If the Court concludes as a matter of law that the social media companies were not government agents, and finds as a matter of fact that Snapchat did not conduct a full human review, then NCMEC would be the first entity to have conducted a human review of the files. In that event, the Court would be called upon to decide whether NCMEC's search was a government search or a private search. If the Court applies the trespass test discussed below, neither the social media companies' nor NCMEC's governmental status is relevant, because the later law enforcement searches would be subject to the Fourth Amendment regardless of any prior private search. It appears beyond dispute that neither Instagram nor Facebook conducted a human review, and instead relied on automated processes, and further beyond dispute that NCMEC conducted no review at all of the Instagram or Facebook communications, making analysis of NCMEC's role unnecessary as to those communications.

21

political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority.'" *See Ackerman*, 831 F.3d at 1295 (quoting *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 668-69 (1819)). "[T]he dispositive question isn't one of form but function, turning on what the entity does, not how it is organized." *Id.* For example, in a pair of cases, the Supreme Court held that Amtrak is a government entity for purposes of the First Amendment and separation-of-powers doctrine, looking to the level of governmental control, Amtrak's broad statutory mandates, its dependence on federal funding, the purpose behind its creation, and the benefits it confers on the government. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397-400 (1995); *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51-55 (2015). Further, "the 'police function' is among the paradigmatic examples" of "what qualifies as a public, political, or sovereign function," and "when an actor is endowed with law enforcement powers beyond those enjoyed by private citizens, courts have traditionally found the exercise of the public police power engaged." *Ackerman*, 831 F.3d at 1295-96 (citing *Romanowski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005)) (emphasis removed).

The Tenth Circuit held that NCMEC is a government entity for Fourth Amendment purposes in *Ackerman*. *Id.* at 1296-1300. In so doing, Judge Gorsuch's opinion noted that "NCMEC's law enforcement powers extend well beyond those enjoyed by private citizens," including by mandating collaboration with federal law

22

enforcement in over a dozen different ways.  *Id.* at 1296 (citing 18 U.S.C. § 2258A; 42 U.S.C. § 5773(b)).  Focusing in particular on NCMEC's CyberTipline functions, Judge Gorsuch noted that NCMEC must maintain the CyberTipline and forward all reports to federal law enforcement agencies; that companies must report violations to NCMEC rather than any law enforcement agency; that NCMEC's receipt of a report automatically constitutes a request to preserve evidence as if made by the government itself; and that NCMEC is authorized to knowingly receive and review child pornography.  *Id.* at 1296-97 (citations omitted).  Judge Gorsuch also noted that NCMEC shares many of the features the Supreme Court relied on to find Amtrak to be a government entity, noting that, in addition to these features, NCMEC exercises law enforcement authority beyond that of a private citizen.  *Id.* at 1297-98.

Then-Judge Gorsuch's well reasoned opinion in *Ackerman* demonstrates that NCMEC is a government entity for Fourth Amendment purposes.  NCMEC's examination of Mr. Ambrose's Snapchat communications is therefore subject to the Fourth Amendment's limitations.  Because that review was without a warrant, it was unreasonable, and the evidence should be suppressed.  *See Carpenter*, 138 S. Ct. at 2221.

D.  NCMEC was a government agent.

As discussed in detail above, in *Ackerman* the court held alternatively that NCMEC acted as a government agent.  *See id.* at 1300-1304.  Nothing about the facts

23

of NCMEC's behavior in this case distinguishes it from *Ackerman*. Every bit of NCMEC's challenged conduct was authorized or mandated by statute, and "the government surely 'encouraged and endorsed and participated' in NCMEC's putative search" under *Skinner*. *See id*. at 1302. NCMEC was therefore a government agent for Fourth Amendment purposes, and its warrantless searches were unreasonable.

    E. <u>The Government's review was a search because it was a trespass.</u>

Even if the Government's examination of the files does not qualify as a Fourth Amendment "search" under the "reasonable expectation of privacy" test because of a prior private search, it was nonetheless a "search" because it was a trespass. Long after the Supreme Court decided *Walter* and *Jacobsen*, the Court decided *United States v. Jones*, 566 U.S. 400, 132 S. Ct. 945 (2012). As then-Judge Gorsuch explained for the Tenth Circuit, following *Jones*, the "reasonable expectation of privacy" test first established in *Katz v. United States*, 389 U.S. 347 (1967), "is but one way to determine if a constitutionally qualifying 'search' has taken place." *Ackerman*, 831 F.3d at 1307 (citing *Jones*, 132 S. Ct. at 949-51). "In light of the Fourth Amendment's original meaning, *Jones* explained that government conduct can constitute a Fourth Amendment search *either* when it infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space or thing ('persons, houses, papers, and effects') for the purpose of obtaining information." *Id*.

24

The holding of *Jacobsen* was an extension of *Katz*'s "reasonable expectation of privacy" test. *See id.* Therefore, "the fact that the government's conduct doesn't trigger *Katz* doesn't mean it doesn't trigger the Fourth Amendment." *Id.* (citing *Jones*, 132 S. Ct. at 950). Judge Gorsuch explained that the law of trespass at the Founding provides the minimum Fourth Amendment protection in the application of the *Jones* test. *See id.* "At common law, a suit for trespass to chattels could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels,' but today there must be 'some actual damage to the chattel before the action can be maintained.'" *Jones*, 564 U.S. at 419 n.2 (Alito, J., concurring in the judgment) (citation omitted). Turning to the NCMEC review of the emails at issue in the case, Judge Gorsuch wrote, "We are dealing . . . with the warrantless opening and examination of (presumptively) private correspondence that could have contained much besides potential contraband for all anyone knew. And that seems pretty clearly to qualify as exactly the type of trespass to chattels that the framers sought to prevent when they adopted the Fourth Amendment." *Id.* (citations omitted). Accordingly, the Tenth Circuit held that NCMEC's review of the files was a Fourth Amendment "search" whether under the *Katz* test or the *Jones* test. *Id.* at 1308.

Here, like in *Ackerman*, whether or not Mr. Ambrose retained any reasonable expectation of privacy in the contents of his online communications at the time of the Government's review of them, that review constituted a common-law trespass to

chattels for the purpose of obtaining information. The Government's review was therefore a Fourth Amendment "search" under *Jones*. Because the search was warrantless, it was unreasonable. *See Carpenter*, 138 S. Ct. at 2221. This Court should therefore suppress the files and information in the NCMEC reports.

## III. Mr. Ambrose's admissions and the physical evidence were the fruit of the poisonous tree.

"In determining whether evidence is tainted by a prior violation of constitutional rights, [courts] ask 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315 (11th Cir. 2009) (quoting *United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007)). Courts consider three non-exhaustive factors in answering that question: (1) the temporal proximity of the illegal police conduct and their obtaining the challenged evidence, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct. *See Delancy*, 502 F.3d at 1309 (citing *United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000)). The burden is on the Government. *See id*. at 1308 (citing *United States v. Robinson*, 625 F.2d 1211, 1219 (5th Cir. 1980)); *Brown v. Illinois*, 422 U.S. 590, 604 (1975).

Here, the unlawful searches led the Government directly to the challenged evidence. At whatever stage the illegality occurred – when the social media

companies searched the messages, when NCMEC searched the messages, or when law enforcement searched the messages – it allowed the Government to locate Mr. Ambrose, interview him, and seize his devices to be searched. The FBI did not know the identity of "Michael/Mixheal," and the Tampa Police Department was unable to locate Mr. Ambrose as the suspect in its investigation. It was not until after the Government received the NCMEC reports, which contained the content of Mr. Ambrose's private messages and detailed information about from where and when they were sent, that the Government was able to locate Mr. Ambrose, surveil him, and positively identify him. Doing that allowed the Government to interrogate Mr. Ambrose and obtain his admissions by confronting him about what it had learned from the NCMEC reports, and then to seize his devices and obtain his consent to search them. When Mr. Ambrose revoked his consent, the Government detailed all of its investigation in its applications for search warrants, including the unlawful searches, allowing it to begin or re-start its searches of the devices. In sum, the unlawful searches of Mr. Ambrose's private communications led the Government quite directly to the challenged evidence, and the taint of the illegality was not purged by any time delay or intervening circumstance. Accordingly, while the communications' themselves and the data the social media companies forwarded NCMEC should be suppressed, so should Mr. Ambrose's admissions and any evidence found on his devices.

DATED this 7th day of April 2023.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

/s Samuel E. Landes
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th of April 2023, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Abigail King.

/s Samuel E. Landes
Samuel E. Landes, Esq.
Assistant Federal Defender