## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                            Case No. 8:23-cr-13-KKM-CPT

**MICHAEL LUCAS AMBROSE**

_____/

## Motion to Compel Discovery

**NOW COMES** Defendant, Michael Lucas Ambrose, and moves this Court to compel the Government to provide in discovery notice or any record or copy of any communication made between January 2018 and the present between any government officer or employee of any government agency, or any government agent, and Snap Inc. or any agent of Snap Inc., relating to Snap's institution, continuation, or discontinuation of end-to-end encryption for any of its products, including but not limited to any oral statement, meeting minutes, text message, email, letter, or other communication.

## Memorandum of Law

### Background

A.  Mr. Ambrose moved to suppress evidence of his Snapchat communications.

Mr. Ambrose filed a motion to suppress evidence forwarded to the National Center for Missing and Exploited Children (NCMEC) and law enforcement by social media companies.  Doc. 38.  In his motion, Mr. Ambrose argues that Snapchat, a

social media application owned by Snap Inc. ("Snap"), acted as an agent of the Government in searching Mr. Ambrose's messages, under the Fourth Amendment. Doc. 38 at 11-18. The Government responded by arguing that Snap was not an agent of the Government.

B. Snapchat instituted default end-to-end encryption.

On January 9, 2019, a Snapchat security engineer, Mr. Subhash Sankuratripati, announced at a conference that, the year prior, Snapchat implemented end-to-end encryption for its users' communications. Exhibit 1. "End-to-end encryption scrambles a message as it travels over an internet network so that it can only be read by the recipient." *Id*. That is, the data is encrypted on the sender's device such that only the recipient can decrypt it. This would mean that no one else – not the government, not a hacker, and not Snapchat – could decipher the meaning or import of the communication while it is in transit or in storage. This feature was enabled by default. *Id*. At the conference, an attendee asked Mr. Sankuratripati, "The terms of service for Snapchat says [sic] that you can respond to warrants. How do you do that with this protocol?" Mr. Sankuratripati smirked, and responded, "We basically respond to warrants with what we have in our systems, and what we have in our systems is bytes we can't decrypt." By this, he meant that Snapchat would send law enforcement undecipherable gibberish. The crowd laughed and applauded. https://www.youtube.com/watch?v=9xePC0Tyeuc (at 1:35::56).

C. <u>Snap may have quietly disabled end-to-end encryption.</u>

The United States government has been a staunch opponent of end-to-end encryption because it prevents law enforcement from understanding the content of Americans' communications. The Government wants social media companies to forgo end-to-end encryption altogether or install a "backdoor" allowing the Government the key to decipher the encrypted content, or to force the social media company to do so for the Government. The Government euphemistically calls this backdoor "lawful access."

In the summer of 2019, after Mr. Sankuratripati announced that Snap had instituted default end-to-end encryption the year prior, several national governments and large internet communications companies convened the "Five Country Ministerial Digital Industry Roundtable" in London, England. Exhibit 2, *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-launch-voluntary-principles-counter-online. "[S]enior representative(s)" of Snap were present at the roundtable. *Id.* There, the parties "agreed that a more robust global response to online child sexual abuse" is necessary. *Id.* The parties established "The 11 Voluntary Principles." *Id.* These "principles" are very broadly worded and are intended to provide only a "baseline." *Id.* For example, Principle 10 provides, "Companies support opportunities to share relevant expertise, helpful practices, data and tools where appropriate and feasible." Exhibits 3 & 4, *available at*

https://www.justice.gov/opa/pr/department-justice-homeland-security-and-international-partners-announce-launch-voluntary.

In July 2019, the FBI hosted an International Conference on Cyber Security. Attorney General William Barr spoke on encryption at the conference, lamenting that

> [s]ervice providers, device manufacturers and application developers are developing and deploying encryption that can only be decrypted by the end user or customer, and they are refusing to provide technology that allows for lawful access by law enforcement agencies in appropriate circumstances. As a result, law enforcement agencies are increasingly prevented from accessing communications in transit or data stored on cell phones or computers, even with a warrant based on probable cause to believe that criminal activity is underway.

Exhibit 5 at 1, *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-keynote-address-international-conference-cyber. Attorney General Barr characterized technologies like end-to-end encryption as "irresponsible encryption that blocks legitimate law enforcement access . . . ." *Id*. at 3. He concluded, "Obviously, the Department would like to engage with the private sector in exploring solutions that will provide lawful access. While we remain open to a cooperative approach, the time to achieve that may be limited. Key countries, including important allies, have been moving toward legislative and regulatory solutions." *Id*. at 6. FBI Director Christopher Wray also spoke to lament the use of end-to-end encryption. Exhibit 6, *available at*

4

https://www.fbi.gov/news/speeches/the-way-forward-working-together-to-tackle-cybercrime.

   After Facebook announced an intent to institute end-to-end encryption, Attorney General Barr and some of his foreign counterparts published an open letter to Facebook.  Exhibit 7, *available at* https://www.justice.gov/opa/press-release/file/1207081/download.  The letter was "to request that Facebook does not proceed with its plan to implement end-to-end encryption across its messaging services without ensuring that there is no reduction to user safety and without including a means for lawful access to the content of communications to protect our citizens."  *Id.* at 1.  The letter continued, "As you know, our governments have engaged with Facebook on this issue, and some of us have written you to express our views."  *Id.*  After listing some of the horrors that could befall the public if the government could not read Americans' private communications, the letter asserted, "Companies should not deliberately design their systems to preclude any form of access to content, even for preventing or investigating the most serious crimes."  *Id.*

   After crediting Facebook for the number of NCMEC reports it had made, the letter then called upon Facebook "and other companies" to take the following steps:

> • Embed the safety of the public in system designs, thereby enabling you to continue to act against the illegal content effectively with no reduction to safety, and facilitating the prosecution of offenders and safeguarding of victims;

- Enable law enforcement to obtain lawful access to content in a readable and usable format;

- Engage in consultation with governments to facilitate this in a way that is substantive and genuinely influences your design decisions; and

- Not implement the proposed changes until you can ensure that the systems you would apply to maintain the safety of your users are fully tested and operational.

*Id*. at 2.

The day after the open letter was published, the Government hosted a "lawful access summit."  FBI Director Wray spoke, again crediting Facebook for the number of NCMEC reports it had made.  Exhibit 8, *available at* https://www.fbi.gov/news/speeches/finding-a-way-forward-on-lawful-access.  He continued,

> But there are other tech companies that have already chosen to blind themselves to the content on their platforms.  Those companies now provide few–if any–leads to law enforcement.   We know their platforms host content involving abused children.  The companies themselves just can't identify it anymore, so they don't warn us about the vast bulk of what's happening.   And some of those companies have millions or even billions of customers–both here and abroad.

*Id*.  Director Wray complained about Facebook's plans to shift policy by implementing end-to-end encryption.  *Id*.  Moving on from Facebook, he said, "We've got to make sure tech companies–all of them–aren't taking steps that will

place content beyond the reach of the courts.  Or to blind themselves deliberately to what's happening on their platforms . . . ."  *Id*.

Deputy Attorney General Jeffrey Rosen also spoke, contrasting Facebook's robust reporting to NCMEC with Apple's, who made only 8 reports in 2017, 43 in 2018, and less than 150 by that point in 2019.  Exhibit 9, *available at* https://www.justice.gov/opa/speech/deputy-attorney-general-jeffrey-rosen-delivers-remarks-justice-departments-lawful-access.  He asked, "[I]s the take-home point that Apple magically ran platforms free of child exploitation as the volume of child sexual exploitation materials grew by massive amounts everywhere else on the internet?  Or is [it] that such companies cannot see the harmful illicit activity that was occurring on their platforms when they chose to avert their eyes by deploying end-to-end encryption?"  *Id*. at 2.  Attorney General Barr provided the keynote address, echoing his remarks at the International Conference on Cyber Security, and lamenting that "some companies want to deploy end-to-end encryption on consumer products that would completely prevent law enforcement from gaining access to data or communications, even when there is probable cause to believe a crime is underway and a judicial magistrate has issued a warrant."  Exhibit 10 at 2, *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-lawful-access-summit.

NCMEC provides annual reports of the number of tips submitted by internet providers to its CyberTipline.  In 2019, which would have been the second year of

default end-to-end encryption for Snapchat, and the year in which the roundtable, open letter, cyber security conference, and "lawful access" summit occurred, Snapchat made only 82,030 reports to NCMEC. Exhibit 11 at 4.

While the Five Country Roundtable took place in the summer of 2019, the "Voluntary Principles" were not announced or endorsed by the technology companies involved until March 5, 2020. Exhibit 2. Attorney General Barr gave a speech alongside his foreign counterparts, again lamenting "virtually unbreakable encryption." *Id.* at 2. He stated that company leaders and employees should ask questions like "Do disappearing messages or certain encryption tools appropriately balance the value of privacy against the risk of safe havens for exploitation?" *Id.* He explained that the Government is "analyzing" "the impact" of Section 230 of the Communications Decency Act, which generally protects internet companies from liability for the content uploaded by users, "on incentives for platforms to address" certain crimes, "and the availability of civil remedies to the victims." *Id.*

Snapchat's reporting to NCMEC saw a rather large uptick in 2020, to 144,095 reports. Exhibit 12 at 5. Then, reporting exploded. In 2021, Snapchat made 512,522 reports, and, in 2022, 551,086 reports. Exhibit 13 at 6; Exhibit 14 at 6. This drastic increase in NCMEC reporting was not accompanied by a like increase in Snapchat users. Exhibit 15. The most plausible explanation for such an increase in NCMEC reports is that Snap was monitoring its users' content on Snapchat. That is something it simply could not do if the content was subject to end-to-end encryption.

In this case, the Government alleges that the FBI began investigating the possibility of an adult man in New Jersey having sex with a minor. Doc. 1 at 4. The minor's mother consented to a search of the minor's phone. *Id. Separately from this physical search*, the Government executed a search warrant on the minor's Snapchat account. *Id.* at 6. The search warrant yielded "conversations" with another Snapchat user, whom the minor addressed as "Michael." *Id.* at 6-7. That is, when the Government obtained a warrant for the minor's Snapchat account, Snap provided the unencrypted contents of her communications, and those with whom she communicated.

An archived copy of Snapchat's "Law Enforcement Guide," dated September 29, 2020, provides:

> Because Snap's servers are designed to automatically delete most user content as described in Section III "How Snapchat Works" above, *and because much of a user's content is encrypted*, we often cannot retrieve user content except in very limited circumstances. Memories content may be available until deleted by a user. *My Eyes Only content is encrypted, and although we can provide the data file, we have no way to decrypt the data*.

Exhibit 16 at 12 (emphases added).

In Count One of the indictment, the Government alleges that Mr. Ambrose distributed child pornography on November 10, 2022. Doc. 14. The Government's evidence for this allegation stems from a report from Snap to NCMEC. On November 10, 2022, Snap reported the upload of a video file depicting child

pornography by one of its Snapchat users, alleged to have been Mr. Ambrose. Snap provided NCMEC with the file and information about its upload. That is, Snap reported to NCMEC the content of one of its user's communications.

On November 15, 2022, Snap posted a new version of its law enforcement guide, backdated to November 1, 2022. Exhibit 17. This new guide was revised, and now provides:

> As explained in Section III "How Snapchat Works" above, Snap's servers are designed to automatically delete most user content by default, such as the content of communications, after a limited period of time, unless it is otherwise saved by a Snapchatter. An exception is the content contained within Memories which, when saved, may be available until deleted by a user. *As noted earlier, content saved to the My Eyes Only section of Memories is encrypted, and cannot be decrypted by Snapchat.*

*Id.* at 15 (emphasis added). That is, after making the NCMEC report that provided the evidence for Count One, Snap revised its law enforcement guide to delete its reference to "much of a user's content" being encrypted, and narrowed its reference to "My Eyes Only" content being encrypted to only content saved under the "Memories" function, excluding by implication encryption for the more common Snapchat functions, "Snaps" and "Chats." Then, Snap backdated the guide to a date before its NCMEC report in this case.

D. <u>Mr. Ambrose requested discovery of the Government's communications with Snap.</u>

On May 22, 2023, by letter, Mr. Ambrose requested from the Government

"[n]otice or any record or copy of any communication made between January 2018 and the present between any government officer or employee of any government agency, or any government agent, and Snap Inc. or any agent of Snap Inc., relating to Snap's institution, continuation, or discontinuation of end-to-end encryption for any of its products, including but not limited to any oral statement, meeting minutes, text message, email, letter, or other communication." Exhibit 18. On June 23, the Government responded that it would seek out any communications between the individual FBI case agent involved in the case and Snap, but would not provide any other responsive discovery. The parties have conferred several times on this matter, and the undersigned certifies, pursuant to this Court's pretrial order (Doc. 24), that counsel for the parties have been unable to resolve their differences or reach an agreement after holding a conference.

## ARGUMENT

This Court should order the Government to provide its communications with Snap and related records because these documents are material to the preparation of the defense under Rule 16 and favorable to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963).

"Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . (i) the item is

11

material to preparing the defense . . . ." Fed. R. Crim. P. 16(a)(1)(E). Items "material to preparing the defense" include items useful to a defendant in making out a claim for the suppression of government evidence. *United States v. Soto-Zuniga*, 837 F.3d 992, 1001-02 (9th Cir. 2016) (citing *United States v. Armstrong*, 517 U.S. 456, 462 (1996)).

Here, the Government has argued that Mr. Ambrose's motion should be denied because Snap did not act as an agent of the Government. To refute that argument, Mr. Ambrose seeks items in the Government's possession showing that the Government influenced Snap to stop providing its users with default end-to-end encryption. Such items are "material to preparing the defense," and so are discoverable under Rule 16(a)(1)(E)(i). Whether or not the items exist, the Government may not willfully blind itself to evidence material to Mr. Ambrose's defense.

Further, the requested items are favorable to the defense, and so are discoverable under *Brady*. *See Brady*, 373 U.S. at 87 (holding that government suppression of evidence favorable to the defense violates Due Process). However, in *United States v. Laines*, __ F.4th __, 2023 WL 3835113, at *6 (11th Cir. 2023), the court held that *Brady* did not extend to evidence material to suppression sought by the defendant. To the extent Mr. Ambrose's *Brady* claim is controlled by *Laines*, he seeks to preserve it for further review.

DATED this 26th day of June 2023.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

/s Samuel E. Landes
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th of June 2023, a true and correct copy

of the foregoing was filed with the Clerk of the Court using the CM/ECF system,

which will send a notice of the electronic filing to AUSA Abigail King.

/s Samuel E. Landes
Samuel E. Landes, Esq.
Assistant Federal Defender

# EXHIBIT 1

## Snapchat adds end-to-end encryption to protect users' messages

telegraph.co.uk

January 9, 2019 Wednesday 9:13 PM GMT

Copyright 2019 Telegraph Media Group Limited All Rights Reserved

# The Telegraph

**Section:** TECHNOLOGY INTELLIGENCE; Version:2

**Length:** 426 words

**Byline:** By James Titcomb

# Body

The messaging app Snapchat has introduced end-to-end encryption, protecting the disappearing photos shared between its users from being intercepted.

The app, which has 186 million users and an estimated 16 million in the UK, is encrypting billions of messages a day.

End-to-end encryption scrambles a message as it travels over an internet network so that it can only be read by the recipient. Messages that are not encrypted can potentially be picked up by security services or hackers monitoring a connection.

Other messaging apps including WhatsApp and iMessage use encryption, claiming the technology keeps users secure. However, it has been questioned by politicians and security chiefs, who have said it risks allowing criminals to communicate safely.

Snapchat security engineer Subhash Sankuratripati, *speaking at a conference in California,* said that the app had implemented the feature a year ago.

The encryption applies to "snaps" - picture and video messages sent between users, which disappear after being watched. Other forms of message on Snapchat, such as text messages and group chats, are not end-to-end encrypted.

*About | Encryption*

In the past, the company has not encrypted messages. Although snaps disappear after being opened, they were not encrypted while being sent and if users were unable to receive messages, they would be stored on the company's servers for up to 30 days. The human rights group Amnesty International has said Snapchat was *"not protecting users' privacy"* .

Mr Sankuratripati said the feature would provide "increased assurance around privacy to our users". He added that the company planned to encrypt text and group chats in a similar way in the future.

Lucasz Olejnik, a cybersecurity and privacy advisor, said the new technology would keep Snapchat users safe.

Snapchat adds end-to-end encryption to protect users' messages

"Private snaps sent between users may naturally contain sensitive information, so additional protections are positive," he said.

Snapchat has faced criticism for not introducing the technology earlier, but faced challenges because of differences with other messaging apps. For example, one phone user often has multiple accounts, which makes it more difficult to tie encryption to a particular device or phone number, as other apps do.

WhatsApp introduced *full end-to-end encryption in 2016*, and Facebook Messenger soon followed suit, although the feature must be enabled, while WhatsApp and Snapchat have it turned on by default.

In 2017, then Home Secretary Amber Rudd *suggested that terrorists were the only real beneficiaries of end-to-end encryption* .

**Load-Date:** January 9, 2019

---

**End of Document**

# EXHIBIT 2

🇺🇸 An official website of the United States government
  Here's how you know



TICE NEWS

## Attorney General William P. Barr Announces the Launch of Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse

Washington, DC ~ Thursday, March 5, 2020

---

### *Remarks as Prepared for Delivery*

Good afternoon.  I am pleased to be joined here today by Acting Secretary Wolf of the U.S. Department of Homeland Security, distinguished colleagues from Australia, Canada, New Zealand, and the United Kingdom, and representatives from leading tech companies, to announce a very important initiative: Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse.

Last summer, I traveled to London for the Five Country Ministerial Digital Industry Roundtable.  There, our five nations met with senior representatives from Facebook, Google, Microsoft, Roblox, Snapchat, and Twitter.  We agreed that a more robust global response to online child sexual abuse was necessary to ensure that all children across the globe are protected, and that there is no safe space online for offenders to operate.  Further, we committed to developing a set of voluntary principles to ensure online platforms and services have the systems they need to combat online child sexual exploitation.  As a result of that meeting and much diligent work since then, today, we are collectively launching the 11 Voluntary Principles.  I am happy that our hard work has come to fruition with today's event.

The 11 Voluntary Principles establish a baseline framework for companies that provide online services to deter use of the Internet as a tool for sexually exploiting and abusing children.  The six technology companies involved in this initiative have now publicly endorsed the Principles, and I commend them for their leadership.

The sexual exploitation and abuse of children is one of the most horrendous crimes affecting the most vulnerable members of society.  Unfortunately, this has emerged as a massive problem not only in the real world, but also in the virtual one.  Last year alone, more than 16.8 million CyberTips of suspected child sexual abuse material offenses were made to the National Center for Missing and Exploited Children (NCMEC), involving children as young as infants.

Earlier today at the White House, we heard from members of the Phoenix 11, which is the group responsible for the powerful video you just watched.  Phoenix 11 is an organization of survivors whose child sexual abuse was recorded and, in the majority of cases, distributed online.  I commend these brave survivors for raising the profile of this issue.  Our nation owes a debt of gratitude to them for their courage in coming forward and telling their stories.  They have given a voice to victims who have been silenced.  They inspire us to take action, and we are thankful for their fearless and unrelenting efforts.

No child should ever have to endure the unspeakable pain and suffering of sexual exploitation and abuse.  Sadly, however, technological change over the past few decades has amplified the scope and harm caused by these crimes.

First, the borderless nature of the Internet has made these crimes transnational.  A global problem requires a global solution.  We are, therefore, collaborating with our international counterparts, particularly our close rule-of-law allies, like those represented in this room.

Second, technology has made it easier to produce, conceal, and distribute child sexual abuse materials.  For example, over the last decade, the Department of Justice has seen a 160-percent increase in cases involving the production of videos and images of children who were sexually exploited and abused.  This increase is due in part to the ready accessibility of smart phones, which can be used to both produce images and videos and distribute them online.

Third, with digital content, sexual-abuse imagery can be preserved online for much longer periods of time and disseminated more broadly.  Victims incur not only the initial harm of abuse, but are victimized again and again when those images are recirculated.  For example, sexual abuse imagery of one particular victim has been found in almost 21,500 separate U.S. investigations over the last 20 years.  As we heard this morning from the courageous survivors in the Phoenix 11, knowing that their child sexual abuse material is still online is debilitating, preventing some from even being able to use the Internet.  Victims should not be forced to live in such fear.

Fourth, the Internet affords child predators more places to hide.  Predators often use anonymous or false personas, even in the most innocuous of settings, like online children's games.  They also communicate using virtually unbreakable encryption.  A suspicious individual interacting with children at a real-world arcade is easier to detect than a predator lurking in the digital world.  As the survivors at our roundtable this morning implored, predators' supposed privacy interests should not outweigh our children's privacy and security.  There is too much at stake.

While technology is part of the problem, it is also part of the solution.  This is why I am heartened to be here today with my partners from the Five Country Ministerial and with representatives from Facebook, Google, Microsoft, Roblox, Snapchat, and Twitter to announce these Voluntary Principles, and to encourage other tech companies to join this initiative.

This is the first time that our five nations have collaborated in this way with technology companies to protect children against online child sexual exploitation and abuse.  The Voluntary Principles that we are announcing today have already been implemented informally by some leaders in the industry.  Now formalized, they will serve as a baseline for the rest of industry to use, and to build upon, as they assess their current vulnerabilities and design new products and services.

While these companies are leaders, they represent just part of the online world.  There is a massive disparity among companies in their child protection efforts.  In 2019, three companies — Facebook, Google, and Microsoft — accounted for 97.5 percent of the CyberTips submitted to NCMEC.  And let us give credit where it is due: Facebook alone submitted 94 percent of last year's CyberTips — almost 16 million in total.

We hope that our actions today will encourage others in the tech industry to consider these Voluntary Principles as they make decisions about their own services.  Company leaders and employees should ask questions like:

- Will children be attracted to a new service, and if so, how can risks of predatory behavior against them be mitigated?
- Have technologies been developed that — with a high degree of accuracy, and with few, if any, false positives — detect exploitation that is occurring and stop it?
- Do disappearing messages or certain encryption tools appropriately balance the value of privacy against the risk of safe havens for exploitation?

The Voluntary Principles are an important first step, but we can and must do more.  The department, for one, is prioritizing combating child sexual exploitation and abuse in our prosecution efforts.  We are also addressing child exploitation in our efforts on lawful access and in analyzing the impact of Section 230 of the Communications Decency Act on incentives for platforms to address such crimes and the availability of civil remedies to the victims.

Government, however, cannot do it alone.  Given the size and scope of this problem, we each need to do our part.  As governments, as industry leaders, as parents, as grandparents, as a global community, we all have a duty — indeed, a moral imperative — to protect our children from these abhorrent abuses in the physical world and the online world.

The Voluntary Principles show that international actors and the public and private sectors are eager to take important first steps to address this vital issue.  It is our sincere hope that other leaders throughout the tech industry will commit to these principles as well.  Nothing less than the safety and security of our children is at stake.

Thank you.

**Speaker:**
Attorney General William Barr

**Topic(s):**
Cybercrime

**Component(s):**
Office of the Attorney General

*Updated March 5, 2020*

# EXHIBIT 3

 An official website of the United States government
   Here's how you know

**STICE NEWS**
THE UNITED STATES
**DEPARTMENT of JUSTICE**

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                        Thursday, March 5, 2020

## Department of Justice, Homeland Security and International Partners Announce Launch of Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse

The Justice Department and Homeland Security, along with government counterparts from Australia, Canada, New Zealand, and the United Kingdom, announced today the publication of *Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse.* Developed in consultation with several leading technology companies, the 11 voluntary principles outline measures that companies in the technology industry can choose to implement to protect the children who use their platforms from sexual abuse online and to make their platforms more difficult for child sex offenders to exploit.

"Today marks a historic event," said U.S. Attorney General William P. Barr. "For the first time, the Five Countries are collaborating with tech companies to protect children against online sexual exploitation. We hope the Voluntary Principles will spur collective action on the part of industry to stop one of the most horrendous crimes impacting some of the most vulnerable members of society."

Online child sexual exploitation and abuse is a global crime that demands a global response. In an increasingly digital and borderless world, this crime has become easier to commit. Rapidly evolving technology and anonymizing tools allow offenders to continuously adapt and diversify their methods to conceal their activities from law enforcement. Not surprisingly, as a consequence, offenses are growing in scale and are becoming more extreme. These crimes have a devastating and lasting impact on victims and survivors.

"Nothing is of greater importance to the Trump Administration than ensuring the safety and security of Americans, especially the most vulnerable among us — our children," said Acting Secretary for the U.S. Department of Homeland Security (DHS) Chad Wolf. "Combating online child sexual exploitation is a top priority for the department. ICE Homeland Security Investigations has one in 10 agents investigating child sexual exploitation at any given time and that is why DHS released its first Strategy to Combat Human Trafficking, the Importation of Goods Produced with Forced Labor, and Child Sexual Exploitation. I am confident the Voluntary Principles will help us move forward our goal of creating a world where children can grow up free from sexual exploitation. The Voluntary Principles set new norms across the private sector, incorporating child safety throughout a company's operations and properly considering the needs of victim-survivors."

"We cannot allow children to fall victim to predators who lurk in the shadows of the web," said UK Security Minister James Brokenshire. "Through global collaboration and with enhanced action from the Five Countries, law enforcement agencies and tech companies, we will ensure that children are protected online."

"It is imperative that we keep children safe from online sexual exploitation and abuse, and we can only accomplish that if we work together with other countries and across sectors," said Canada's Minister of Public Safety and Emergency Preparedness Bill Blair. "Today's release of the Voluntary Principles represents a huge step forward and is the result of innovative cooperation between Five Eyes partners and industry stakeholders. For Canada, the principles directly align

with our efforts guided by our *National Strategy* and continues to fulfill our commitment of protecting children from sexual exploitation of any kind."

"When it comes to tackling child abuse committed on online platforms and services, the digital industry has a vital role to play," said Australian Minister for Home Affairs Peter Dutton.  "The Voluntary Principles will help industry optimize these efforts; they reflect Governments' expectations of digital industry, and are scalable and practical to implement across various platforms — from search engines to gaming services to social media networking sites."

"Those who engage in online child sexual exploitation work to get around current barriers and regulations, despite the best efforts and hard work of the digital industry," said New Zealand Minister of Internal Affairs and Minister for Children Tracey Martin.  "This is a global crime that demands a global response.  Working with my colleagues from the Five Countries and the digital industry has ensured we have a set of principles that are robust, flexible, and most importantly, will create effective responses."

At the Five Country Ministerial Digital Industry Roundtable on July 30, 2019 in London, the Five Country Ministers and senior representatives from Facebook, Google, Microsoft, Roblox, Snap and Twitter agreed "tackling [the online child sexual abuse] epidemic requires an immediate upscaling of the global response to ensure that all children across the globe are protected…and that there is no safe space online for offenders to operate."  As a result, the Five Countries developed the *Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse* in consultation with the six companies and a broad range of experts from industry, civil society and academia.

The voluntary principles provide a common and consistent framework to guide the digital industry in its efforts to combat the proliferation of online child exploitation.  The voluntary principles cover the following themes:

- Prevent child sexual abuse material;
- Target online grooming and preparatory behavior;
- Target livestreaming;
- Prevent searches of child sexual abuse material from surfacing;
- Adopt a specialized approach for children;
- Consider victim/survivor-led mechanisms; and
- Collaborate and respond to evolving threats.

These voluntary principles are built on existing industry efforts to combat these crimes.  Some leading companies have dedicated significant resources to develop and deploy tools in the fight to protect children online and to detect, disrupt and identify offenders.  Although significant progress has been made, there is much more to be done to strengthen existing efforts and enhance collective action.

These principles are intended to have sufficient flexibility to ensure effective implementation by industry actors.  Some companies have already implemented measures similar to those outlined in these principles.  Regardless of whether or not a company chooses to adopt these principles, existing laws and regulations in relevant jurisdictions continue to apply to all companies.  Nothing in these principles overrides or is contrary to the need for companies to comply with the law.

The Five Country governments have partnered with the WePROTECT Global Alliance — an international body comprising government, industry and civil society members — to promote the Principles globally and drive collective industry action.  The WePROTECT Global Alliance will also collate information about industry's uptake of the Principles, connect subject matter experts to share best practices for implementation, and analyze the evolving threat environment to identify gaps in the global response.  Five Country Governments will work closely with the WePROTECT Global Alliance to ensure the Principles remain fit-for-purpose for emerging trends and threats.

The year 2020 marks the 150th anniversary of the Department of Justice.  Learn more about the history of our agency at www.Justice.gov/Celebrating150Years.

**Attachment(s):**
Download 11 voluntary principles - formal letter

**Component(s):**

Office of the Attorney General

**Press Release Number:**

20-274

*Updated March 5, 2020*

# EXHIBIT 4


# Introduction

Online child sexual exploitation and abuse is a global crime that demands a global response. In an increasingly digital and borderless world, this crime is becoming easier to commit, more extreme in nature and growing in scale. These crimes have a devastating and lasting impact on victims and survivors and offenders continuously adapt and diversify their methods as technology rapidly evolves.

Keeping children safe from online sexual exploitation and abuse and limiting their revictimisation by preventing the sharing and viewing of child sexual abuse material can only be achieved through systematic cross-sector collaboration. Only by strengthening collaboration among governments, industry and others and drawing on our collective skills and resources will we achieve the safe online environment that our children and the global community expect and deserve.

Digital industry delivers many benefits through its services and ability to connect people. This industry is also instrumental in preventing online services and platforms from being used to facilitate online child sexual exploitation and abuse. Platforms and services, including but not limited to social media, gaming, livestreaming, messaging services, app stores and devices, and infrastructure providers such as internet service providers, web-hosting and virtual private networks can all play a part in combating online child sexual exploitation and abuse. These varying parts of the ecosystem will respond and the principles will apply differently depending on the provider's role, available technology, the nature of their terms of service and contractual obligations.

Governments acknowledge the extensive existing industry efforts to combat these crimes. Companies have dedicated significant resources to develop and deploy policies, tools and processes in the fight to protect children online and to detect, disrupt and identify offenders. While significant progress has been made, there is much more to be done to strengthen existing efforts and enhance collective skills.

Our goal is the prevention of child sexual exploitation and abuse. To this end, our five Governments, having consulted with a wide range of stakeholders including a leading group of industry representatives, have developed this set of voluntary principles.

The principles aim to provide a framework to combat online child sexual exploitation and abuse, and are intended to drive collective action. It is anticipated that they will evolve over time, as they are discussed with and adopted by a much broader range of companies and stakeholders. The WePROTECT Global Alliance, which currently comprises 97 governments, 25 technology companies and 30 civil society organisations, will promote and support the adoption of the principles at a global level to drive collective industry action.

It is important to recognise that every service to which these principles may apply is different. Some services' primary risk in combating online child sexual exploitation and abuse will relate to the sharing of abuse material, while others may be more likely to be used for grooming or livestreaming. As a result of the services they offer, many companies will have a combination of risk factors. A company's risk profile will determine the way in which it applies the voluntary principles, and which ones are relevant. When applying these principles, companies will take into account technical limitations, available resources, and legal and privacy considerations.

These principles are intended to provide a consistent and high-level framework for industry actors that is flexible and can be applied across different services. Some companies have already implemented measures similar to those outlined in these principles. Regardless of whether a company chooses to adopt these principles, existing laws and regulations in relevant jurisdictions continue to apply to all companies. Nothing in these principles overrides or is contrary to the need for companies to act according to law.

Examples of the types of things a company may want to do to apply these principles include:

- review existing safety processes against each of the applicable principles

- understand the level and nature of the online child sexual exploitation and abuse threat and areas of high risk on its platform

- identify gaps, consider where existing measures can go further, and improve and invest in innovative tools solutions

- respond to the evolving threat and changing societal and offending behaviours to reduce foreseeable and unexpected risks for users.

The voluntary principles are part of wider efforts to protect children, both on and offline. Governments, law enforcement agencies, industry companies, non-governmental organisations and other partners all have a critical role to play as set out in the WePROTECT Global Alliance's Model National Response.

# The Voluntary Principles

 **Prevent child sexual abuse material**

**Principle 1:** Companies seek to prevent **known** child sexual abuse material from being made available to users or accessible on their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.

*Context: Companies, non-governmental organisations and law enforcement agencies have done significant work to identify and catalogue child sexual abuse material. This process can prevent the continued circulation of such materials and avoid further re-victimising the children depicted. These children suffer ongoing and additional trauma each time materials depicting their abuse are viewed. Reducing the availability of known material can also help avoid further offending, including offences concerning distribution. Interventions where offenders are sharing material on mainstream platforms without actually transmitting files are also critical.*

**Note on reporting to appropriate authorities (applicable to all relevant principles 1-5)**: for companies based in the United States of America, reporting is mandated via the National Center for Missing and Exploited Children (NCMEC). In other jurisdictions, different reporting frameworks will apply (whether under law or as otherwise arranged). All reporting to authorities must be compliant with applicable legislative frameworks.

**Principle 2:** Companies seek to identify and combat the dissemination of **new** child sexual abuse material via their platforms and services, take appropriate action under their terms of service, and report to appropriate authorities.

*Context: The threat to children depicted in new materials is often different to the threat to children in known materials. Newly generated material is more likely to indicate current and ongoing offending, such as against an unidentified victim who continues to be abused or a child being groomed and coerced into producing new abusive images. The identification of these materials and their referral to appropriate authorities is time critical.*



## Target online grooming and preparatory behaviour

**Principle 3:** Companies seek to identify and combat preparatory child sexual exploitation and abuse activity (such as online grooming for child sexual abuse), take appropriate action under their terms of service, and report to appropriate authorities.

*Context: Online grooming is a preparatory phase in which someone builds trust and rapport with a child or a third party (such as their guardian or sibling) in order to gain access to that child for the purposes of sexual activity. Online grooming may include offenders encouraging the victim to engage in sexual activity or to send the offender sexually explicit material. It may lead to offenders meeting the victim, or blackmailing them to produce more abuse material (for example by threatening to send images and videos to friends and family). Offenders may also convince a victim to migrate to other platforms in the grooming phase to evade detection.*

**Principle 4:** Companies seek to identify and combat advertising, recruiting, soliciting, or procuring a child for sexual exploitation or abuse, or organising to do so, take appropriate action under their terms of service, and report to appropriate authorities.

*Context: Disrupting preparatory actions such as procuring a child for sexual abuse is one potential intervention that can prevent more serious harm from occurring. These types of actions are often undertaken by offenders seeking to obtain greater access to a child with the intent of committing more serious online or contact offences. They also make it easier for like-minded offenders to work together to enhance individual and collective access to children for the purposes of sexual exploitation and abuse.*



## Target livestreaming

**Principle 5:** Companies seek to identify and prevent child sexual exploitation and abuse facilitated or amplified by livestreaming, take appropriate action under their terms of service, and report to appropriate authorities.

*Context: Whilst other emerging technologies may be used to commit child sexual exploitation and abuse, livestreaming is particularly complex because it allows offenders to interact with child sexual abuse production in real-time and leave limited evidence. Adult offenders may direct the child abuse whilst the acts are streamed live to an audience of offenders. Alternatively, offenders may entice or coerce children into using livestreaming platforms to produce child sexual abuse material. In some cases, a livestream is captured and distributed.*



## Search

**Principle 6:** Companies seek to prevent search results from surfacing child sexual exploitation and abuse, and seek to prevent automatic suggestions for such activity and material.

*Context: Prevention efforts such as addressing the avenues used to access child sexual abuse material are fundamental to ending this abuse. Searching for child sexual exploitation and abuse using related terms gives current or potential offenders an easy way to access child sexual abuse material. Mainstream routes of access to this material normalise the process of seeking it out. Algorithms that suggest child sexual abuse material could have the effect of encouraging or inspiring new offending, as well as increasing re-victimisation of those who are victims of abuse. Providing the user with details of how to report illegal material and, when appropriate and where available, information on interventions for those who are at risk of offending (for example, providing links to support services) is also critical.*



## A specialised approach for children

**Principle 7:** Companies seek to adopt enhanced safety measures with the aim of protecting children, in particular from peers or adults seeking to engage in harmful sexual activity with children; such measures may include considering whether users are children.

*Context: There are identified risks that are unique to children online. These include content risks (which generally position the child as the recipient of unwelcome and inappropriate content), contact risks (where a child participates in risky communication, possibly unwittingly or unwillingly), and conduct risks (where a child's behaviour contributes to risky content or contact within a wider peer-to-peer or adult-to-child network). These risks require taking a considered approach to the safety of users, which may include efforts to understand whether users are children when appropriate and where possible.*



**Principle 8:** Companies seek to take appropriate action, including providing reporting options, on material that may not be illegal on its face, but with appropriate context and confirmation may be connected to child sexual exploitation and abuse.

*Context: : Material depicting child sexual exploitation and abuse is illegal. However, certain images, videos, discussions and other recordings may fall below this threshold but still warrant action.*

*Appropriate context and confirmation is required to demonstrate that material in the following and other relevant examples is connected to child sexual exploitation and abuse:*

- *self-generated materials,*

- *materials that form part of an abuse series (and may show content directly before or after the abuse occurred),*

- *discussions relating to victims depicted in child sexual abuse material (including where offenders are discussing non-illegal imagery of a victim as a child or an adult), and*

- *otherwise innocent materials that have been misappropriated and used in connection with child sexual exploitation and abuse.*

*Identifying and taking appropriate action on this material can reduce new and ongoing opportunities for victimisation. For example, self-generated images can indicate a child is being groomed and coerced into producing images, or can be shared beyond the original recipient causing significant distress to the child.*



## Collaborate & respond to evolving threat

**Principle 9:** Companies seek to take an informed global approach to combating online child sexual exploitation and abuse and to take into account the evolving threat landscape as part of their design and development processes.

*Context: Criminal means and methods evolve quickly as offenders exploit new technology to commit online child sexual exploitation and abuse. To respond effectively to the evolving threat and changing behaviours, companies should seek to design their products with child safety in mind. This includes routinely reviewing efforts to tackle child sexual exploitation and abuse, adapting internal processes and technology, participating in multi-stakeholder processes to keep up to date with the threat landscape, collaborating across industry and considering the privacy interests of their users alongside safety protections for children.*

**Principle 10:** Companies support opportunities to share relevant expertise, helpful practices, data and tools where appropriate and feasible.

*Context: Companies have been working together, sharing helpful practices, data, tools and techniques for many years via a range of collaborative forums and non-governmental organisations. Companies plan to continue to expand this collaborative work, sharing outcomes and outputs across the technology sector.*

**Principle 11:** Companies seek to regularly publish or share meaningful data and insights on their efforts to combat child sexual exploitation and abuse.

*Context: Regular and transparent reporting will improve available data about the production, distribution, blocking and removal of child sexual exploitation and abuse. Combined with data from governments and non-governmental organisations, this will result in a better understanding of the threat and provide support for ongoing initiatives to combat this crime. Reporting will also ensure cooperative efforts between governments, law enforcement agencies, companies and other stakeholders are focussed on areas of greatest need.*



FIVE COUNTRY
# MINISTERIAL

# EXHIBIT 5

🇺🇸 An official website of the United States government
 Here's how you know



JUSTICE NEWS

**Attorney General William P. Barr Delivers Keynote Address at the International Conference on Cyber Security**

New York, NY ~ Tuesday, July 23, 2019

---

*Remarks as prepared for delivery*

Good Morning.

Thank you all for being here this morning.  I would like to offer particular thanks to Fordham University for hosting this Conference and this morning's opening ceremony.  As a native New Yorker, it is always nice to have a good excuse to be in the City.

I would also like to thank the New York Division of the FBI for their work in putting on this Conference.

Of all that has changed over the last 30 years, cyber-related issues and cybersecurity may well be the most significant difference between my first tenure as Attorney General and this one.  Since taking office in February, I have spent a significant amount of time getting up to speed on the developments in this important area.  And I have been both impressed and reassured as I have learned about all of the investment and effort that makes the FBI a leader in this area.

As individuals and as a nation we have become dependent on a vast and expanding digital infrastructure. That, in turn, has made us vulnerable to cybercriminals and foreign adversaries that target that infrastructure. The danger cannot be overstated, and enhancing cybersecurity is a national imperative — one shared by the private sector whose networks, data systems and products are at risk, as well as the government agencies charged with securing our critical national infrastructure and guarding our citizens against criminal activity.  Among the most critical advances in cybersecurity has been the development of advanced encryption techniques and their deployment in a range of important applications. Encryption provides enormous benefits to society by enabling secure communications, data storage and on-line transactions. Because of advances in encryption, we can now better protect our personal information; more securely engage in e-commerce and internet communications; obtain secure software updates; and limit access to sensitive computers, devices, and networks.

As the Federal Government, we welcome these improvements to privacy and security, and will work to preserve and strengthen them.  But at the same time, we must recognize that our citizens face an array of threats to their safety far broader than just cyber threats. Hackers are a danger, but so are violent criminals, terrorists, drug traffickers, human traffickers, fraudsters, and sexual predators.  While we should not hesitate to deploy encryption to protect ourselves from cybercriminals, this should not be done in a way that eviscerates society's ability to defend itself against other types of criminal threats.  In other words, making our virtual world more secure should not come at the expense of making us more vulnerable in the real world.  But, unfortunately, this is what we are seeing today.

Service providers, device manufacturers and application developers are developing and deploying encryption that can only be decrypted by the end user or customer, and they are refusing to provide technology that allows for lawful access by law enforcement agencies in appropriate circumstances. As a result, law enforcement agencies are increasingly prevented from accessing communications in transit or data stored on cell phones or computers, even with a warrant based on probable cause to believe that criminal activity is underway. Because, in the digital age, the bulk of evidence is becoming digital, this form of "warrant proof" encryption poses a grave threat to public safety by extinguishing the ability of law enforcement to obtain evidence essential to detecting and investigating crimes. It allows criminals to operate with impunity, hiding their activities under an impenetrable cloak of secrecy. As you know, some

refer to this eclipsing of the Government's investigative capabilities as "going dark." While encryption protects against cyberattacks, deploying it in warrant-proof form jeopardizes public safety more generally. The net effect is to reduce the overall security of society. I am here today to tell you that, as we use encryption to improve cybersecurity, we must ensure that we retain society's ability to gain lawful access to data and communications when needed to respond to criminal activity.

This proposition should not be controversial. It simply reflects the balance struck in the Constitution itself and maintained since the Founding era. The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment strikes a balance between the individual citizen's interest in conducting certain affairs in private and the general public's interest in subjecting possible criminal activity to investigation. It does so, on the one hand, by securing for each individual a private enclave around his "person, house, papers, and effects" — a "zone" bounded by the individual's own reasonable expectations of privacy. So long as the individual acts within this "zone of privacy," his activities are shielded from unreasonable Government investigation. On the other hand, the Fourth Amendment establishes that, under certain circumstances, the public has a legitimate need to gain access to an individual's zone of privacy in pursuit of public safety, and it defines the terms under which the Government may obtain that access. When the Government has probable cause to believe that evidence of a crime is within an individual's zone of privacy, the Government is entitled to search for or seize the evidence, and the search usually must be preceded by a judicial determination that "probable cause" exists and be authorized by a warrant.

The key point is that the individual's right to privacy and the public's right of access are two sides of the same coin. The reason we are able, as part of our basic social compact, to guarantee individuals a certain zone of privacy is precisely because the public has reserved the right to access that zone when public safety requires. If the public's right of access is blocked, then these zones of personal privacy are converted into "law-free zones" insulated from legitimate scrutiny.

Since the Founding, advances in technology have disrupted this balance in different ways. Sometimes, technology creates new spheres of privacy that the drafters of the Fourth Amendment could not have thought to enumerate, such as with the advent of the telephone. Sometimes, technology gives law enforcement new means to invade privacy that were previously unimaginable, such as thermal imaging devices. And sometimes, technology makes it easier for suspects to evade law enforcement even when there is a lawful basis to investigate, such as automobiles — or to bring us back today's topic, data encryption.

With each of these earlier examples, our society has ensured that the traditional balance between individual privacy and public safety was maintained, as reflected in rulings from the Supreme Court. In *Katz v. United States* (1967), the Court held that the Fourth Amendment applied to government bugging of a phone booth — even though this technique did not strictly involve a search of the suspect's person, house, papers, or effects. Decades later in *Kyllo v. United States*(2001), the Court held that the Fourth Amendment applied to the use of a thermal imaging device to look inside a home — even though prior doctrine strongly suggested that government exploitation of light waves emitted from the property was outside the scope of Fourth Amendment protection. The Supreme Court's application of Fourth Amendment protection to the attachment of a GPS tracking device to a car in *United States v. Jones* (2012) had a similar effect. In each of these cases, the Court protected privacy against advances in technology. But of course, law enforcement retained the ability to bug a phone booth, to use thermal imaging on a house, or to attach a GPS device to a car if a warrant issued first.

The same script has played out in reverse, with the Supreme Court taking steps to ensure that advances in technology do not unduly tip the scales against public safety by preventing effective law enforcement. A notable example concerns automobiles. If the zone of privacy was extended to automobiles — as a type of personal "effect" or mobile "house" — then it would be difficult, if not impossible, for law enforcement to work within the traditional requirement that police obtain a warrant from a neutral magistrate before conducting a search or seizure. Even when an officer had probable cause to seize a car and search its contents, the driver could get away long before the officer could complete the

process to obtain a warrant.  This development threatened again to disrupt the traditional balance between individual privacy and public safety.

So what did we do?  In a series of decisions that started with *Carroll v. United States* (1925), the Supreme Court articulated an exception to the traditional warrant requirement which allows police to seize and search a car without a warrant so long as it can later be shown that they had probable cause to support the investigation.  In other words, we did not make automobiles law-free zones.  We preserved the constitutional balance by ensuring that law enforcement retained the practical capability to conduct a search when lawfully predicated.

The point I hope you take away today is that our societal response to advances in technology that affect the balance between individual privacy and public safety always has been — and always should be — a two-way street.  When these advances tip the scales too far in favor of the Government, the response is to expand privacy protections.  And when these advances threaten public safety by thwarting effective law enforcement, the response should be to preserve lawful access.

By enabling dangerous criminals to cloak their communications and activities behind an essentially impenetrable digital shield, the deployment of warrant-proof encryption is already imposing huge costs on society.  It seriously degrades the ability of law enforcement to detect and prevent crime before it occurs. And, after crimes are committed, it thwarts law enforcement's ability to identify those responsible or to successfully prosecute the guilty parties. These costs will grow exponentially as deployment of warrant-proof encryption accelerates and criminals are emboldened by their ability to evade detection.

At conferences like this, we talk about those costs in abstract terms. They are not abstract; they are real. The costs of irresponsible encryption that blocks legitimate law enforcement access is ultimately measured in a mounting number of victims — men, women, and children who are the victims of crimes — crimes that could have been prevented if law enforcement had been given lawful access to encrypted evidence.  Law enforcement has generally not wanted to get too specific about these cases because details can help sophisticated criminals and terrorists evade detection.  But, given the frequency with which these situations are now arising, it is only a matter of time before a sensational case crystalizes the issue for the public.  FBI Director Wray will be speaking later in the week at this Conference and will address some of the damage being inflicted on law enforcement by encryption that blocks lawful access.  But, for now, I want to make a couple of points about the extent of the harm.

Like everybody else, criminals of all stripes increasingly rely on wireless communications, hand-held devices, and the internet.  This is especially true of larger-scale criminal organizations that need to coordinate many conspirators over a wide geographical area.  Thus, we have seen transnational drug cartels increasingly move their communications onto commercially available encrypted platforms designed to block lawful access.  One of many examples is a Mexican cartel that recently started trafficking large quantities of finished fentanyl from Asia to Mexico and then to the United States.  The cartel started using WhatsApp as their primary communication method, preventing U.S. law enforcement from conducting wiretaps that would enable us to locate fentanyl shipments and seize them at the border.   We also found that the cartel had used WhatsApp for the specific purpose of coordinating the murders of Mexico-based police officials.  The cartel ended up murdering hundreds of these police officers.  Had we been able to gain lawful access to the chat on a timely basis, we could have saved these lives.  So the costs of not being able to gain lawful access in this case were the lives of the assassinated officers, as well as the many lives impacted here by unimpeded entry into the United States of huge amounts of deadly fentanyl.

This is just one of countless examples involving the drug war.  Indeed, just the damage done by warrant-proof encryption to our ability to combat drug trafficking is a cost too high to pay. The tsunami of opioids, cocaine, and methamphetamine that started surging into the United States from Mexico in the latter years of the Obama Administration is one of the greatest dangers to the wellbeing of our Nation that we face today. In a single year, more Americans die from drug overdoses than we lost in the entire Vietnam War. In addition to this death toll, hundreds of thousands of lives are destroyed. The vast majority of the drugs are trafficked into the United States by large, transnational criminal organizations.  In times past, when we had considerable success in combating similar cartels, the indispensable tool was communications intelligence.  It remains the indispensable tool today. If our law enforcement agencies do not recover the ability to gain lawful access to encrypted communications and platforms, the prospects of successfully prosecuting the drug war by traditional law enforcement means are dim.

Warrant-proof encryption is also seriously impairing our ability to monitor and combat domestic and foreign terrorists. As with drug cartels, we are seeing terrorist organizations moving their communications to encrypted platforms designed to block lawful access. Even smaller terrorist groups and "lone wolf" actors have turned increasingly to encryption.  The 2015 terrorist attack in Garland, Texas still rankles. There, two Islamist extremists carried out an attack for which ISIS claimed responsibility. On the morning of the attack, one of the terrorists exchanged approximately 100 instant messages with an overseas terrorist using an end-to-end encrypted app. To this date, the FBI has still not been able to determine the content of these messages. The deployment of warrant-proof encryption is diminishing the communications intelligence we are able to collect on terrorist threats.  Due to the very nature of terrorism – where each actor seeks to inflict high casualties – encryption that allows terrorists to operate beyond the reach of lawful surveillance poses an unacceptable risk to the country.

One further point about the costs imposed on society by warrant-proof encryption: it is not only about the crimes that could have been avoided, or the criminals that escape punishment.  Converting the internet and communication platforms into "law free" zones, and thus giving criminals the means to operate free of lawful scrutiny, will inevitably propel an expansion of criminal activity. If you remove any possibility that the cops are going to be watching a neighborhood, the criminals already in the neighborhood will commit a lot more crimes.

The "going dark" problem is not limited to terrorism or drug cartel cases.  While those cases are vitally important, it is also important that law enforcement at the federal, state, and local level retain the ability to investigate and prosecute the full spectrum of crimes that plague society. We are aware, for example, that a large violent gang is using encrypted apps to "green light" assassinations, and yet, because we cannot access the messages, we cannot prevent the murders. We also know that human traffickers and pedophiles use the internet to facilitate their crimes, and yet encryption is impairing our visibility into some of these activities. With the growing availability of commoditized encryption, it is becoming easier for common criminals to communicate beyond the reach of traditional surveillance. This problem is becoming especially acute for our State and local partners, who lack the resources of the federal government, and whose ability to investigate and prosecute crime is being seriously impaired by warrant-proof encryption.

The Department has made clear what we are seeking.  We believe that when technology providers deploy encryption in their products, services, and platforms they need to maintain an appropriate mechanism for lawful access.  This means a way for government entities, when they have appropriate legal authority, to access data securely, promptly, and in an intelligible format, whether it is stored on a device or in transmission.  We do not seek to prescribe any particular solution.  Our private-sector technology providers have immensely talented engineers who have built the very products and services that we are talking about.  They are in the best position to determine what methods of lawful access work best for their technology.  But there have been enough dogmatic pronouncements that lawful access simply cannot be done.  It can be, and it must be.

We are confident that there are technical solutions that will allow lawful access to encrypted data and communications by law enforcement without materially weakening the security provided by encryption.  Such encryption regimes already exist.  For example, providers design their products to allow access for software updates using centrally managed security keys. We know of no instance where encryption has been defeated by compromise of those provider-maintained keys. Providers have been able to protect them.

We think our tech sector has the ingenuity to develop effective ways to provide secure encryption while also providing secure legal access. Some good minds have already started to focus on this, and some promising ideas are emerging. Our colleagues from GCHQ have proposed "Virtual Alligator Clips" which allow a provider to respond to a warrant by adding a silent law enforcement recipient to an otherwise secure chat.  Ray Ozzie has tabled a proposal for "Exceptional Access Keys" for locked, encrypted phones so they can be unlocked pursuant to a warrant.  Matt Tait has proposed Layered Cryptographic Envelopes to allow lawful access to encrypted data-at-rest on disks or other storage devices. I am sure that the putative shortcomings of these ideas have been identified, which hopefully will spur further refinements and alternative proposals.  Through this dialectic we can identify workable solutions. I am not endorsing any particular solution. And we will likely need different kinds of solutions for communications and data in transit, as opposed to data at rest. But I am suggesting that it is well past time for some in the tech community to abandon the indefensible posture that a technical solution is not worth exploring and instead turn their considerable talent and

ingenuity to developing products that will reconcile good cybersecurity to the imperative of public safety and national security. As Microsoft's Bill Gates has observed, "[t]here's no question of ability; it's the question of willingness."

Some object that requiring providers to design their products to allow for lawful access is incompatible with some companies' "business models."  But what is the business objective of the company?  Is it "A" — to sell encryption that provides the best protection against unauthorized intrusion by bad actors?  Or is it "B" — to sell encryption that assures that law enforcement will not be able to gain lawful access?  I hope we can all agree that if the aim is explicitly "B" — that is, if the purpose is to block lawful access by law enforcement, whether or not this is necessary to achieve the best protection against bad actors — then such a business model, from society's standpoint, is illegitimate, and so is any demand for that product.  The product jeopardizes the public's safety, with no countervailing utility.  Few companies would say this is their goal.

On the other hand, it is contended that achieving "B" (the blocking of lawful access) is essential to achieving "A" (giving the best protection against bad actors). Thus, the argument is that a business is thwarted in its purpose of offering the best protection against bad actors unless it can also override society's interest in retaining lawful access. Some hold this view dogmatically, claiming that it is technologically impossible to provide lawful access without weakening security against unlawful access.  But, in the world of cybersecurity, we do not deal in absolute guarantees but in relative risks. All systems fall short of optimality and have some residual risk of vulnerability — a point which the tech community acknowledges when they propose that law enforcement can satisfy its requirements by exploiting vulnerabilities in their products.  The real question is whether the residual risk of vulnerability resulting from incorporating a lawful access mechanism is materially greater than those already in the unmodified product.  The Department does not believe this can be demonstrated.

Moreover, even if there was, in theory, a slight risk differential, its significance should not be judged solely by the fact it falls short of theoretical optimality.  Particularly with respect to encryption marketed to consumers, the significance of the risk should be assessed based on its practical effect on consumer cybersecurity, as well as its relation to the net risks that offering the product poses for society.  After all, we are not talking about protecting the Nation's nuclear launch codes. Nor are we necessarily talking about the customized encryption used by large business enterprises to protect their operations. We are talking about consumer products and services such as messaging, smart phones, e-mail, and voice and data applications. If one already has an effective level of security — say, by way of illustration, one that protects against 99 percent of foreseeable threats — is it reasonable to incur massive further costs to move slightly closer to optimality and attain a 99.5 percent level of protection even where the risk addressed is extremely remote?  A company would not make that expenditure; nor should society.  Here, some argue that, to achieve at best a slight incremental improvement in security, it is worth imposing a massive cost on society in the form of degraded public safety. This is untenable, again using a crude illustration, if the choice is between a world where we can achieve a 99 percent assurance against cyber threats to consumers, while still providing law enforcement 80 percent of the access it might seek; or a world, where we have boosted our cybersecurity to 99.5 percent but at a cost reducing law enforcements access to zero percent — the choice for society is clear.

Some who resist lawful access complain it places an unreasonable burden on companies, who must spend time and resources on developing and implementing a compliance mechanism.  To that, I first say, "Welcome to civil society." We regularly expect — and often mandate if necessary — that our companies take steps to ensure that their products and services do not impose negative externalities on the public interest.  Sometimes this requires prohibiting certain products all together; other times it requires modification of products so they are compatible with the public interest.

Further, the burden is not as onerous as some make it out to be.  I served for many years as the general counsel of a large telecommunications concern.  During my tenure, we dealt with these issues and lived through the passage and implementation of CALEA — the Communications Assistance for Law Enforcement Act.  CALEA imposes a statutory duty on telecommunications carriers to maintain the capability to provide lawful access to communications over their facilities.  Companies bear the cost of compliance but have some flexibility in how they achieve it, and the system has by and large worked.  It is absurd to think that we would preserve lawful access by mandating that physical telecommunications facilities be accessible to law enforcement for the purpose of obtaining content, while allowing tech providers to block law enforcement from obtaining that very content.

The United States is not alone in addressing this issue.  In fact, many of our international partners such as the UK and Australia are already moving on statutory frameworks to address it.  China and Russia have their predictable approach, American companies have an opportunity to advance their interests by setting industry standards now that can influence the conversation here and worldwide in the years to come.

Obviously, the Department would like to engage with the private sector in exploring solutions that will provide lawful access.  While we remain open to a cooperative approach, the time to achieve that may be limited. Key countries, including important allies, have been moving toward legislative and regulatory solutions.  I think it is prudent to anticipate that a major incident may well occur at any time that will galvanize public opinion on these issues. Whether we end up with legislation or not, the best course for everyone involved is to work soberly and in good faith together to craft appropriate solutions, rather than have outcomes dictated during a crisis.  As this debate has dragged on, and deployment of warrant-proof encryption has accelerated, our ability to protect the public from criminal threats is rapidly deteriorating.  The status quo is exceptionally dangerous, unacceptable, and only getting worse.  The rest of the world has woken up to this threat.  It is time for the United States to stop debating *whether* to address it, and start talking about *how* to address it.

**Speaker:**
Attorney General William Barr

**Topic(s):**
Cybercrime

**Component(s):**
Office of the Attorney General

*Updated July 23, 2019*

# EXHIBIT 6

🇺🇸 An official website of the United States government. Here's how you know

Submit Search .search-icon-link { fill: #ffffff; } Search

# NEWS

| Stories | News Blog | Videos | Podcasts | Press Releases | Speeches | Testimony | Photos |

**Christopher Wray**
Director
Federal Bureau of Investigation

Twitter    Facebook    Email

Fordham University - FBI International Conference on Cyber Security
New York City, New York
*July 25, 2019*

# The Way Forward: Working Together to Tackle Cybercrime

*Remarks prepared for delivery.*

Good afternoon. You've already covered a lot of ground this week, and I'm the only thing standing between you and lunch and either a summer afternoon in the city—maybe a rooftop bar—or your trip back home. So let me jump right in.

When this conference began 10 years ago, I understand it used to be held around the corner, in the bowels of the old law school. You had to walk through dim corridors—even through the gym—to get from session to session. Still, even back then—in its very first year —it was standing room only. And now, here we are, in this sophisticated setting, with what I'm told is much better food.

Like this conference, the cyber and digital threats we face have become much more sophisticated, with a greater range of actors and techniques. These threats have also become more pervasive, with a far wider variety of victims. And more dangerous, with the potential for ominously greater damage, as we become increasingly dependent on digital capabilities.

And with every advance in technology, from AI to drones to the many different ways we

now communicate with each other, the degree of risk posed by these threats increases. You've talked about this issue all week. Most of you live it, every day. From a technological standpoint, it's a new world—and every day, it keeps evolving. So we've gathered this week to help combine the talents, resources, and insights of folks across the government, private sector, and academia. And to press forward, together, towards even better ways of protecting ourselves and keeping our nation safe.

## Brief Overview of FBI's Role

I'd like to spend a few minutes talking about what the FBI brings to our common fight.

Given our law enforcement authorities, our central role in the Intelligence Community, and the span of our responsibilities—from counterterrorism to counterintelligence to criminal investigations—we're particularly well-positioned to address cyber threats to our national security. And because we're out on the ground, running these investigations, we've got a lot of unique information to share with our partners—in law enforcement, in the IC, with our private and public sector partners, with academia, and with Congress.

But our role isn't limited to investigations. We're using our expertise to warn the public and private sectors about what we're seeing—and to spotlight risks and vulnerabilities. I want to touch on a few of those—foreign influence, foreign investment, and lawful access to digital evidence. And then I want to wrap up by talking about our way forward, working together.

## How We're Addressing Cyber Threats

My view is that the cyber threat is bigger than any one government agency—or even the government itself. But the FBI brings a rare combination of scope and scale, experience, and tools to the mix. We investigate criminal activity like intrusions and cyber attacks, but we also investigate national security threats like foreign influence.

Our Cyber Division leads our response to high-level intrusions. But we've also got decades of experience in our Counterintelligence, Weapons of Mass Destruction, Counterterrorism and Criminal Divisions—thousands of folks throughout the Bureau, in all 50 states across the U.S. and in almost 75 countries overseas, who are experts in the people and technology behind the crimes.

We've got technically trained personnel—with cutting-edge tools and skills you might never have imagined seeing outside of a James Bond movie—covering roughly 400 offices

around the country. We've got an elite rapid deployment force, our Cyber Action Team, which can respond to a cyber incident pretty much anywhere in the world. And we've got dedicated Cyber Task Forces—a lot like the JTTFs in the terrorism context—all over the country. These task forces include folks from more than 180 different federal, state, and local law enforcement agencies. CyWatch, our 24-hour watch floor, coordinates the U.S. law enforcement response to intrusions, tracks victim notification, and collaborates with other federal cyber centers.

All that adds up to a pretty formidable arsenal. And we're bringing it to bear against some of the most challenging cyber threats out there.

To pick one recent example, in December, we indicted members of APT10, a hacking group operating in China, associated with the Ministry of State Security. They conducted major intrusion campaigns targeting managed service providers to compromise the networks of U.S. government agencies and companies around the world. The list of 45 victim companies ran the gamut from biotech, agriculture, and health care to oil and gas exploration and NASA. They stole hundreds of gigabytes of intellectual property and confidential business information.

The scope of the investigation was broad, including FBI field offices in New Orleans, New York, Sacramento, San Antonio, and Houston. We worked closely with the Department of Justice, Defense Criminal Investigative Service, and the Department of Homeland Security. Our Cyber Action Team, with our counterparts at DHS, deployed to multiple locations to provide investigative assistance. And we worked with the Naval Criminal Investigative Service to investigate APT10's theft of Personally Identifiable Information (PII) from more than 100-thousand naval service members.

Some people are skeptical about the value of indictments where a foreign nation-state actor is involved. But in the case of APT10, the indictments marked an important step in publicly exposing China's continued practice of stealing intellectual property to give Chinese firms an unfair advantage in the marketplace. The indictment led to statements of condemnation against China from 11 foreign governments. It also led to the first formal declaration that China had violated the 2015 Cyber Commitments agreed to by President Obama and the Chinese president.

By revealing the names and activities of hackers in cases like these, we limit their travel and job prospects, and we raise their cost to operate. An indictment signals to our allies

that we're so confident in our assessment of culpability that we're willing to put the full weight of the U.S. criminal justice system behind it. Perhaps most importantly, such indictments reaffirm our commitment to the rule of law and to rooting out criminal conduct. We stand behind American individuals and companies who have been victimized, no matter how powerful the culprit—and even when the culprit is a foreign government. So these indictments are paying off in a number of ways.

And that's why if you do suffer a breach, it's important to take the long-term view. Waiting to report a breach almost always proves counterproductive. Getting the FBI involved early allows us—and our federal partners—to mitigate any damage to your networks and your data. It helps us connect the intrusion to any larger threat streams, and give you information you need to understand what really happened. It helps you mitigate sometimes crippling reputational risk from a delayed notification. And it helps us notify other potential victims.

I know there's sometimes a reluctance out there to turn to the feds when you've been hacked. But we want to help you. And it's much harder for us to do that if you don't turn to us promptly.

**Foreign Influence**

So that's a run-down of our investigative capabilities. I want to turn to the risks of foreign influence.

We're working hard to combat a variety of digital threats to election security. In the last few years, we've seen many examples of cyber actors targeting political campaigns to glean intelligence, and directing bots to propagate divisive messaging. We've also seen examples of actors targeting election infrastructure to obtain PII, exact ransoms, temporarily disrupt election operations, and undermine voter confidence in the electoral process.

We expect much of the same in 2020, especially with new cyber tools continuing to fall into the hands of adversaries who wish us harm, like services sold on the darknet and DDoS capabilities that have become available to an even wider range of would-be hacktivists.

We've yet to see attacks manipulating or deleting election and voter-related data, or attacks taking election management systems offline. But we know our adversaries are relentless. So are we.

Through the FBI's Foreign Influence Task Force, we're tackling malign foreign influence with a three-pronged approach: investigations, information sharing, and outreach. We're also working closely with our partners at every level to share information and intelligence. And we've been building on our strong relationships with the private sector, providing companies with actionable intelligence to help them address abuse of their platforms by foreign actors.

But the foreign influence threat isn't just limited to election season. We've got to remain vigilant, all year round. We've got to raise public awareness and increase our country's resilience in a more sustained and enduring way. That combines the efforts of many folks— government agencies, election officials, journalists, technology and social media companies, think tanks, NGOs, researchers, and the public. All have a role to play.

**Foreign Investment**

Foreign investment is another issue on our radar, because it can be another way that hostile foreign powers seek to exercise their influence. Our economy benefits tremendously from a wide array of outside investments. At the same time, certain foreign investments in U.S. companies, especially investments by certain foreign governments and closely associated companies or state-owned enterprises, may put American proprietary data and technology at serious risk.

Our adversaries want access to our information, and if they can't get it some other way, they're willing to buy access. We're working with the Committee on Foreign Investment in the United States—better known as CFIUS—to make sure we're all on the same page when it comes to reviewing foreign investment in American companies that produce critical technologies or collect sensitive personal data of U.S. citizens.

We know that those of you in the private sector take protecting IP, data, and R&D seriously and that you consider that as part of your risk management plans. But we in the intelligence and law enforcement communities have facts that aren't always available to you. You may be underestimating the level of risk, on the one hand, or overestimating the effectiveness of protections and countermeasures available to you, on the other hand.

We want you, your executives, and your boards of directors, to look long and hard at the decisions you're making. You've got to look beyond near-term financial performance to the long-term bottom line. A decision to enter into a joint venture or contract with a particular

vendor or cloud computing company may look good today—it may make a lot of money this quarter. But that decision might not look so great five years down the road, if you're then in the throes of a slow bleed of data. Or, worse, if you're then suffering a major hemorrhage of intellectual property.

And you've got to take steps, and make hard choices, to safeguard your R&D, PII, and proprietary data even after a deal is done. You've got to think about restricting access to protected information, and monitoring those who are accessing that data—even if they're trusted insiders.

## Lawful Access

Before I wrap it up, I want to talk about the FBI's need to ensure that our nation's protectors, the people in law enforcement, have lawful access to the digital evidence that they need to stop criminals—and to keep you, your families, and your colleagues safe. The attorney general spoke on this topic at the opening of this conference, and I share his concerns.

Just as technology has become a force multiplier for the good guys, it has become a force multiplier for all sorts of bad guys—for terrorists, hackers, child predators, and more. User-controlled default encryption is a real challenge for law enforcement. Our agents continue to encounter criminals, from street drug-dealers to foreign spies, who relish the ability to hide on encrypted devices and inside encrypted messaging platforms. They're attracted to these technologies, for the common-sense reason that they think it helps them do their harm with impunity, and without detection.

This isn't just a national security issue, it's a public safety issue. And if not addressed, it impedes not only federal law enforcement, but our state and local partners as well. Let me give you just a few recent examples.

Last month, in a New England town, a cyber tip came in to FBI agents and state and local officers, suggesting that a 9-year-old girl was being sexually abused. The tip indicated that the abuser was using a particular app to send out images of what he was doing to that little girl anonymously. Agents and officers contacted the app provider and—using legal process—got information that allowed us to locate the child in less than 24 hours. After obtaining multiple search warrants, we rescued her and arrested the guy. Without the information from that company, we wouldn't have even known about that young girl. And we wouldn't

have been able to rescue her.

In another case a few weeks ago, another child predator used a different app to distribute sexually explicit images of two young girls. Responding to a tip, agents served legal process on that app provider, and located and rescued the two young girls in less than 12 hours.

Both of those examples could have ended very differently. Think about what might have happened had we not been able to rescue those young girls. Law enforcement receives millions of tips like these every year. I don't want to think about a world in which we lose the ability to detect dangerous criminal activity because a technology provider decides to encrypt this traffic—data "in motion"—in such a way that the content is cloaked and no longer subject to our longstanding legal process. Our ability to do our jobs—law enforcement's ability to protect the American people—will be degraded in a major way.

The challenge of lawful access also affects data that might be at rest on a device, like a phone. Take for example the 2017 church shooting in Sutherland Springs, Texas. The gunman killed 26 people and injured 20 more. It was the fifth deadliest shooting in the United States at that time. The FBI got the gunman's phone for analysis. It's configured with a complex numeric code that allows a new PIN every few minutes. We applied the most advanced commercial tool available to crack the code, and more than 600 days later, we've still had no luck. With the tools and capabilities we have right now, it could take hundreds of years to unlock the device.

In this case, the attacker is deceased, but we still want to get in there to find out what we can. Experience tells us that information might lead us to a network of likeminded people bent on committing similar acts of violence. It might help us prevent a future attack. If we were dealing with a living subject—someone we were still trying to track down, who could be out planning another attack—the situation could be even more dangerous.

These are real-world concerns, happening to us now. And this isn't just a communications issue—if you layer on top of this trend the rise of virtual currency as a tool for criminals to hide their transactions, the public safety threat becomes exponentially more daunting.

I'm well aware that these are provocative subjects in some quarters. I get a little frustrated when people suggest that we're trying to weaken encryption—or weaken cybersecurity more broadly. We're doing no such thing.

Cybersecurity is a central part of the FBI's mission, as I described at the outset. But as the attorney general discussed earlier this week, our request for lawful access cannot be considered in a vacuum. It's got to be viewed more broadly, taking into account the American public's interest in the security and safety of our society, and our way of life. That's important because this is an issue that's getting worse and worse all the time.

As FBI Director, I've now visited all 56 of our field offices and met with law enforcement leaders from all over the country and around the world. And I can tell you that police chief after police chief, sheriff after sheriff, Intelligence Community leaders, our closest foreign partners, and other professionals are raising this issue with growing concern and urgency. Barely a week goes by in my job that I'm not confronted with an investigation impacted by this obstacle. So while we're big believers in privacy and security, we also have a duty to protect the American people. That's the way it's always been in this country; no technological advance or company's business model changes that fundamental precept.

There's one thing I know for sure: It cannot be a sustainable end state for us to be creating an unfettered space that's beyond lawful access for terrorists, hackers, and child predators to hide. But that's the path we're on now, if we don't come together to solve this problem.

So to those resisting the need for lawful access, I would ask: What's your solution? How do you propose to ensure that the hardworking men and women of law enforcement sworn to protect you and your families maintain lawful access to the information they need to do their jobs?

I know we've started hearing increasingly from experts like cryptographers and cryptologists that there are solutions to be had that account for both strong cybersecurity and the need for lawful access. And I believe those solutions will be even better if we seek them together.

That's what I hope we can accomplish. That's where we need to be—solving this important public safety predicament. Because this issue isn't going anywhere, and it's only getting worse.

**The Way Forward**

We're working hard to tackle all these challenges. But we can't do it alone. These threats strike—and they strike hard—at our security. That means our economic security and our

ability to keep our companies safe from theft and intrusion. It means our national security and protecting ourselves from terrorists and malign foreign influence. And it means our safety as everyday citizens, walking the streets and sending our kids to school.

We hear folks talk about a "whole of society" approach to cybersecurity, and the importance of public-private sector partnership. The point is that we have a shared interest. And we're strongest when we act together. I think you all recognize the risks we face—the real impact to our marketplaces, our everyday lives, our networks, our information—or you wouldn't be here. And I hope that's a promising sign that you want to work together.

* * *

Last week marked the 50th anniversary of the Apollo 11 moon landing—July 20, 1969. It's a reminder of how rapidly technological developments can unfold and the type of awe-inspiring accomplishments they can yield. But, as the Space Race showed, such rapid change brings hard questions.

As President Kennedy put it at the time, "Surely the opening vistas of space promise high costs and hardships, as well as high reward."

The same applies to us today in the world of cyber. So much is happening, so quickly, that we're all challenged to keep up.

As we leave here today, it's a good time to think about where we are, and where we need to be—tomorrow, the next time we meet here at Fordham, even 10 years down the road. Thank you for having me, and thanks for sticking around to hear my thoughts.

Most Wanted

Ten Most Wanted

Fugitives

Terrorism

Kidnappings / Missing Persons



## What We Investigate

Terrorism

Counterintelligence

Cyber Crime

Public Corruption

Civil Rights

Organized Crime

White-Collar Crime

Violent Crime

WMD

## About

Mission & Priorities

Leadership & Structure

Partnerships

Community Outreach

FAQs

## Contact Us

Field Offices

FBI Headquarters

Overseas Offices

## Additional Resources

Accessibility

eRulemaking

Freedom of Information / Privacy Act

Legal Notices

Legal Policies & Disclaimers

Privacy Policy

USA.gov

White House

No FEAR Act

Equal Opportunity



**FEDERAL BUREAU
OF INVESTIGATION**

FBI.gov Contact Center

# EXHIBIT 7

Mark Zuckerberg
Chief Executive Officer
Facebook
1 Hacker Way
Menlo Park, California 94025

4 October 2019

Dear Mr. Zuckerberg,

**OPEN LETTER: FACEBOOK'S "PRIVACY FIRST" PROPOSALS**

We are writing to request that Facebook does not proceed with its plan to implement end-to-end encryption across its messaging services without ensuring that there is no reduction to user safety and without including a means for lawful access to the content of communications to protect our citizens.

In your post of 6 March 2019, "A Privacy-Focused Vision for Social Networking," you acknowledged that "there are real safety concerns to address before we can implement end-to-end encryption across all our messaging services." You stated that "we have a responsibility to work with law enforcement and to help prevent" the use of Facebook for things like child sexual exploitation, terrorism, and extortion. We welcome this commitment to consultation. As you know, our governments have engaged with Facebook on this issue, and some of us have written to you to express our views. Unfortunately, Facebook has not committed to address our serious concerns about the impact its proposals could have on protecting our most vulnerable citizens.

We support strong encryption, which is used by billions of people every day for services such as banking, commerce, and communications. We also respect promises made by technology companies to protect users' data. Law abiding citizens have a legitimate expectation that their privacy will be protected. However, as your March blog post recognized, we must ensure that technology companies protect their users and others affected by their users' online activities. Security enhancements to the virtual world should not make us more vulnerable in the physical world. We must find a way to balance the need to secure data with public safety and the need for law enforcement to access the information they need to safeguard the public, investigate crimes, and prevent future criminal activity. Not doing so hinders our law enforcement agencies' ability to stop criminals and abusers in their tracks.

Companies should not deliberately design their systems to preclude any form of access to content, even for preventing or investigating the most serious crimes. This puts our citizens and societies at risk by severely eroding a company's ability to detect and respond to illegal content and activity, such as child sexual exploitation and abuse, terrorism, and foreign adversaries' attempts to undermine democratic values and institutions, preventing the prosecution of offenders and safeguarding of victims. It also impedes law enforcement's ability to investigate these and other serious crimes.

Risks to public safety from Facebook's proposals are exacerbated in the context of a single platform that would combine inaccessible messaging services with open profiles, providing unique routes for prospective offenders to identify and groom our children.

Facebook currently undertakes significant work to identify and tackle the most serious illegal content and activity by enforcing your community standards. In 2018, Facebook made 16.8 million reports to the US National Center for Missing & Exploited Children (NCMEC) – more than 90% of the 18.4 million total reports that year. As well as child abuse imagery, these referrals include more than 8,000 reports related to attempts by offenders to meet children online and groom or entice them into sharing indecent imagery or meeting in real life. The UK National Crime Agency (NCA) estimates that, last year, NCMEC reporting from Facebook will have resulted in more than 2,500 arrests by UK law enforcement and almost 3,000 children safeguarded in the UK. Your transparency reports show that Facebook also acted against 26 million pieces of terrorist content between October 2017 and March 2019. More than 99% of the content Facebook takes action against – both for child sexual exploitation and terrorism – is identified by your safety systems, rather than by reports from users.

While these statistics are remarkable, mere numbers cannot capture the significance of the harm to children. To take one example, Facebook sent a priority report to NCMEC, having identified a child who had sent self-produced child sexual abuse material to an adult male. Facebook located multiple chats between the two that indicated historical and ongoing sexual abuse. When investigators were able to locate and interview the child, she reported that the adult had sexually abused her hundreds of times over the course of four years, starting when she was 11. He also regularly demanded that she send him sexually explicit imagery of herself. The offender, who had held a position of trust with the child, was sentenced to 18 years in prison. Without the information from Facebook, abuse of this girl might be continuing to this day.

Our understanding is that much of this activity, which is critical to protecting children and fighting terrorism, will no longer be possible if Facebook implements its proposals as planned. NCMEC estimates that 70% of Facebook's reporting – 12 million reports globally – would be lost. This would significantly increase the risk of child sexual exploitation or other serious harms. You have said yourself that "we face an inherent tradeoff because we will never find all of the potential harm we do today when our security systems can see the messages themselves". While this tradeoff has not been quantified, we are very concerned that the right balance is not being struck, which would make your platform an unsafe space, including for children.

Equally important to Facebook's own work to act against illegal activity, law enforcement rely on obtaining the content of communications, under appropriate legal authorisation, to save lives, enable criminals to be brought to justice, and exonerate the innocent.

We therefore call on Facebook and other companies to take the following steps:

- Embed the safety of the public in system designs, thereby enabling you to continue to act against illegal content effectively with no reduction to safety, and facilitating the prosecution of offenders and safeguarding of victims;

- Enable law enforcement to obtain lawful access to content in a readable and usable format;

- Engage in consultation with governments to facilitate this in a way that is substantive and genuinely influences your design decisions; and

- Not implement the proposed changes until you can ensure that the systems you would apply to maintain the safety of your users are fully tested and operational.

We are committed to working with you to focus on reasonable proposals that will allow Facebook and our governments to protect your users and the public, while protecting their privacy. Our technical experts are confident that we can do so while defending cyber security and supporting technological innovation. We will take an open and balanced approach in line with the joint statement of principles signed by the governments of the US, UK, Australia, New Zealand, and Canada in August 2018[1] and the subsequent communique agreed in July this year[2].

As you have recognised, it is critical to get this right for the future of the internet. Children's safety and law enforcement's ability to bring criminals to justice must not be the ultimate cost of Facebook taking forward these proposals.


Yours sincerely,


Rt Hon Priti Patel MP
United Kingdom Secretary of State for the Home Department

William P. Barr
United States Attorney General

Kevin K. McAleenan
United States Secretary of Homeland Security (Acting)

Hon Peter Dutton MP
Australian Minister for Home Affairs

---

[1] https://www.ag.gov.au/About/CommitteesandCouncils/Documents/joint-statement-principles-access-evidence.pdf
[2] https://www.gov.uk/government/publications/five-country-ministerial-communique/joint-meeting-of-five-country-ministerial-and-quintet-of-attorneys-general-communique-london-2019

# EXHIBIT 8

An official website of the United States government. Here's how you know

Submit Search .search-icon-link { fill: #ffffff; } Search

# NEWS

| Stories | News Blog | Videos | Podcasts | Press Releases | Speeches | Testimony | Photos |

**Christopher Wray**
Director
Federal Bureau of Investigation

Twitter      Facebook      Email

Department of Justice Lawful Access Summit
Washington, D.C.
*October 4, 2019*

# Finding a Way Forward on Lawful Access: Bringing Child Predators out of the Shadows

*Remarks as delivered.*

This past June, in a New England town, a cyber tip came in to FBI agents and local law enforcement. The tip suggested that a 9-year-old girl was being sexually abused. The abuser was using a particular app to send out images of what he was doing to that little girl while remaining anonymous.

Our agents, along with our state and local partners, contacted the app provider. Using legal process, we got information that allowed us to locate the little girl in less than 24 hours. We obtained multiple search warrants, rescued her, and arrested her abuser. In another case over the summer, a different child predator used a different app to distribute sexually explicit images of two young girls—one 12 and one 13 years old. Responding to a tip, agents served legal process on that app provider and located and rescued those two girls in less than 12 hours.

Both of those cases could have ended very differently. Because without the information from the tech companies—both tips and responses to lawful orders—we wouldn't even have known about those children. And we wouldn't have been able to rescue them. I gave you just two heart-wrenching examples. Law enforcement receives millions of tips like

these every year.

Success stories are great, but the landscape has been changing under our feet. With the spread of user-controlled default encryption, providers frequently can't identify horrific images within encrypted data. That means tips like the ones that allowed us to rescue the three girls in those examples—those tips just don't get sent. The harm doesn't stop. The victims—those little kids—are still out there enduring the abuse.

Only the tips—the information that could help us identify them—disappear. Our ability to use legal process to quickly investigate and save the kids in those images is eroding, too. All too often, vital electronic evidence has been made unavailable through encryption that doesn't allow for execution of legal process including court-approved search warrants.

That's why we're here today: to talk about the challenges of default encryption and lawful access and what we can all do together to find a way forward. Today, you'll hear about other cases like the two I just mentioned. Some of these stories will come from the victims themselves—survivors of abuse who can tell us firsthand about the sobering costs and consequences we all face if we lose the ability to keep people safe. These stories are hard to listen to—and they should be hard to listen to—because no one should ever have to endure what these victims lived through. It's hard for us to contemplate what those images actually show. Horrific abuse. Scarring, awful crimes against kids, even infants and toddlers. Photographed and videotaped, so it can follow them for years to come.

But if we don't talk about this, if we don't confront these real-life horrors happening to real people, if we don't take action and do something soon to address the lawful access problem, it will be too late and we'll lose the ability to find those kids who need to be rescued. We're going to lose the ability to find the bad guys who need to be arrested and stopped. And we're going to lose the ability to keep the most vulnerable people we serve safe from harm. We just cannot let that happen.

Technology has made life much easier for the good guy—there's no doubt. But it's also made life much easier for a wide range of bad guys—including international and domestic terrorists, hackers, opioid traffickers, and child predators. Like other criminals, child predators routinely rely on encrypted phones and laptops to store explicit photographs and exchange illegal media, contact victims, and coordinate with co-conspirators over encrypted messaging platforms.

These devices and platforms have become spaces where vital rules—against soliciting child abuse, against trading in and feeding that abuse, against threatening abuse victims struggling to make a normal life—can no longer effectively be applied.

It makes sense to gather here today, because we're at a turning point. Some of our partners in the tech industry have been a huge help in getting us the digital evidence we need. Facebook and some other tech companies employ thousands of people to help identify child sexual abuse imagery, and then notify NCMEC—the National Center for Missing & Exploited Children—a vital partner you'll hear more from later.

That alone is an uncomfortable fact—the sheer volume of this awful imagery really does keep thousands of people (and more) fully occupied to handle it, and that's not even talking about the law enforcement response. But uncomfortable facts are still facts. Every year, Facebook provides more than 90 percent of the referrals received by NCMEC—and NCMEC now receives more than 18 million referrals a year, any one of which might be a tip that leads us to the next predator.

In that sense, Facebook is saving lives with those tips. But there are other tech companies that have already chosen to blind themselves to the content on their platforms. Those companies now provide few—if any—leads to law enforcement. We know their platforms host content involving abused children. The companies themselves just can't identify it anymore, so they don't warn us about the vast bulk of what's happening. And some of those companies have millions or even billions of customers—both here and abroad. So there's a whole lot of abuse going undetected.

Unfortunately, Facebook could be headed in the same direction. Facebook announced a "privacy first" plan in March. Their intention is to make all communications on Facebook and Instagram end-to-end-encrypted. If Facebook carries out that plan, it will have access to metadata—for example, the time a message was sent, and its recipient—but **not** (double underscore, **not**) the content of any messages, including attached photos and videos.

When it comes to people who create and distribute child pornography, it shouldn't be hard to see why timestamps and address blocks are poor substitutes—as leads, and certainly as evidence—for the images and videos they are disseminating.

This is incredibly concerning, to put it mildly. When it comes to protecting children, we're at a real inflection point—and we risk falling off a cliff. Most of the tips Facebook currently

provides are based on **content**. With end-to-end encryption, those would dry up. Facebook itself would no longer be able to see the content of its users' accounts.

That won't just stop the tips. It will prevent Facebook from providing content to law enforcement in response to legal process—the content we need to actually find who and where a victim is. The fact that NCMEC receives over 18 million tips a year shows we aren't talking about some handful of abusers. This is a huge problem. Fighting it with metadata just isn't going to work. To conduct a search and bring criminal charges in this country, we in the government have to meet a high standard. To convict, an even higher one. Metadata will almost never meet either standard. While an algorithm or AI might reveal suspicious customer usage, that kind of information—standing alone—will rarely be adequate to make a case and bring the perpetrators to justice.

Even when it can, we will find ourselves laboring only on the tip of the iceberg. Working on the small number of cases that authorities actually learn about, while the vast bulk of the kids who need us then remain out of view hidden below. The real impact would be to those victims, those kids. Facebook would transform from the main provider of child exploitation tips to a dream-come-true for predators and child pornographers. A platform that allows them to find and connect with kids, and like-minded criminals, with little fear of consequences. A lawless space created not by the American people, or their elected officials, but by the owners of one big company.

But this is not just about Facebook. We've got to make sure tech companies—all of them— aren't taking steps that will place content beyond the reach of the courts. Or to blind themselves deliberately to what's happening on their platforms, where so much child exploitation takes place. We've got to make sure that companies can't keep creating unfettered spaces beyond the protection of law. Because there are kids out there we haven't found, and dangerous criminals we haven't caught, who are already moving on to their next victims.

So what are we going to do about it? I'm well aware that encryption is a provocative subject for some. Although I will tell you, I get more than a little frustrated when people suggest that we're trying to weaken encryption—or weaken cybersecurity more broadly. We're doing no such thing. And dispensing with straw men would be a big step forward in this discussion. Cybersecurity is a central part of the FBI's mission. It's one part of the broader safety net we try to provide the American people: not only safe data, safe personal information, but also safe communities, safe schools.

We also have no interest in any "back door," another straw man. We—the FBI, our state and local partners—we go through the front door. With a warrant, from a neutral judge, only after we've met the requirements of the Fourth Amendment. We've got to look at the concerns here more broadly, taking into account the American public's interest in the security and safety of our society, and our way of life. That's important because this is an issue that's getting worse and worse all the time.

As FBI Director, I've now visited all 56 of our field offices, and I meet frequently with law enforcement leaders from all over the country and around the world. I can tell you that police chief after police chief, sheriff after sheriff, our closest foreign partners, and other key professionals are raising this issue with growing concern and urgency. They keep telling us that their work is too often blocked by encryption schemes that don't provide for lawful access.

So while we're big believers in privacy and security, we also have a duty to protect the American people. That's the way it's always been in this country; no technological advance or company's business model changes that fundamental precept. But make no mistake: that's the path we're on now, if we don't come together to solve this problem. So to those out there who are resisting the need for lawful access, I would ask: What's your solution? How do you propose to ensure that the hardworking men and women of law enforcement, sworn to protect you and your families, actually maintain lawful access to the information they need to do their jobs? What will you say to victims who are denied justice—or left unrescued—in the name of some incremental amount of additional data security?

I know we've started hearing increasingly from experts that there are solutions to be had, that enable both strong cybersecurity and lawful access. And I believe those solutions will be even better if we move forward together.

Today we'll hear from experts on the dangers we face if lawful access slips away from us. We'll hear from state and local and federal investigators and prosecutors, who see the impact of lawless spaces on the safety of our communities and can tell you from first-hand experience what a world without lawful access to content looks like. And we'll hear from those outside law enforcement who work to protect our children, and from some of our foreign partners, who are struggling with the same issues we are.

We've made a point of inviting the tech industry to attend today, and we continue to reach

out to industry to find ways forward that protect both our data and our families—our children. They aren't on **stage** today—**today** is about showing the human cost of technology that undermines the protections our kids deserve. But there will be many more discussions to come. Let me be clear: we are not here to demonize tech, and we couldn't do our day-jobs without technological tools. We know the concerns of some tech companies—about privacy and protecting their users' data—are laudable. With the context we can provide today, about how data security fits in with all the other flesh-and-blood safety needs of our communities, we'll be better able to forge ahead.

This summit couldn't come at a better time. Lawful access isn't just a future problem, it's here now. Together, we in government, law enforcement, the victim's advocacy community, and the tech industry have the power, the ability, and the skills to find a mutually acceptable solution. We've put some of the brightest minds in the country on this issue, and we've learned that it can, responsibly, be done.

We're not prescribing a particular technical solution—every company that's instituting default encryption is different, and the companies themselves are likely in the best position to develop lawful access solutions. We all want safe, secure, private data, but we also want safe and secure communities. And we can have both, I really do believe that. I hope you have a great conference and I look forward to hearing some of the ideas that come out of today's discussions.

## Most Wanted

Ten Most Wanted

Fugitives

Terrorism

Kidnappings / Missing Persons

Seeking Information

Bank Robbers

ECAP

ViCAP

## FBI Jobs

Submit a Tip

Crime Statistics

History

FOIPA

Scams & Safety

FBI Kids

FBI Tour

## News

Stories

Videos

Press Releases

Speeches

Testimony

Podcasts and Radio

Photos

Español

Apps

## How We Can Help You

Law Enforcement

Victims

Parents and Caregivers

Students

Businesses

Safety Resources

Need an FBI Service or More Information?

## What We Investigate

Terrorism

Counterintelligence



Cyber Crime

Public Corruption

Civil Rights

Organized Crime

White-Collar Crime

Violent Crime

WMD

## About

Mission & Priorities

Leadership & Structure

Partnerships

Community Outreach

FAQs

## Contact Us

Field Offices

FBI Headquarters

Overseas Offices

## Additional Resources

Accessibility

eRulemaking

Freedom of Information / Privacy Act

Legal Notices

Legal Policies & Disclaimers

Privacy Policy

USA.gov

White House

No FEAR Act

Equal Opportunity



FBI.gov Contact Center

EXHIBIT 9



🇺🇸 An official website of the United States government
Here's how you know

### TICE NEWS

**Deputy Attorney General Jeffrey A. Rosen Delivers Remarks at Justice Department's Lawful Access Summit**

Washington, DC ~ Friday, October 4, 2019

---

Thank you for that kind introduction.

I'd like to thank each of you for being here today.  Before I get into my remarks, I hope you'll join me in recognizing those who have spoken this morning.  I'd especially like to salute the courageous survivors and their family members for gracing us with their stories, and for inspiring us with their strength.

The title of today's summit is "lawless spaces."  And that's exactly what warrant-proof encryption creates: bounded-off areas in the digital world that are impervious to the light of scrutiny by the judicial system.  Those areas remain dark even when a neutral judge has found that the constitutional balance has been satisfied, and the judge has ordered that sworn law enforcement officers should have access to the specified evidence in order to protect public safety.

Outside the digital world, none of us would accept the proposition that grown-ups should be permitted to mingle in closed rooms with children they don't know in order to groom them for sexual exploitation.  Neither would we ever accept the idea that a person should be allowed to keep a hoard of child sexual abuse material from the scrutiny of the justice system when all of society's traditional procedures for protecting the person's privacy, like the Fourth Amendment's warrant requirement, have been satisfied.  But in the digital world, that is increasingly the situation in which we find ourselves.

Take, for example, a recent case where information derived from a publicly available peer-to-peer network indicated that, in early 2017, an individual at a particular physical address was requesting child sexual abuse material through that network.  Investigators obtained a search warrant and seized the suspect's computer.  It was encrypted.  The suspect denied downloading child pornography and subsequently retained counsel.  To this day, law enforcement has been unable to access the computer to conduct a search.  To this day — over two and a half years later — the suspect remains at large, neither cleared of wrong-doing nor charged with a crime.

Let's take things one step further.  Assume that the suspect did in fact download child sexual abuse material.  What if the files on his encrypted device would help us identify child victims of sexual abuse?  And, because we could not obtain access to the data stored on that device even with court authorization, what if those abused children are still out there, waiting to be rescued?

These are not sensationalistic scenarios.  They are real cases that raise the hard questions that we, as a society, need to confront.  Privacy is important.  So is cybersecurity, and the integrity of user data.  Those are good and necessary things.  But there are other important values, like user and public safety, that also need to be considered and factored in.  If we lose sight of that, we fail to honor the victims of these horrible crimes — victims who are often the most vulnerable members of our society.

I am not for a moment suggesting that we should "weaken" encryption.  As we confront the problem of "warrant-proof" encryption, nobody is calling for secret "back doors" to communications systems, even though that is often how the issue is misreported.  As FBI Director Wray said this morning, law enforcement seeks a front door — that is, access through a transparent and publicly acknowledged system, and only once we have secured the authorization of a court. And we don't want the keys to that door.  The companies that develop these platforms should keep the keys, maintaining their users' trust by providing access to content only when a judge has ordered it.

That is exactly how it is with traditional telecommunications providers. Every day, companies like AT&T, Verizon, and Sprint provide law enforcement with targeted lawful access to the content of phone communications in ways that promote public safety — but only after the government has complied with the rigorous requirements of the law, and a judge has authorized access. Why should internet technology companies operate under different rules? For a young girl who is being trafficked for sex, it makes no difference whether her tormenters are communicating via traditional voice calls over a cell phone, or via an encrypted internet app. But it makes a huge difference to the investigators trying to find her, as they can gather the first category of electronic evidence, but not the second. From a policy point of view, it doesn't make any sense.

As we'll hear later this morning when the Attorney General and his international counterparts take the stage, other rule-of-law nations like the United Kingdom and Australia have, through the legislative process, begun addressing this problem. The fact is, this challenge is pervasive, and it touches society at all levels, from state and local, to federal, to international. It will take serious discussion — and real action — at each of those levels for us to adequately confront it. And it will take real effort on the part of all stakeholders for us to move towards solutions.

The good news is that, at least in the child exploitation context, stakeholders have begun coming together to attack the scourge of online child exploitation in powerful ways. NGOs, including parents' groups and victims' rights groups, are critical parts of civil society that have raised awareness of this issue. You heard this morning the impactful stories that victims tell, and the important work that organizations like the National Center for Missing & Exploited Children (NCMEC), Team HOPE, and the Canadian Centre for Child Protection undertake to protect and to empower survivors.

You've also heard about how the internet has transformed the scope and nature of child exploitation, and how, candidly, it has generated a massive problem for our society. In the face of this problem, law enforcement needs to redouble its efforts, and collaborate in new and creative ways. Other important stakeholders in the broader conversation need to up their game, too. You've heard how some companies in the technology industry have made strides in helping confront this challenge by, for example, voluntarily searching communications on their system for known child sexual abuse material using hash values or PhotoDNA. This technique has led to an explosion of reports of suspected child pornography offenses to NCMEC's CyberTipline, exceeding 18 million last year. Since 2010, the number of CyberTips that have been sent to the Internet Crimes Against Children Task Forces for investigation by law enforcement have increased by more than 555 percent. And as John Walsh told you, the resulting investigations have resulted in the rescue of children who were being sexually assaulted. Law enforcement benefits from the leads voluntarily generated by private sector companies, and we truly thank them for their work. But, unfortunately, the numbers themselves make clear that there is significantly more to be done.

And that's where we run into a more difficult part of the conversation. The monitoring practices I've described are inconceivable with end-to-end encryption, which will dramatically reduce the number of reports to the CyberTipline. For example, an estimated 70 percent of Facebook's reporting, which last year totaled well over 16 million reports of child sexual exploitation and abuse globally, would likely be lost if the company deploys end-to-end encryption across all of its platforms, as it has publicly announced it plans to do. And we have little insight into the actual volume of child sexual abuse material being traded on platforms that already use end-to-end encryption.

It's worth focusing for a moment on the platforms that employ end-to-end encryption, because the metrics we do have are chilling. Consider Apple, which reported a grand total of eight tips in 2017; 43 in 2018; and less than 150 to date in 2019. When contrasted to the millions of tips reported by Facebook over the same time frame, is the take-home point that Apple magically ran platforms free of child exploitation as the volume of child exploitation materials grew by massive amounts everywhere else on the internet? Or is that such companies cannot see the harmful illicit activity that was occurring on their platforms when they chose to avert their eyes by deploying end-to-end encryption? Simply stated, end-to-end encryption prevents many investigations from even getting started, and leaves many victims undetected. Some companies have completely favored the privacy of their users over the safety of their users.

My hope is that today's summit drives that point home. Right now, technology companies make unilateral decisions that have profound impacts on public safety. Our society needs to understand the stakes. Protecting users of the internet and communications services often entails monitoring what is traveling through those systems, whether it is malware, stolen intellectual property, terrorists' communications, or images of child sexual abuse. If we are to move to a world where even judge-approved search warrants become useless to the protection of exploited children, and to

public safety more broadly, our country needs an open discussion of the costs some such technology platforms will be imposing on all of us. If our efforts to make the virtual world more secure leave us more vulnerable in the physical world, that decision should be an informed one.

One can strongly support privacy and civil liberties, but still find it hard to fathom why a digital tech platform would provide warrant-proof spaces for child exploiters, or even terrorists, when a judge has found a lawful need for access consistent with the Fourth Amendment to the US Constitution.  Why not have a regime where cybersecurity and encryption remain compatible with lawful access to data when a judge issues a search warrant?

I thank each of you for being here today to contribute to this critically important discussion.

**Speaker:**
Deputy Attorney General Jeffrey A. Rosen

**Topic(s):**
Human Trafficking
Cybercrime

**Component(s):**
Office of the Deputy Attorney General

*Updated October 4, 2019*

# EXHIBIT 10



🇺🇸 An official website of the United States government
 Here's how you know

**TICE NEWS**

**Attorney General William P. Barr Delivers Remarks at the Lawful Access Summit**

Washington, DC ~ Friday, October 4, 2019

---

*Remarks as Prepared for Delivery*

Thank you for that introduction.

It's great to see so many members of the law enforcement community here today. Many of you have come from far away, and we are grateful for your presence. You are joined by those from the NGO community, industry, academia, and Capitol Hill. This is likely the first time that so many stakeholders in the lawful-access conversation have been in one place.

I'm especially thankful to be joined by two good friends from abroad: Peter Dutton, the Australian Minister for Home Affairs, and Priti Patel, the U.K. Home Secretary. Thank you to each of you for accepting my invitation to be here, and for traveling such a long way. Our nations face a constellation of common security concerns. But we do not face them alone. We have always stood shoulder to shoulder in the fight for freedom, peace, and security. And we will continue to do so.

Just last night, Priti and I, on behalf of our governments, signed the first-ever agreement under the CLOUD Act, which became law last year thanks to industry support, bipartisan Congressional action, and President Trump's leadership. That Act greatly facilitates criminal investigations by allowing law enforcement from each country to obtain evidence directly from commercial providers pursuant to legal process that safeguards privacy rights.

The theme of today's summit – warrant-proof encryption – is distinct from the CLOUD Act. But the Act is worth mentioning at the outset because it serves as an excellent example of how much we can achieve when all stakeholders come together in pursuit of a common goal. To address the lawful access issue, it will take that kind of commitment, along with an honest, public discussion of pros and cons.

As individuals and as a nation we have become dependent on a vast digital infrastructure. That, in turn, has made us vulnerable to cybercriminals and foreign adversaries that target that infrastructure. Encryption provides enormous benefits to society by enabling secure communications, data storage, and online transactions.

As the Federal Government, we welcome these improvements to privacy and security, and will work to preserve and strengthen them.

But the digital world that has proven such a boon in many ways has also empowered criminals. Like everybody else, criminals of all stripes increasingly rely on wireless communications, hand-held devices, and the internet. In today's world, evidence of crime is increasingly digital evidence. As we work to secure our data and communications from hackers, we must recognize that our citizens face a far broader array of threats. Hackers are a danger, but so are violent criminals, terrorists, drug traffickers, human traffickers, fraudsters, and sexual predators. While we should not hesitate to deploy encryption to protect ourselves from cybercriminals, this should not be done in a way that eviscerates society's ability to defend itself against other types of criminal threats. In other words, making our virtual world more secure should not come at the expense of making us more vulnerable in the real world.

Enjoyment of all the personal rights we cherish – whether to life, liberty, property, speech, or privacy – ultimately depends upon our ability to maintain a safe society. Whether you agree with John Locke about everything, he was

certainly right about that.  The founding document of our republic, the Constitution, states at the outset that one of the principal reasons we have framed our body politic is to provide this security – "to provide for the Common Defense," that is, security from foreign enemies; and "to insure Domestic Tranquility," that is protection from the predators within our society.  Unless society as a whole has the ability to preserve this peace and security, our rights ultimately become meaningless.

The essence of all political thinking is about how we reconcile the claims of the individual with the interests of the broader community.  In all the great countries represented on the stage, we have erected strong protections around our individual rights, while at the same time placing some constraints on them where necessary to protect the safety of society as a whole.

Apart from life itself, liberty is our greatest value.  And yet, limits are placed even on this core right when necessary to protect society.  We deprive people of their liberty – we arrest them – when we have probable cause to believe they have committed, or are engaged in, a crime.

If we could wave a magic wand and conjure up a technology that could enhance our liberty by absolutely insulating every individual from being hindered – even preventing any possibility of arrest – would we want to deploy it?  It might protect the innocent from muggers but it would also insulate all criminals from arrest.

What is happening here is that some companies want to say to the individual, "Hey, we can make you invisible to law enforcement."  But do we want to live in a society where everyone is invisible to law enforcement?

These considerations apply to privacy.  That right has never been absolute.  The Fourth Amendment strikes a balance between the individual citizen's interest in conducting certain affairs in private and the general public's interest in subjecting possible criminal activity to investigation.  It does so, on the one hand, by securing for each individual a private enclave around his "person, house, papers, and effects" – a "zone" bounded by the individual's own reasonable expectations of privacy.  So long as the individual acts within this "zone of privacy," his activities are shielded from unreasonable Government investigation.

On the other hand, the Fourth Amendment establishes that, under certain circumstances, the public has a legitimate need to gain access to an individual's zone of privacy in pursuit of public safety, and it defines the terms under which the Government may obtain that access.  When the Government has probable cause to believe that evidence of a crime is within an individual's zone of privacy, the Government is entitled to search for or seize the evidence, and the search usually must be preceded by a judicial determination that "probable cause" exists and be authorized by a warrant.

As you heard this morning, some companies want to deploy end-to-end encryption on consumer products that would completely prevent law enforcement from gaining access to data or communications, even when there is probable cause to believe a crime is underway and a judicial magistrate has issued a warrant.  Essentially, this would establish privacy as an absolute right without any regard to the safety of society as a whole.

It is hard to overstate how perilous this is.  By enabling dangerous criminals to cloak their communications and activities behind an essentially impenetrable digital shield, the deployment of warrant-proof encryption is already imposing huge costs on society.

It's not just the reprehensible behavior of sexual predation on children, but myriad additional forms of serious crime enabled by end-to-end encryption.  This technology is quickly extinguishing our ability to detect and prevent a wide range of criminal activity – from terrorism, to large-scale drug trafficking, to financial fraud, to human trafficking, to transnational gang activity.  The clock is ticking.

One further point about the costs imposed on society by warrant-proof encryption: It is not only about the crimes that could have been avoided, or the criminals that escape punishment.  Converting the internet and communication platforms into "law free" zones, and thus giving criminals the means to operate free of lawful scrutiny, will inevitably propel an expansion of criminal activity.  If you remove any possibility that the cops are going to be watching a neighborhood, the criminals already in the neighborhood will commit a lot more crimes.

Let me address some of the canards that are floating around in this discussion.

First, it is claimed that law enforcement is asking to impinge on privacy. Nothing can be further from the truth. We are not seeking to move the goal posts at all. We are seeking to preserve the degree of privacy to which we have always been entitled under our Constitution. It is not a degree of privacy that is absolute and impervious under all circumstances. It is a right to privacy that allows for lawful access when society can demonstrate a sufficiently compelling need.

In this regard, I was amused to see the impassioned statement from a leading digital-rights activist two days ago. It said: "A secure messenger [platform] should provide the same amount of privacy as you have in your living room." That is right. I agree. That's exactly what law enforcement is seeking. And as you should all know, with a warrant, law enforcement can gain access to your living room, both physically and virtually.

It is also said that the Government is seeking a secretive "backdoor" to everyone's communications and data. That is false. We are seeking a front door. We would be happy if the companies providing the encryption keep the keys. What we are asking is that some responsible party have the keys so that, when we can demonstrate a lawful basis – probable cause that crimes are being committed – law enforcement is able to gain access.

It also seems to me that the argument of companies that want to deploy warrant-proof encryption rests on an unsustainable premise. The companies seem to think that the debate is over once they show that their technology will achieve some incremental increase in privacy, regardless of its impact on the welfare of society. But, as our whole history shows, the extent of rights has always depended on a balance between the claims of the individual and the claims of society as a whole.

Think of it this way. In the hierarchy of rights and values, the right to life is at the top. There are many technologies available that could provide more security for my personal right to life. I'd be much safer cruising down the highway in an M1 tank. But the risks that would be invariably posed to all the other drivers would be too great. Optimizing for one value, and one value only, is not the end of the inquiry. The externalities of achieving that isolated goal at all costs are just unacceptably high.

The heart of the matter is this: Do the security advantages of warrant-proof encryption offered to the individual outweigh the risk posed to the public by that same technology? This is not a decision for the companies to make by themselves. It is a decision for society to make.

The public can enjoy the benefits of encryption while still allowing for lawful access. There's no doubt that we all benefit from encryption. It allows for e-commerce and many other online applications. But those aren't the applications we're talking about. We are not talking about consumers' interactions with online enterprises, such as banks and retailers. Law enforcement can go to banks and firms dealing with customers and request and receive access to information with a warrant. Nor are we talking about the encryption that enterprises, like power companies, use to protect their operations. What we're instead concerned about is consumer-to-consumer communications, consumer devices, and data storage.

The argument is made that, to achieve perfect protection against bad actors, it is essential to override society's interest in retaining lawful access. Some hold this view dogmatically, claiming that it is technologically impossible to provide lawful access without weakening security against unlawful access. But, in the world of cybersecurity, we do not deal in absolute guarantees but in relative risks. All systems fall short of optimality and have some residual risk of vulnerability – a point which the tech community acknowledges when they propose that law enforcement can satisfy its requirements by exploiting vulnerabilities in their products. The real question is whether the residual risk of vulnerability resulting from incorporating a lawful access mechanism is materially greater than those already in the unmodified product. The Department does not believe this can be demonstrated.

We are confident that there are technical solutions that will allow lawful access without materially weakening the security provided by encryption. Such encryption regimes already exist. To that point, the tech community regularly implements new features that slightly affect the potency of encryption and other security protocols. They do so because it's profitable and those features benefit consumers. For example, providers design their products to allow access for software updates using centrally-managed security keys.

Moreover, even if allowing for lawful access resulted, in theory, in a slight risk differential, its significance should not be judged solely by the fact it falls short of theoretical optimality. The significance of any incremental risk should be assessed based on its practical effect on consumer cybersecurity, as well as its relation to the net risks that offering the product poses for society. And the analysis must take into account alternative and less socially injurious ways of mitigating the risk.

If one already has an effective level of security – say, by way of illustration, one that protects against 99 percent of foreseeable threats – is it reasonable to incur massive further costs to move slightly closer to optimality and attain a 99.5-percent level of protection, even where the risk addressed is extremely remote? A company would not make that expenditure – nor should society.

At the end of the day, we must make these choices based on the net benefit to society. If the choice is between a world where we can achieve a 99-percent assurance against cyber threats to consumers, while still providing law enforcement 80 percent of the access it might seek; or a world, where we have boosted our cybersecurity to 99.5 percent but at a cost reducing law enforcements access to zero percent – the choice for society is clear.

I want to make a point about our freedom and our privacy. Throttling the ability of law enforcement to detect and interdict criminal actors does not advance either value.

Ultimately, there are two ways of protecting society: either detect and neutralize the bad guys or regiment society as a whole. Anyone who has gone through a security line at an airport – sometimes removing your shoes, belt, and toiletries for all to see – knows firsthand the burden that regimentation places on privacy rights.

More so than ever before, the principal tool law enforcement has to identify and neutralize the bad guys is to listen to and read their communications. There is no substitute. If we lose the ability to conduct electronic surveillance or to access digital records, we will inevitably be driven to greater and greater regimentation of society in order to secure ourselves. In turn, we will lose our liberty as well as our privacy. That is the extremely high price we will pay if we prioritize impenetrable encryption above all else.

I do wish to give credit where credit is due: Some tech companies have taken significant steps to help detect and report criminality. When it comes to preventing crime, we hope that industry will be an ally, not an adversary. We hope that the power of technology will provide greater safety to the public, not place us at greater risk of harm and exploitation.

We think our tech sector has the ingenuity to develop effective ways to provide secure encryption while also providing secure legal access. It is well past time for some in the tech community to abandon the indefensible posture that a technical solution is not worth exploring, and instead turn their considerable talent and ingenuity to developing products that will reconcile good cybersecurity to the imperative of public safety and national security. As Microsoft's Bill Gates has observed, "[t]here's no question of ability; it's the question of willingness."

Obviously, the Department would like to engage with the private sector in exploring solutions. The time to achieve that may be limited. As this debate has dragged on, and deployment of warrant-proof encryption has accelerated, our ability to protect the public from criminal threats is rapidly deteriorating. The status quo is exceptionally dangerous, unacceptable, and only getting worse. It is time for us to stop debating whether to address it, and start talking about how to address it.

My colleagues in the Department of Commerce will be reaching out to you soon to continue this dialogue. Please accept that invitation. And let's do more than just talk. Let's move forward in a good faith effort to find solutions.

**Speaker:**
Attorney General William Barr

**Component(s):**
Office of the Attorney General

*Updated October 4, 2019*

# EXHIBIT 11



# 2019 CyberTipline Reports by Electronic Service Providers (ESP)

NCMEC's CyberTipline is the nation's centralized reporting system for the online exploitation of children, including child sexual abuse material, child sex trafficking and online enticement.
In 2019, the CyberTipline received 16.9 million reports related to suspected child sexual exploitation. These reports contained 69.1 million videos, images and files.

The following is a breakdown of reports by electronic service providers.

*Report totals for related platforms and companies have been combined.*

| ESP | Number of Reports |
| --- | --- |
| 4chan | 1,380 |
| 4shared | 117 |
| Absolute Software Corporation | 3 |
| Adobe Systems Incorporated | 825 |
| Afilias USA | 171 |
| Airbnb, Inc. | 59 |
| Amazon | 8 |
| Amino Apps | 383 |
| Apple Inc | 205 |
| Ask.fm | 103 |
| Asurion Corporation | 1 |
| AT&T WorldNet Service | 2 |
| Automattic* | 10,443 |
| Bark Technologies Inc | 316 |
| Bitly | 3 |
| Box | 53 |
| Cafepress | 1 |
| Care.com | 7 |
| Chatango LLC | 6 |
| Chatrandom | 218 |

Copyright © 2020 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| Cloudflare, Inc. | 1,173 |
| Cloudmark, Inc. | 1 |
| Club Domains, LLC | 1 |
| Cogent Communications | 2 |
| Comcast Cable Communications, LLC | 27 |
| Craigslist | 11 |
| Deluxe Corporation/ColoCrossing / HudsonValleyHost | 22 |
| DeviantART, Inc. | 20 |
| Digital Ocean | 16 |
| Directnic.com | 1 |
| Discord Inc. | 19,480 |
| Dropbox, Inc. | 5,113 |
| EasyOnlineSolutions/MojoHost/ North Tone/ Hosthead | 18 |
| eBay Inc. | 45 |
| Ello.co | 828 |
| Endurance International Group* | 96 |
| Enom | 33 |
| Etsy, Inc. | 3 |
| Evasyst, Inc. (dba Kast) | 1 |
| Facebook* | 15,884,511 |
| FreeDNS.Afraid.org | 1 |
| Gab AI Inc. | 5 |
| Gaggle.Net, Inc. | 2,222 |
| Giphy, Inc. | 7 |
| GitHub | 2 |
| GoDaddy.com/Wild West Domains | 25 |
| GoGuardian | 27 |
| Google* | 449,283 |
| Grindr | 13 |
| Gumroad | 1 |
| Hacker Factor | 608 |
| Hewlett Packard Enterprise | 1 |
| Hosting Services Inc/Midphase/WestHost/ Autica/VPS | 46 |
| HostMantis | 1 |
| IAC / excite / myway / zwinky / mindspark | 5 |

Copyright © 2020 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
| --- | --- |
| Imagebam/ Flixya Entertainment/ videobam | 4,256 |
| Imgur, LLC | 73,929 |
| IMVU, Inc. | 31 |
| INHOPE | 74,165 |
| Internet Archive | 88 |
| JNJ Mobile, Inc. (d/b/a MocoSpace) | 50 |
| KnownHost/ PrivateSystems Networks | 1 |
| LegitScript, LLC | 3 |
| LEGO System A/S | 61 |
| Letgo/Ambatana | 28 |
| Linden Lab/ SecondLife | 36 |
| LinkedIn Corporation | 88 |
| Linode LLC | 14 |
| LiveMe | 2 |
| LookingGlass Cyber Solutions, Inc. | 2 |
| Marinus Analytics LLC / Traffic Jam | 5 |
| Match Group, LLC* | 810 |
| MediaFire | 156 |
| MediaLab AI* | 38 |
| The Meet Group* | 5,709 |
| MeWe | 4,318 |
| Microsoft* | 123,839 |
| motherless | 1,836 |
| Movie Star Planet | 6 |
| Multi Media, LLC/Zmedianow, LLC/ Chaturbate | 1,466 |
| myrete/whoshere | 7 |
| Name.com | 8 |
| NameCheap | 28 |
| Neustar | 40 |
| Nexeon Technologies | 1 |
| Niteflirt/Phrendly.com/Platphorm, LLC | 42 |
| OfferUp | 3 |
| Omegle.com LLC | 3,470 |
| OTI Holdings,Inc.* | 75 |
| Patreon | 5 |
| PayPal Inc. | 322 |

Copyright © 2020 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| Photobucket | 120 |
| Pinger, Inc. | 5 |
| Pinterest Inc. | 7,360 |
| Porkbun LLC | 3 |
| ProBoards | 37 |
| Public Interest Registry | 89 |
| Quora | 1 |
| Rabbit | 2,969 |
| Redbubble Inc. | 3 |
| Reddit, Inc. | 724 |
| Reflected Networks, Inc | 234 |
| Remind | 1 |
| Roblox | 675 |
| Scratch Foundation | 2 |
| sendvid | 2,044 |
| Shutterfly | 5 |
| SimilarWorlds | 2 |
| SmugMug-Flickr | 2,545 |
| Smule | 7 |
| Snapchat | 82,030 |
| Social Minds ApS | 14 |
| Softlayer | 1 |
| Sony Interactive Entertainment | 237 |
| Sprint Nextel | 3 |
| StackPath, LLC/Highwinds | 3 |
| StarNow | 4 |
| Stelivo, LLC | 2,771 |
| Streamable (Apricot Mountain Inc.) | 1 |
| Sykes | 2 |
| Synchronoss Technologies, Inc | 251 |
| Taboola | 2 |
| Take-Two Interactive Software, Inc | 1 |
| The Walt Disney Company | 2 |
| Thorn | 12 |
| Thumbtack | 1 |
| TikTok | 596 |
| TrevorSpace | 6 |

Copyright © 2020 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---:|
| Twitch Interactive, Inc. | 541 |
| Twitter, Inc. | 45,726 |
| Various, Inc./FriendFinder/Tangotime | 22 |
| Verizon Media | 13,418 |
| Verizon Online | 136 |
| Verizon Wireless | 4 |
| Vero Labs, Inc. | 75 |
| Vimeo LLC | 306 |
| Visual Supply Company (VSCO) | 4 |
| Vokal (First Media) | 116 |
| Web.com/Network Solutions/Register/NameBargain | 1 |
| Weebly, Inc. | 12 |
| West Interactive Services Corporation | 140 |
| Wickr Inc. | 1 |
| Wikimedia Foundation Inc. | 13 |
| Wistia Inc. | 4 |
| Younow | 459 |
| Yubo | 3 |
| Zendesk Inc. | 2 |
| Zoom Video Communications, Inc | 57 |
| **Totals:** | **16,836,694** |

Copyright © 2020 National Center for Missing & Exploited Children. All rights reserved.

# EXHIBIT 12



# 2020 CyberTipline Reports by Electronic Service Providers (ESP)

NCMEC's CyberTipline is the nation's centralized reporting system for the online exploitation of children, including child sexual abuse material, child sex trafficking and online enticement. In 2020, the CyberTipline received more than 21.7 million reports. 21.4 million of these reports were from Electronic Service Providers that report instances of apparent child sexual abuse material that they become aware of on their systems.

Higher numbers of reports can be indicative of a variety of things including larger numbers of users on a platform or how robust an ESP's efforts are to identify and remove abusive content. NCMEC applauds ESPs that make identifying and reporting this content a priority and encourages all companies to increase their reporting to NCMEC. These reports are critical to helping remove children from harmful situations and to stopping further victimization.

The following is a breakdown of reports by electronic service providers.

*Report totals for related platforms and companies have been combined.*

| ESP | Number of Reports |
|---|---|
| 4chan | 1,143 |
| 4shared | 95 |
| Absolute Software Corporation | 2 |
| Adobe | 1,207 |
| Afilias USA | 271 |
| Airbnb | 25 |
| Airtime Media | 42 |
| Amazon / Twitch | 2,235 |
| Amino Apps | 97 |
| animebw | 3 |
| Apple | 265 |
| Ask.fm | 109 |
| Asurion Corporation | 6 |
| AT&T WorldNet Service | 2 |
| Automattic* | 9,130 |
| Bark Technologies | 661 |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
| --- | --- |
| Big Fish Games | 1 |
| Box | 153 |
| Bublup | 5 |
| Care.com | 1 |
| Center for International Cyber Intelligence | 1 |
| Chatango | 18 |
| Cloudflare | 3,769 |
| Cogent Communications | 1 |
| Comcast Cable Communications | 10 |
| Deluxe Corporation/ColoCrossing/HudsonValleyHost | 14 |
| deviantART | 6 |
| Digital Ocean | 60 |
| Directnic.com | 1 |
| Discord | 15,324 |
| Donuts | 1 |
| Dropbox | 20,928 |
| Dynadot | 1 |
| EasyOnlineSolutions/MojoHost/North Tone/Hosthead | 23 |
| Ebay | 20 |
| Electronic Arts | 1 |
| Ello.co | 88 |
| Endurance International Group* | 73 |
| Enom | 67 |
| Etsy | 1 |
| Evasyst | 4 |
| Facebook* | 20,307,216 |
| Fotoloce | 8 |
| FreeDNS.Afraid.org | 2 |
| Gaggle | 3,952 |
| Giphy | 22 |
| GitHub | 2 |
| Globtech* | 1,907 |
| GLU MOBILE | 3 |
| GoDaddy | 30 |
| GoFundMe | 1 |
| GoGuardian | 40 |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
| --- | --- |
| Google | 546,704 |
| Grindr | 302 |
| Gumroad | 5 |
| Hacker Factor | 523 |
| Hewlett Packard Enterprise | 11 |
| Hosting Services Inc/Midphase/WestHost/Autica/VPS | 26 |
| IAC/excite/myway/zwinky/mindspark | 3 |
| Imagebam/Flixya Entertainment/videobam | 10,820 |
| Imgur | 31,571 |
| IMVU | 16 |
| Indeed | 2 |
| INHOPE* | 57,170 |
| Internet Archive | 143 |
| Interspace Technologies (Byte) | 75 |
| JMS Internet, | 35 |
| JNJ Mobile Inc, dba MocoSpace | 5 |
| LBRY INC | 4 |
| LegitScript | 3 |
| LEGO System A/S | 52 |
| Letgo/Ambatana | 7 |
| Life on Air Inc/Houseparty | 2,482 |
| Linden Lab/SecondLife | 63 |
| LinkedIn | 60 |
| Linode | 22 |
| LiveMe | 1 |
| LookingGlass Cyber Solutions | 2 |
| Marinus Analytics LLC/Traffic Jam | 32 |
| Match Group* | 3,387 |
| MediaFire | 421 |
| MediaLab AI* | 14,515 |
| Medium | 2 |
| Meet Group* | 6,384 |
| Mega | 2 |
| Mercari | 1 |
| MeWe | 3,566 |
| Microsoft* | 96,776 |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
| --- | --- |
| MindGeek* | 13,229 |
| MMGuardian | 31 |
| motherless | 3,036 |
| Multi Media, LLC/Zmedianow, LLC/Chaturbate | 1,367 |
| myrete/whoshere | 3 |
| NameCheap | 45 |
| National Center on Sexual Exploitation | 33 |
| Neustar | 4 |
| Nexeon Technologies | 3 |
| Niteflirt/Phrendly.com/Platphorm, LLC | 28 |
| Notion Labs | 1 |
| OfferUp | 2 |
| Omegle | 20,265 |
| OTI Holdings | 26 |
| OVH US LLC | 4 |
| Patreon | 19 |
| PayPal | 282 |
| Photobucket | 6 |
| PicsArt | 113 |
| Pinger | 3 |
| Pinterest | 3,432 |
| Porkbun | 7 |
| ProBoards | 4 |
| Public Interest Registry | 240 |
| Quora | 2 |
| Reddit | 2,233 |
| RedGIFs | 37 |
| Reflected Networks | 130 |
| Remind | 1 |
| RingCentral | 8 |
| Roblox | 2,203 |
| Scratch Foundation | 15 |
| Scruff App/Perry Street Software | 6 |
| sendvid | 1,166 |
| SimilarWorlds | 18 |
| Slack Technologies | 599 |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| SmugMug-Flickr | 895 |
| Smule | 3 |
| Snapchat | 144,095 |
| Sniffies | 3 |
| Sony Interactive Entertainment | 836 |
| Sprint Nextel | 1 |
| StackPath/Highwinds | 70 |
| StarNow | 5 |
| Stelivo | 6,184 |
| SurveyMonkey | 1 |
| Sykes | 35 |
| Synchronoss Technologies | 2,056 |
| Taboola | 1 |
| Take-Two Interactive Software | 1 |
| The Walt Disney Company | 2 |
| Thorn | 46 |
| ThumbSnap | 1 |
| Thumbtack | 3 |
| TikTok* | 22,692 |
| Tsu, Inc | 2 |
| Twitter | 65,062 |
| Uncharted Software | 40 |
| Various, Inc./FriendFinder/Tangotime | 9 |
| VeriSign | 30 |
| Verizon Media | 10,267 |
| Verizon Online | 130 |
| Verizon Wireless | 1 |
| Vero Labs | 329 |
| Vimeo | 209 |
| Vistaprint | 2 |
| Visual Supply Company | 29 |
| Vokal (First Media) | 160 |
| Web.com/Network Solutions/ Register/ NameBargain | 2 |
| Weebly | 5 |
| West Interactive Services Corporation | 180 |
| WeTransfer | 82 |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| Wikimedia Foundation | 11 |
| Wildlife Studios | 41 |
| WildWorks | 5 |
| Wink | 15 |
| Younow | 862 |
| Yubo | 42 |
| Zendesk | 1 |
| Zoom Video Communications | 499 |
| | |
| **Totals:** | **21,447,786** |

Copyright © 2021 National Center for Missing & Exploited Children. All rights reserved.

# EXHIBIT 13



# 2021 CyberTipline Reports by Electronic Service Providers (ESP)

NCMEC's CyberTipline is the nation's centralized reporting system for the online exploitation of children, including child sexual abuse material, child sex trafficking and online enticement. In 2021, the CyberTipline received more than 29.3 million reports. 29.1 million of these reports were from Electronic Service Providers that report instances of apparent child sexual abuse material that they become aware of on their systems.

Higher numbers of reports can be indicative of a variety of things including larger numbers of users on a platform or how robust an ESP's efforts are to identify and remove abusive content. NCMEC applauds ESPs that make identifying and reporting this content a priority and encourages all companies to increase their reporting to NCMEC. These reports are critical to helping remove children from harmful situations and to stopping further victimization.

The following is a breakdown of reports by electronic service providers.

| ESP | Number of Reports |
|---|---|
| 4chan | 973 |
| 4shared | 75 |
| 7web | 1,908 |
| Absolute Software Corporation | 3 |
| Adobe Systems Incorporated | 1,066 |
| Affinity Apps | 869 |
| Afilias USA | 203 |
| Airbnb | 62 |
| Airtime Media | 95 |
| Alpha Exploration Co (Clubhouse) | 620 |
| Amazon | 99 |
| Amazon Games | 4 |
| Amazon Photos | 27,101 |
| Amino Apps | 75 |
| animebw | 16 |
| Apple | 160 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| Apricot Digitals | 1 |
| Arctic Wolf Networks, Inc. | 3 |
| Ariemgroup Limited | 32 |
| Ask.fm | 117 |
| Asurion Corporation | 2 |
| AT&T WorldNet Service | 1 |
| Badoo | 475 |
| Bark Technologies Inc | 282 |
| BigBang Media | 225 |
| Blizzard Entertainment (World of Warcraft) | 4 |
| Blue Vision | 43 |
| Box | 2,599 |
| Bublup | 13 |
| Canva | 1 |
| Care.com | 2 |
| Chatango LLC | 2 |
| Checkstep | 127 |
| Classmates Online | 1 |
| Cloudflare | 12,932 |
| Comcast Cable Communications | 8 |
| Cyveillance | 5 |
| deviantART | 6 |
| Digital Ocean | 200 |
| Discord | 29,606 |
| Dreamstime.com | 2 |
| Dropbox | 48,371 |
| Easynews/Newshosting/Usenetserver | 21 |
| EasyOnlineSolutions/MojoHost/North Tone/Hosthead | 41 |
| Ebay | 19 |
| Electronic Arts | 7 |
| Ello.co | 4 |
| Endurance International Group | 103 |
| Enom | 56 |
| Etsy | 6 |
| Facebook | 22,118,952 |
| Fenix International Limited | 2,984 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
| --- | --- |
| Fotoloce | 9 |
| FreeDNS.Afraid.org | 3 |
| Gaggle | 4,656 |
| Get Together (IRL) | 1 |
| GF Networks | 12 |
| Giphy | 229 |
| GitHub | 4 |
| Globtech | 4,078 |
| GLU MOBILE | 2 |
| GoDaddy | 32 |
| GoFundMe | 1 |
| GoGuardian | 21 |
| Google | 875,783 |
| Grindr | 10,671 |
| Gumroad | 2 |
| Hacker Factor | 386 |
| Hewlett Packard Enterprise | 5 |
| Hinge.co | 6 |
| Hosting Services Inc/Midphase/WestHost/Autica/VPS | 33 |
| HowlogicKFT | 3 |
| Imagebam/Flixya Entertainment/Videobam | 54,742 |
| Imgur | 47,274 |
| IMVU | 10 |
| Indeed | 2 |
| InfraWeb Solution Limited | 7 |
| INHOPE | 130,723 |
| Instagram | 3,393,654 |
| Internap Corporation (INAP) | 15 |
| Internet Archive | 188 |
| Interspace Technologies (Byte) | 11 |
| Intrado Interactive Services Corporation | 184 |
| JMS Internet | 1 |
| JNJ Mobile (MocoSpace) | 33 |
| Joyo Technology Pte | 1 |
| Kaleton Web S.R.O | 1 |
| KnownHost/PrivateSystems Networks | 1 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|-----|-------------------|
| Lain.la | 2 |
| LBRY INC | 2 |
| LegitScript | 1 |
| LEGO System | 37 |
| Life on Air (Houseparty) | 8,575 |
| Linden Lab (SecondLife) | 30 |
| LinkedIn | 110 |
| Linode | 28 |
| Luftgescheft | 5,270 |
| Marbore Web Solutions Limited | 4 |
| Marinus Analytics (Traffic Jam) | 9 |
| Match Group | 158 |
| Medal.tv | 26 |
| MediaFire | 3,506 |
| MediaLab (Kik) | 33,619 |
| Medium | 113 |
| MeetMe | 2,930 |
| MeWe | 1,444 |
| MG Freesites | 16 |
| MG Freesites (Pornhub) | 9,029 |
| MG Freesites (Redtube) | 21 |
| MG Freesites (Tube8) | 6 |
| MG Freesites (Youporn) | 31 |
| Microsoft | 78,603 |
| Microsoft - Xbox | 170 |
| MMGuardian | 54 |
| Momentive | 3 |
| motherless | 3,110 |
| Movie Star Planet | 5 |
| Mozilla Corporation | 2 |
| Multi Media/Zmedianow/Chaturbate | 532 |
| Name.com | 1 |
| NameCheap | 5 |
| National Center on Sexual Exploitation | 14 |
| NEOSOLUT WEB SERVICES | 3 |
| Nexeon Technologies | 8 |
| NextDoor | 2 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| Niteflirt/Phrendly.com/Platphorm | 22 |
| NorfexHoldingsLimited | 7 |
| Northlock Holdings Limited | 2 |
| Notion Labs | 1 |
| Novi | 1 |
| OfferUp | 1 |
| Okcupid | 178 |
| Omegle | 46,924 |
| Orbiseen s.r.o | 2 |
| Outschool | 1 |
| OVH US | 25 |
| Padlet/Wallwisher/Cloudfront | 235 |
| Patook | 2 |
| Patreon | 37 |
| PayPal | 970 |
| People Media | 1 |
| Photobucket | 10 |
| PicsArt | 316 |
| Pinger | 2 |
| Pinterest | 2,283 |
| PocketStars | 1 |
| Pokemon | 2 |
| Porkbun | 1 |
| PORTICATO MEDIA | 13 |
| ProBoards | 5 |
| Public Interest Registry | 183 |
| Quora | 25 |
| RealNetworks | 4 |
| Redbubble | 41 |
| Reddit | 10,059 |
| Redgifs | 87 |
| Reflected Networks | 124 |
| RingCentral | 1 |
| Roblox | 4,684 |
| Scratch Foundation | 20 |
| Scruff App (Perry Street Software) | 19 |
| sendvid | 703 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---|
| SimilarWorlds | 94 |
| Skout | 1,203 |
| Slack Technologies | 1,263 |
| SmugMug-Flickr | 1,169 |
| Smule | 2 |
| Snapchat | 512,522 |
| Sniffies | 9 |
| Softlayer | 1 |
| Sohosolutions | 2 |
| Sony Interactive Entertainment | 2,071 |
| Spotify USA | 258 |
| Squarespace | 1 |
| StackPath/Highwinds | 4 |
| Stanford Internet Observatory | 1 |
| StarNow | 1 |
| Stelivo | 2,034 |
| Stolichnaq | 29 |
| Streamable | 90 |
| Streamate | 16 |
| Stripe | 1 |
| Sykes | 2 |
| SynaptiCAD | 31 |
| Synchronoss Technologies | 3,472 |
| Tagged | 5,504 |
| Take-Two Interactive Software | 3 |
| TECH MEDIALAND KFT | 1 |
| The Walt Disney Company | 1 |
| Thorn | 114 |
| ThumbSnap | 308 |
| Thumbtack | 1 |
| TikTok | 154,618 |
| Tinder | 3,642 |
| Toontown Rewritten | 12 |
| Tropical Sun (Clips4Sale) | 2 |
| Tsu | 18 |
| Tumblr | 4,511 |
| Twitch | 6,629 |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Number of Reports |
|---|---:|
| Twitter | 86,666 |
| Uncharted Software | 18 |
| Various/FriendFinder/Tangotime | 26 |
| Veoh Networks | 1 |
| VeriSign | 341 |
| Verizon Online | 50 |
| Verizon Wireless | 5 |
| Vero Labs | 177 |
| Vimeo | 360 |
| Vistaprint | 2 |
| Visual Supply Company | 34 |
| Voice | 1 |
| Vokal (First Media) | 130 |
| Web.com/Network Solutions/ Register/NameBargain | 3 |
| Weebly | 4 |
| WhatsApp | 1,372,696 |
| Whisper | 1 |
| Wickr | 15 |
| Wikimedia Foundation | 8 |
| Wildlife Studios | 84 |
| WildWorks (AnimalJam) | 8 |
| Wink | 108 |
| Wixpress (Wix) | 1 |
| WordPress.com (Automattic) | 310 |
| x-up.ws | 636 |
| Yahoo! | 5,485 |
| Younow | 1,001 |
| Yubo | 885 |
| ZeroFox | 1 |
| Zoom Video Communications | 548 |
| Zvelo | 1 |
| **Total:** | **29,157,083** |

Copyright © 2022 National Center for Missing & Exploited Children. All rights reserved.

# EXHIBIT 14



# 2022 CyberTipline Reports by Electronic Service Providers (ESP)

NCMEC's CyberTipline is the nation's centralized reporting system for the online exploitation of children, including child sexual abuse material, child sex trafficking and online enticement. In 2022, the CyberTipline received more than 32 million reports. More than 31.8 million of the these reports were from Electronic Service Providers that report instances of apparent child sexual abuse material that they become aware of on their systems.

U.S. based ESPs are legally required to report instances of "apparent child pornography" to the CyberTipline when they become aware of them, but there are no legal requirements for proactive efforts to detect this content or what information an ESP must include in a CyberTipline report. As a result, both the volume and content of reports can vary greatly. Higher numbers may indicate robust efforts to identify and remove abusive content. NCMEC encourages all companies to make identifying and reporting this content a priority. For more information about reports made in 2022, visit MissingKids.org/CyberTiplineData.

The following is a breakdown of reports by electronic service providers.

| ESP | Reports |
| --- | --- |
| 4chan | 1,374 |
| 4shared | 631 |
| 7web | 3,628 |
| 9Cloud / luscious | 80 |
| Absolute Software Corporation | 1 |
| Adobe Systems Incorporated | 1,939 |
| Affinity Apps, LLC | 270 |
| Afilias USA | 144 |
| Airbnb, Inc. | 41 |
| Airtime Media Inc. | 8 |
| Alpha Exploration Co, Inc (d/b/a "Clubhouse") | 1,355 |
| Alterweb Kft | 9 |
| Amazon | 106 |
| Amazon Photos | 55,543 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
| --- | --- |
| Amino Apps | 178 |
| Ancestry.com | 1 |
| animebw | 38 |
| Antheia Services Limited | 2 |
| Apple Inc | 234 |
| Apricot Digitals LLC | 131 |
| Arctic Wolf Networks, Inc. | 2 |
| Ariemgroup Limited | 19 |
| Ask.fm | 26 |
| Asurion Corporation | 1 |
| Badoo | 2,024 |
| Bark Technologies Inc | 265 |
| BigBang Media, LLC | 625 |
| Box , Inc. / Box.com | 2,407 |
| Brainly, Inc | 5 |
| Bublup, Inc. | 21 |
| Bumble | 182 |
| Canva | 1 |
| Chatango LLC | 6 |
| CloudFlare, Inc | 7,901 |
| Coinbase | 32 |
| Comcast Cable Communications, LLC | 7 |
| CounterSocial | 4 |
| Depop Ltd | 1 |
| deviantART Inc. | 11 |
| Digital Nomad, Ltd | 11,854 |
| Digital Ocean | 188 |
| Discord Inc. | 169,800 |
| Display Social, Inc. | 25 |
| Dreamstime.com, LLC | 1 |
| Dropbox, Inc. | 45,992 |
| Easynews / Newshosting / Usenetserver | 32 |
| EasyOnlineSolutions/MojoHost/ North Tone/ Hosthead | 66 |
| Ebay Inc. | 63 |
| Edgecast Networks Inc | 2 |
| Electronic Arts | 1 |
| Ello.co | 2 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
|---|---|
| Endurance Int'l Group, Inc. | 27 |
| Enom | 86 |
| Etsy, Inc. | 6 |
| Facebook | 21,165,208 |
| Fenix International Limited (OnlyFans) | 310 |
| Forward Handle, LLC | 25,042 |
| Fotoloce | 19 |
| Fracture | 2 |
| FreeDNS.Afraid.org | 3 |
| Frontier Communications of America, Inc. | 2 |
| Gaggle.Net, Inc. | 3,872 |
| gayboystube | 6,506 |
| Get Together, Inc. (d.b.a IRL) | 19 |
| GF Networks Ltd | 4 |
| Giphy.com | 438 |
| GitHub | 6 |
| Globtech LLC | 1,448 |
| GoDaddy.com/Wild West Domains | 52 |
| GoGuardian | 6 |
| Google | 2,174,548 |
| Grindr | 22,819 |
| Guilded LLC | 1,461 |
| Gumroad | 1 |
| Hacker Factor | 378 |
| Haschek Solutions | 5 |
| HER App | 12 |
| Hinge.co | 21 |
| Hopin Ltd. | 111 |
| Hosting Services Inc/Midphase/WestHost/Autica/VPS | 15 |
| HowlogicKFT | 24 |
| IAC / excite / myway / zwinky / mindspark | 1 |
| Identity Digital Inc. | 61 |
| Imagebam/ Flixya Entertainment/ videobam | 12,886 |
| Imgur, LLC | 64,211 |
| IMVU, inc. | 103 |
| Indeed, Inc | 3 |
| InfraWeb Solution Limited | 82 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
| --- | --- |
| INHOPE | 81,150 |
| Instagram, Inc. | 5,007,902 |
| Internap Corporation (INAP) | 12 |
| Internet Archive | 185 |
| Interspace Technologies (Byte) | 4 |
| Intrado Interactive Services Corporation | 110 |
| Izeo Dating Ltd | 1 |
| JMS Internet, Inc. | 33 |
| JNJ Mobile, Inc, d/b/a MocoSpace | 8 |
| JustAnswer | 1 |
| Kaleton Web S.R.O | 43 |
| Lain.la | 14 |
| LegitScript, LLC | 1 |
| LEGO System A/S | 30 |
| Life on Air Inc/Houseparty | 1 |
| Lightspeed Systems | 38 |
| Linden Lab/ SecondLife | 37 |
| LinkedIn Corporation | 201 |
| Linode LLC | 18 |
| Marbore Web Solutions Limited | 19 |
| Marinus Analytics LLC / Traffic Jam | 11 |
| Match Group, LLC | 7 |
| Medal.tv | 31 |
| MediaFire | 2,947 |
| MediaLab/Kik | 36,801 |
| Medium | 2 |
| MeetMe.com (fka myYearbook.com) | 2,972 |
| Megapersonals | 281 |
| MeWe | 1,355 |
| MG Freesites Ltd | 91 |
| MG Freesites Ltd (dba Pornhub) | 1,996 |
| MG Freesites Ltd (dba Redtube) | 6 |
| MG Freesites Ltd (dba Youporn) | 2 |
| Microsoft - Online Operations | 107,274 |
| Microsoft- other products | 138 |
| Microsoft - Xbox | 1,185 |
| Milada Ltd. | 3 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
|---|---|
| MMGuardian | 12 |
| Momentive Inc. | 2 |
| motherless | 1,906 |
| Movie Star Planet | 6 |
| Multi Media, LLC/Zmedianow, LLC/Chaturbate | 1,149 |
| My Free Cams | 1 |
| Name.com | 3 |
| NameCheap.com | 22 |
| National Center on Sexual Exploitation | 10 |
| NEOSOLUT WEB SERVICES LTD | 17 |
| New Meta AB | 21 |
| Nexeon Technologies | 12 |
| NextDoor, Inc | 1 |
| Niantic Labs | 1 |
| Niteflirt / Phrendly.com / Platphorm, LLC | 17 |
| Norfex Services Ltd | 2 |
| Notion Labs, Inc. | 5 |
| Novi | 3 |
| Okcupid.com - Humor Rainbow, Inc. | 2,126 |
| Omegle.com LLC | 608,601 |
| OpenSea | 28 |
| OVH US LLC | 13 |
| Padlet | 19 |
| Patook LLC | 2 |
| Patreon | 113 |
| PayPal Inc. | 1,137 |
| Photobucket.com | 14 |
| PicsArt | 549 |
| Pinterest Inc. | 34,310 |
| Pixshare.de/Pixshare.org | 3 |
| PocketzWorld Inc | 4 |
| Porkbun LLC | 2 |
| PORTICATO MEDIA LTD | 8 |
| Public Interest Registry | 121 |
| Quora | 2,242 |
| Ravex Web s.r.o. | 7 |
| RealNetworks, Inc. | 7 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
|---|---|
| Redbubble Inc. | 118 |
| Reddit, Inc. | 52,592 |
| Redgifs.com | 470 |
| Reflected Networks, Inc | 80 |
| Replit Inc | 3 |
| Roblox | 2,973 |
| Saturn Technologies | 7 |
| Scratch Foundation | 81 |
| Scruff App/Perry Street Software, Inc | 16 |
| Securly | 32,662 |
| Select Media LLC (Fansly) | 2 |
| sendvid | 264 |
| SimilarWorlds | 212 |
| Skout.com | 489 |
| Skynet | 309 |
| Slack Technologies, Inc. | 911 |
| SmugMug-Flickr | 802 |
| Snapchat | 551,086 |
| Sniffies, LLC | 139 |
| Sony Interactive Entertainment | 4,102 |
| Spotify USA Inc. | 213 |
| Squarespace, Inc. | 1 |
| SR LIMNATIS HOLDINGS LTD Hungarian Branch Office | 3 |
| Stelivo, LLC | 1,003 |
| Streamable, Inc | 1,095 |
| Streamate | 4 |
| Substack, Inc | 11 |
| SynaptiCAD, Inc | 156 |
| Synchronoss Technologies, Inc | 30,903 |
| Tagged.com | 2,991 |
| Take It Down | 18 |
| Take-Two Interactive Software, Inc | 3 |
| The Rocket Science Group, LLC d/b/a MailChimp | 1 |
| The Walt Disney Company | 2 |
| Thorn | 59 |
| ThumbSnap | 1,133 |
| Thumbtack | 1 |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

| ESP | Reports |
|---|---|
| TikTok Inc. | 288,125 |
| Tinder, Inc. | 1,518 |
| TMTG, Corp. | 89 |
| Toontown Rewritten | 1 |
| TrevorSpace | 1 |
| Tropical Sun, Ltd. d/b/a Clips4Sale.com | 9 |
| Tsu, Inc | 6 |
| Tumblr | 4,845 |
| Twitch Interactive, Inc. | 14,508 |
| Twitter, Inc. | 98,050 |
| UNDECAGON Kft. | 29 |
| Upwork | 1 |
| Various, Inc. / FriendFinder/ Tangotime | 19 |
| VeriSign, Inc. | 525 |
| Verizon Online - Account #2 (External) | 30 |
| Verizon Wireless | 3 |
| Vero Labs, Inc. | 469 |
| Vimeo LLC | 368 |
| Visual Supply Company | 54 |
| Vokal (First Media) | 185 |
| Weebly, Inc. | 3 |
| WhatsApp Inc. | 1,017,555 |
| Wickr Inc. | 48 |
| Wikimedia Foundation Inc. | 29 |
| Wildlife Studios | 52 |
| WildWorks, Inc. / AnimalJam | 9 |
| Wink | 78 |
| WordPress.com/Automattic | 190 |
| x-up.ws | 709 |
| Xymara Ltd | 1 |
| Yahoo! Inc | 3,639 |
| Yelp Inc. | 2 |
| YikYak | 17 |
| Younow.com | 2 |
| Yubo | 1,821 |
| Zoom Video Communications, Inc | 136 |
| Zvelo | 1 |
| **Total** | **31,802,525** |

Copyright © 2023 National Center for Missing & Exploited Children. All rights reserved.

# EXHIBIT 15

Source: https://www.statista.com/statistics/545967/snapchat-app-dau/

### Daily active users of Snapchat 2014-2023

Published by S. Dixon, May 2, 2023

As of the first quarter of 2023, photo and video sharing app Snapchat had 383 million daily active users worldwide, up from 375 million global DAU in the fourth quarter of 2022. The app has seen steady increases in daily active users since the beginning of 2019.

### Snapchat is relevant for teenagers

Originally launched in 2011, Snapchat has become one of the most popular social messaging and photo sharing apps worldwide;

## Number of daily active Snapchat users from 1st quarter 2014 to 1st quarter 2023

*(in millions)*



ⓘ Additional Information

© Statista 2023 🏴

Show source ⓘ

**Source**
→ Show sources information → Show publisher information
→ Use Ask Statista Research Service

**IN COOPERATION WITH**
Snap Inc.

**Release date**
April 2023

**Region**
Worldwide

**Survey time period**
Q1 2014 to Q1 2023

**Special properties**
quarterly average

**Supplementary notes**
According to the source: "We define a Daily Active User, or DAU, as a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period. We calculate average Daily Active Users for a particular quarter by adding the number of DAUs on each day of that quarter and dividing that sum by the number of days in that quarter."

**Open this statistic in...**

   Spanish

**Citation formats**

➡  View options

# EXHIBIT 16



# Snap Inc.
# Law Enforcement Guide

*Last Updated: September 29, 2020*

Download the most recent version at https://www.snapchat.com/lawenforcement

## Contact Information for Law Enforcement

**Sending Legal Process and Related Inquiries**

U.S. law enforcement and governmental agencies should submit legal process (including preservation requests) to Snap Inc. ("Snap") via Snap's Law Enforcement Service Site: less.snapchat.com.

- From there, U.S. law enforcement and governmental agencies can create an account for the purpose of submitting requests and checking the status of submissions.

We also accept service of legal process and general questions from law enforcement via email or mail.

**Email:**    lawenforcement@snapchat.com

**Mail:**    Custodian of Records
Snap Inc.
2772 Donald Douglas Loop
North  Santa Monica, CA 90405

Receipt of law enforcement requests by these means is for convenience only and does not waive any objections or legal rights of Snap or Snapchat users. We will not respond to correspondence from non-law enforcement or non-governmental officials submitted through the channels described above.

## Emergency Disclosure Requests

U.S. law enforcement officials seeking the emergency disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via Snap's Law Enforcement Service Site: less.snapchat.com.

Non-U.S. law enforcement officials seeking the emergency disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via: https://lawenforcement.snapchat.com/emergency.

**Note:** The Law Enforcement Emergency Response Form is for use only by sworn law enforcement officials requiring emergency assistance regarding a threat of imminent death or serious bodily injury. All other inquiries from law enforcement must be directed to lawenforcement@snapchat.com.

# Table of Contents

I.  Snap and Law Enforcement Overview                                          1

II.  Snap User Notice Policy                                                    2

III.  How Snapchat Works                                                        3

IV.  Identifying a Snapchat Account                                             5

V.  Required Legal Process                                                      7

VI.  Preservation Requests                                                     10

VII.  Emergency Disclosure Requests                                            11

VIII.  Testimony                                                               11

IX.  Sample Language for Legal Process and Preservation Requests               12

# I. Snap and Law Enforcement Overview

Snapchat is a mobile application made by Snap Inc. ("Snap") and available through the iPhone App Store and Google Play Store. The Snapchat app provides users a way to share moments with photos, videos, and chats.

This guide provides information for law enforcement officials seeking Snapchat account records (i.e., Snapchat user data) from Snap.

## U.S. Legal Process Requirements

Snap discloses Snapchat account records solely in accordance with our Terms of Service, the Stored Communications Act, 18 U.S.C. § 2701, et seq. ("SCA"), and other applicable laws. The SCA mandates that we disclose certain Snapchat account records only in response to specific types of legal process, including subpoenas, court orders, and search warrants. Generally, the SCA authorizes U.S. law enforcement and governmental entities to compel us to disclose basic subscriber information, non-content account information, and account content (as described in Section V "Required Legal Process" below) in response to appropriate legal process.

## International Legal Process Requirements

Non-U.S. law enforcement and governmental agencies generally must rely on the mechanics of the Mutual Legal Assistance Treaty ("MLAT") or letters rogatory processes to request Snapchat account records from Snap. As a courtesy to non-U.S. law enforcement, we will review and respond to properly submitted preservation requests (see Section VI "Preservation Requests" below) while the MLAT or letters rogatory process is undertaken. Snap may, at its discretion, provide limited Snapchat account records to law enforcement and governmental agencies outside of the U.S. on an emergency basis when we believe that doing so is necessary to prevent imminent death or serious bodily injury to someone.

## Support for Law Enforcement

Because Snap is committed to assisting law enforcement investigations as the law requires, we provide email support to law enforcement agencies for non-emergency matters, and 24-hour online support for emergency situations involving the threat of imminent death or serious bodily injury. Contact information for our Law Enforcement Operations team is provided on the cover of this Guide.

Please note that Snap cannot provide legal advice to law enforcement. If you need clarification about the SCA's restrictions on providers like Snap, please contact the U.S. Department of Justice's Computer Crime and Intellectual Property Section ("CCIPS").

# II. Snap User Notice Policy

Snap's policy is to notify our Snapchat users when we receive legal process seeking the disclosure of their records. Before we respond to the legal process, we allow affected users to challenge the legal process in court and to provide us a file-stamped copy of the challenge.

We recognize two exceptions to this policy. First, we will not notify users of legal process where providing notice is prohibited by a court order issued under 18 U.S.C. § 2705(b) or by other legal authority. Second, where we, in our sole discretion, believe an exceptional circumstance exists — such as cases involving child exploitation or the threat of imminent death or serious bodily injury — we reserve the right to forgo user notice.

To minimize delays related to our user notice policy, law enforcement can take one of the following steps, if applicable:

1. Inform us upfront that you have no objection to us notifying the affected user(s) of your legal process. This saves us the step of notifying you of Snap's user notice policy and awaiting your confirmation that you have no objection.

2. Provide a court order issued in accordance with 18 U.S.C. § 2705(b) that prohibits Snap from providing notice to the affected user(s).

3. Provide a valid legal basis that prohibits Snap from providing notice to the affected user(s).

4. Inform us that your case involves child exploitation, or the threat of imminent death or serious bodily injury, and provide a sufficient factual basis for Snap to independently make that determination.

# III. How Snapchat Works

The following is an overview of how the Snapchat app works. The most up-to-date (and additional) information is available on the Snapchat Support Site at: support.snapchat.com.

## Snaps

Snaps are photos or videos taken using the Snapchat app's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat.

Snap's servers are designed to automatically delete a Snap after it has been opened by all intended recipients. Snap's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

## Stories

A user can add Snaps to their "Story". A Story is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience. A user can also submit their Snaps to our crowd-sourced service "Our Story", which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map.

Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the Snap, but the user may delete part or all of the Story earlier. Submissions to Our Story may be saved for longer periods of time.

## Memories

Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

**Chat**

A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature. Our servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings.

Snap's servers are designed to automatically delete unopened one-to-one chats in 30 days. Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not. A user can save a message in Chat by pressing and holding the message. The user can unsave the message by pressing and holding it again. This will delete it from our servers. Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

**Location Data**

If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings.

# IV. Identifying a Snapchat Account

Before sending us legal process seeking the disclosure of Snapchat account records (i.e., Snapchat user data), law enforcement must first identify the **username** of the Snapchat account. ***Note:*** *a Snapchat account's username is often confused with an account's display name (also referred to as a "vanity name"). We cannot locate a Snapchat account by a display name.*

## Snapchat Username

A Snapchat username is a unique identifier associated with a specific Snapchat account, and it cannot be changed by the user. A Snapchat display name, on the other hand, is not a unique identifier and can be created and changed by a user to indicate how the user will appear within the app. A user can also change a friend's display name to determine how that friend will appear to that particular user on the app, similar to how one can customize contact names on a smartphone.

Snapchat username attributes:

- Must be 3-15 characters long
- Must begin with a letter
- Can only contain letters, numbers, and the special characters hyphen ( - ), underscore ( _ ), and period ( . )
- Cannot end with a hyphen, underscore, or period
- Cannot contain spaces
- Cannot contain emojis or other symbols such as @, $, #, etc.
- Will appear only in lower-case letters within the app

Unlike a username, a display name can contain special characters and symbols beyond hyphen, underscore, or period, as well as spaces, emojis, and capital letters.

*Example of Snapchat username and display name:*



(A user's profile like the example above can be accessed in Snapchat by tapping on a user's profile image on the Chat screen or in Search.)

In the Snapchat example above, the **username** is "niknak_111" and the **display name** has been set to "Niki", which appears above the username. Note that there can be only one Snapchat user with the username "niknak_111," but there can be any number of users with the display name "Niki."

If a display name has not been created, the username will appear on its own.

If you are unsure if you have a valid Snapchat account, type the username into the Snapchat Search screen to see if it appears. If the username does not appear, then the username does not exist or the account may have been deleted. ***Note:*** *some deleted Snapchat accounts may still have certain limited account records stored depending on various factors.*

If you are unable to identify a Snapchat username, we can try – with varying degrees of success – to locate a Snapchat account with a phone number or email address if that information was provided by the user for their account. For context, Snap does not require Snapchat users to submit a phone number or email address to create a Snapchat account. Because phone numbers and email addresses can easily be changed by users, this information has historically not been reliable in identifying Snapchat users.

***Note:*** *we are unable to locate Snapchat accounts based on any of the following: Snapchat display name, real name, date of birth, street address, Social Security number, content of Snaps, or similar identifiers.*

# V. Required Legal Process

**Sending Legal Process to Snap**

U.S. law enforcement and governmental agencies should submit legal process (including preservation requests) to Snap via Snap's Law Enforcement Service Site: less.snapchat.com.

- From there, U.S. law enforcement and governmental agencies can create an account for the purpose of submitting requests and checking the status of submissions.

Although we accept service of legal process from law enforcement by email to lawenforcement@snapchat.com, and via U.S. mail and overnight courier services delivered to the address provided on the cover of this Guide, our response time will be significantly slower. **Note:** we do <u>not</u> utilize fax service and are unable to accept service of legal process by fax.

**Legal Process Requirements Overview**

Snap discloses Snapchat account records (i.e., Snapchat user data) to law enforcement on a non-emergency basis only if we receive legal process that fully complies with the law. The legal process should be submitted on a non-editable static file (such as PDF), name "Snap Inc." as the Custodian of Records, and be signed and dated. To facilitate a response when requesting records regarding more than one Snapchat account (e.g., multiple usernames), such requests should be contained in a single piece of legal process (e.g., one subpoena).

**Note:** we are unable to respond to legal process seeking the disclosure of records regarding more than <u>10</u> Snapchat accounts unless we are provided with <u>an additional copy</u> of your request in an editable format (such as DOCX or TXT).

When providing legal process requesting the disclosure of Snapchat account records, please specify the following:

- Snapchat username, email address, or phone number (see Section IV "Identifying a Snapchat Account" above)
  - o **Note:** law enforcement must include the international calling code if specifying a non-U.S. phone number.
- The specific type of data requested (see below)
- Any applicable timezone
  - o **Note:** available Snapchat account records disclosed by Snap are provided in Coordinated Universal Time ("UTC").
- Any applicable due date
- Response contact information (including a governmental email address)
- If you object to us notifying affected users and why (see Section II "Snap User Notice Policy" above)

The required legal process varies depending on the type of Snapchat account records you are requesting, as described below. Please also see Section VI below regarding preservation requests.

## Basic Subscriber Information

Basic subscriber information is collected when a user creates a new Snapchat account, alters information at a later date, or otherwise interacts with the Snapchat app. Basic subscriber information may include:

- Snapchat username
- Email address
- Phone number
- Snapchat display name
- Snapchat account creation date and IP address
- Timestamp and IP address of Snapchat account logins and logouts

**Note:** not all information listed above is required for a user to use the Snapchat app, and Snap does not independently verify user-provided subscriber information.

The basic subscriber information entered by a user when creating a Snapchat account is maintained as long as the user has not edited the information or removed the information from the account. Once the user makes a change, the previously existing information is overwritten. Upon receipt of a preservation request (see Section VI below), however, we can attempt to capture the basic subscriber information available at that time; and future actions by the user will not affect the preserved records. We also retain logs containing IP addresses associated with Snapchat account logins and logouts for a limited period of time after a user has deleted their Snapchat account.

**Legal process required for basic subscriber information:** law enforcement can obtain basic subscriber information through a subpoena (including one issued by a grand jury) pursuant to 18 U.S.C. § 2703(c)(2); a court order issued in accordance with 18 U.S.C. § 2703(d); or a federal or state search warrant.

## Logs of Previous Snaps, Stories, and Chats

Logs contain metadata about a user's Snaps, Stories, and Chats, but not the user's content.

**Legal process required for logs:** law enforcement can obtain logs of previous Snaps, Stories, and Chats pursuant to a court order issued in accordance with 18 U.S.C. § 2703(d), or a federal or state search warrant.

## Location Data

Location data may be available for a Snapchat user who has turned on location services on their device and opted into location services in the Snapchat app settings.

**Legal process required for location data:** law enforcement can obtain location data, to the extent available, pursuant to a federal or state search warrant.

## Content

Because Snap's servers are designed to automatically delete most user content as described in Section III "How Snapchat Works" above, and because much of a user's content is encrypted, we often cannot retrieve user content except in very limited circumstances. Memories content may be available until deleted by a user. My Eyes Only content is encrypted, and although we can provide the data file, we have no way to decrypt the data.

**Legal process required for content:** law enforcement can obtain content, to the extent available, pursuant to a federal or state search warrant.

# VI. Preservation Requests

Because Snapchat user data is not retained for a long period of time, it is important that law enforcement understands the concept of preservations and why it is important to request them.

A preservation is a snapshot in time of a user's data, including basic subscriber information, metadata (usage logs) and content (Chats, Snaps, Stories, and Memories). As referenced earlier, Snap retains different types of user data for different periods of time. It is likely that law enforcement would want Snap to make a preservation as soon as possible after an alleged incident for which it seeks evidence.

We honor formal requests from law enforcement to preserve information in accordance with 18 U.S.C. § 2703(f). Upon receiving a signed and dated preservation request on law enforcement department letterhead, we will attempt to preserve available Snapchat account records associated with any properly identified Snapchat user(s) (see Section IV "Identifying a Snapchat Account" above) in an offline file for up to 90 days, and will extend the preservation for one additional 90-day period with a formal extension request.

If you require an extension, submit a formal signed and dated preservation **<u>extension</u>** request on law enforcement department letterhead. The request needs to stipulate that it is an extension request and <u>not</u> an original preservation request.

**Note:** 18 U.S.C. § 2703(f) does not contemplate 'serial' preservation requests or multiple extension requests beyond one additional 90-day period. Accordingly, we do not comply with such requests.

# VII. Emergency Disclosure Requests

U.S. law enforcement officials seeking the emergency disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via Snap's Law Enforcement Service Site: less.snapchat.com.

Non-U.S. law enforcement officials seeking the emergency disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via: https://lawenforcement.snapchat.com/emergency.

Emergency disclosure requests must be submitted by a sworn law enforcement official and must come from an official law enforcement (or governmental) email domain. When submitting an emergency disclosure request, please provide the Snapchat username (see Section IV "Identifying a Snapchat Account" above) or associated phone number or email address, describe the nature of the emergency as specifically as possible, and specify the information that you are seeking to resolve the emergency situation.

Consistent with 18 U.S.C. §§ 2702(b)(8) and 2702(c)(4), we are able to voluntarily disclose Snapchat account records when we believe in good faith that an emergency posing a threat of imminent death or serious bodily injury requires the immediate disclosure of such records.

# VIII. Testimony

Records disclosures made to U.S. law enforcement will be accompanied by a signed Certificate of Authenticity, which should eliminate the need for the testimony of a Custodian of Records.

Snap does not provide expert witness testimony.

# IX. Sample Language for Legal Process and Preservation Requests

This section provides sample language that law enforcement may use to request the disclosure of basic subscriber information or logs of previous Snaps, or the preservation of Snapchat account records. As a reminder, legal process and preservation requests must be addressed to Snap Inc. and sent from an official governmental email address.

## Sample Language to Request Basic Subscriber Information

"Basic subscriber information for the Snapchat account(s) associated with the username(s) _____ consisting of the email address, phone number, account creation date, and timestamps and IP address for account logins/logouts."

## Sample Language to Request Logs of Previous Snaps

"Logs, including sender, recipient, date, and time, concerning the previous Snaps sent to or from the Snapchat account(s) with the username(s) _____."

## Sample Preservation Request Letter

(Must be on law enforcement department letterhead, dated, and signed.)

Dear Custodian of Records:

The below listed account(s) is(are) the subject of an ongoing criminal investigation at this agency, and it is requested pursuant to 18 U.S.C. § 2703(f) that records associated with said account(s) be preserved pending the issuance of a search warrant or other legal process seeking disclosure of such information:

[Specify Snapchat account username(s) or associated email address(es) or phone number(s) to be preserved (See Section IV, above).]

I understand that Snap Inc. reserves the right to delete any account that violates its Terms of Service.

If you have any questions concerning this request please contact me at [insert email address and phone contact].

Sincerely,

(Your Signature)
(Your Name and Title Typed)

# EXHIBIT 17

# Snap Inc. Law Enforcement Guide

Last Updated: November 1, 2022

Download at: https://www.snapchat.com/lawenforcement

## Welcome

This operational Guide is provided for members of U.S. and non-U.S. law enforcement (including appropriate government officials) who are seeking to request the preservation or disclosure of Snapchat account records (*i.e.*, Snapchat user data) from Snap Inc. ("Snap").

Among other information, this Guide provides details regarding the possible availability of Snapchat account records, the type of legal process required to compel disclosure of that data, and how to reach our Law Enforcement Operations Team.

To learn more about our Global Safety Operations and how we work with Law Enforcement to keep our platform safe, please follow our Safety and Impact Blog.

To locate safety resources that can be shared with schools, students and parents, please visit our Safety Center.

## Contact Information for Law Enforcement

Sending Legal Process, Preservation Requests, and Related Inquiries

U.S. law enforcement and governmental agencies should submit legal process and preservation requests to Snap via Snap's Law Enforcement Service Site ("LESS"): less.snapchat.com.

We strongly encourage all members of U.S law enforcement and governmental agencies who have not yet requested access to LESS to do so as it also provides you the ability to check on the status of your submissions. To get started, visit https://less.snapchat.com/ and submit your government-issued email address. You will then receive an email from no_reply@snapchat.com to your government-issued email address with a link to the Law Enforcement Service System. Please note that the account creation process may take some time as we verify registrants for security purposes, but you may continue to communicate with us via lawenforcement@snapchat.com until your account has been created.

We are currently working to introduce LESS to designated single-point-of-contact (SPOC) members of non-U.S. law enforcement. If LESS has already been introduced in your location, please note that it is the optimal method by which to communicate with Snap.

If you do not yet have access to LESS, we can accept service of legal process and preservation requests – and receive general questions – from members of law enforcement via email (from an official government email domain only) to lawenforcement@snapchat.com. Please note that we do not accept service of process or respond to questions from private email domains (e.g., Gmail, Yahoo).

Receipt of law enforcement requests by the means listed above is for convenience only and does not waive any objections or legal rights of Snap or Snapchat users.

Snap is prohibited by California law from responding to legal process relating to alleged violations of laws that create liability for, or arise out of, providing, facilitating, or obtaining an abortion or intending or attempting to provide, facilitate, or obtain an abortion that is lawful under California law.  Accordingly, please be advised that Snap does not accept such legal process through the means described above.

Please note that we will not respond to correspondence from non-law enforcement or non-governmental officials submitted through the channels described above.


Emergency Disclosure Requests

Members of law enforcement (including appropriate government officials) seeking the *emergency* disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via Snap's Law Enforcement Service Site: https://less.snapchat.com/emergency.

Please note that you do not need a LESS account to submit an Emergency Disclosure Request through LESS, although members of law enforcement who already have LESS accounts may also access the Emergency Disclosure Form by first signing in to their LESS account here: https://less.snapchat.com/.

When submitting an Emergency Disclosure Request to Snap, you will be prompted to provide information regarding the nature of the emergency that is causing you to seek immediate disclosure rather than relying on standard legal process. Please be specific about the nature of the emergency and the way it is related to an imminent risk of death or serious bodily injury . Specific details are needed to ensure we have all the information legally required when reviewing and processing of your request.  (See 18 U.S.C. §§ 2702(b)(8), (c)(4).) We therefore ask that you provide as much information as possible about the nature and recency of the

emergency, the identity of the individual who is threatened, and how the Snapchat information sought will address the emergency.

*Important Note:* The Law Enforcement Emergency Response Form is for use <u>only by sworn law enforcement (or other appropriate) officials</u> requiring emergency assistance regarding a <u>threat of imminent death or serious bodily injury</u>. Please note that it may be a crime in the United States and other countries to pretend to be or to impersonate a law enforcement official. Non-urgent inquiries submitted via the Law Enforcement Emergency Response Form will receive a response redirecting the request to the above-described submission process for non-urgent requests (*e.g.*, LESS or <u>lawenforcement@snapchat.com</u>).

# Table of Contents

I. Snap and Law Enforcement Overview                                    1

II. Snap User Notice Policy                                             7

III. How Snapchat Works                                                 8

IV. Identifying a Snapchat Account                                      10

V. Required Legal Process                                              13

VI. Preservation Requests                                              16

VII. Emergency Disclosure Requests                                     17

VIII. Testimony                                                        17

IX. Sample Language for Legal Process and Preservation Requests        18

# I. Snap and Law Enforcement Overview

Snapchat is a visual messaging app made by Snap Inc. ("Snap") that enhances relationships with friends, family, and the world. Snapchat empowers people to express themselves, live in the moment, learn about the world, and have fun together. Snapchat is available as a mobile and web application; the mobile app is available through the iPhone App Store and Google Play Store, while the web application can be accessed at web.snapchat.com.

This Guide provides information for law enforcement officials seeking Snapchat account records (*i.e.*, Snapchat user data) from Snap. While we make every effort to keep this Guide up-to-date, please note there may be new products or features launched after this update which are not addressed below. Questions that are not addressed in this Guide may be sent to lawenforcement@snapchat.com.

## U.S. Legal Process Requirements

Snap discloses Snapchat account records solely in accordance with our Terms of Service, the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* ("SCA"), and other applicable laws. The SCA mandates that we disclose certain Snapchat account records only in response to specific types of legal process, including subpoenas, court orders, and search warrants. Generally, the SCA authorizes U.S. law enforcement and governmental entities to compel us to disclose basic subscriber information, non-content account information, and account content (as described in Section V "Required Legal Process" below) in response to appropriate legal process. Snap requires a valid order under the Pen Register Act, 18 U.S.C § 3121, *et seq.*, or the Wiretap Act, 18 U.S.C. § 2510, *et. seq.*, or an equivalent state law, in order to provide metadata or content information, respectively, on a prospective basis.

## Non-U.S. Legal Process Requirements

Non-U.S. law enforcement generally must rely on the mechanics of the Mutual Legal Assistance Treaty ("MLAT") or letters rogatory processes to request Snapchat account records from Snap. As a courtesy to non-U.S. law enforcement, we will review and respond to properly submitted preservation requests (see Section VI "Preservation Requests" below).

Snap may, at its discretion, provide limited Snapchat account records to law enforcement and governmental agencies outside the U.S. in response to legal process that is duly authorized in the requesting country and that seeks non-content information such as basic subscriber information and IP data.

Additionally, Snap may, at its discretion and in accordance with the requirements of U.S. law, provide limited Snapchat account records to law enforcement outside of the U.S. on an

*emergency basis* when we believe that doing so is necessary to prevent imminent death or serious bodily injury to someone.

Support for Global Law Enforcement

Snap is committed to assisting law enforcement investigations as the law requires and the safety of Snapchatters and others demands. Therefore, we provide email support to law enforcement agencies for non-emergency matters and 24-hour online support for emergency situations involving the threat of imminent death or serious bodily injury. Contact information for our Law Enforcement Operations Team is provided on Page 1 of this Guide.

Please note that Snap cannot provide legal advice to law enforcement. If you need clarification about the legal restrictions on providers like Snap, please contact the U.S. Department of Justice's Computer Crime and Intellectual Property Section ("CCIPS").

Please also note that Snap cannot provide expert testimony, though we will endeavor, to the best of our ability, to answer questions from law enforcement that are submitted to lawenforcement@snapchat.com.

## II. Snap User Notice Policy

Snap's policy is to notify Snapchatters when we receive U.S. legal process seeking the disclosure of their records. Before we respond to the legal process, and unless otherwise required by law or court order, we allow affected users a period of time to challenge the legal process in court and to provide us a court file-stamped copy of the challenge to the legal process. Snap does not notify users when we are served with preservation requests.

We recognize two exceptions to our user notice policy.

1. We will not notify users of legal process where providing notice is prohibited by a court order issued under 18 U.S.C. § 2705(b) or by other legal authority. Non-disclosure orders must be duly authorized by a judge's signature and must be for a finite duration.

2. We reserve the right to forgo user notice when we, in our sole discretion, believe an exceptional circumstance exists, such as cases involving child exploitation, the sale of lethal drugs, or the threat of imminent death or serious bodily injury.

To minimize delays related to our user notice policy, law enforcement should take one of the following steps:

1. When submitting legal process using LESS, choose the appropriate choice from the dropdown menu to inform us that you have no objection to us notifying the affected user(s) of your legal process. This saves us the step of notifying you of Snap's user notice policy and awaiting your confirmation that you have no objection, which means we can process your request more quickly.

2. Provide a court order issued in accordance with 18 U.S.C. § 2705(b) or state law that prohibits Snap from providing notice to the affected user(s). Ensure that the non-disclosure order is connected to the applicable legal process by some unique identifying information, such as a case number or Snapchat username(s). Please also note we do not recognize the validity of indefinite non-disclosure orders; all orders prohibiting Snap from providing notice to the affected user(s) should include an end date.

3. Inform us of an alternate, valid legal basis that prohibits Snap from providing notice to the affected user(s).

4. Inform us if your case involves child exploitation, the sale of lethal drugs, or the threat of imminent death or serious bodily injury, and provide a sufficient factual basis for Snap to independently make that determination.

## III. How Snapchat Works

The following is an overview of how the Snapchat app works. Snapchat is often introducing new or improved features. The most up-to-date (and additional) product information is available on the Snapchat Support Site at: https://support.snapchat.com.

Please note that the information provided below reflects the default settings of the Snapchat app, but users may opt to change default settings to reduce the retention period of some types of data within the app.

Snaps

Snaps are photos or videos taken using the Snapchat app's camera on an individual's mobile device. Snaps may be shared either directly in a Chat with one or a group of the user's friends, or shared in a Story (explained below).

Snapchatters can save a Snap message by pressing and holding on it to save while viewing or directly after viewing a Snap. After saving a Snap, the Snap will appear in the conversation as Chat Media. (Chat Media is discussed in the Chat section below.)

Snap's servers are designed to automatically delete a shared Snap after it has been opened by all recipients. Please refer to our Support Page for more detailed information about retention of Snaps.

Stories

A user can add Snaps, Memories, or images and video from their device camera roll to their "Story." In general, users can manage their privacy settings so that their Story may be able to be viewed by all Snapchatters, their friends, or a custom audience. Users can also elect to create other types of Stories, or to submit content to the Snap Map or Spotlight. For additional information about Stories, or submitting to the Snap Map or Spotlight, please refer to our Support Site.

Snap's servers are currently designed to automatically delete the content in a user's Story, by default, 24 hours after it is shared on Snapchat, but the user may delete part or all of the Story earlier or they may, in certain instances, change their settings to have the Story visible longer. Submissions to the Snap Map and Spotlight may be saved for longer periods.

Memories

Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their device's camera roll in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may choose to encrypt their content in Memories by saving it in "My Eyes Only," in which case the content is not accessible to Snap and cannot be decrypted by Snap. Please note that because Memories functions as cloud storage, Snap will not provide Memories files in response to legal process that requests interpersonal communications.

Chat

A user can send text and send Snaps in Chat. A user may also send Memories, media uploaded from their device's camera roll, or audio notes (collectively "Chat Media") to friends within the Snapchat app using the Chat feature. Users can Chat one-on-one or in groups. Please refer to this Support Page for more detailed information about retention of Chats. You can read more about how Snapchatters can save and delete chats on this Support Page.

Location Data

If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data from the device at various points during the user's use of Snapchat. Retention periods for location data may vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings. You can learn more about Snap's retention of location data on our Privacy by Product page, specifically in the sections on Location and Snap Map.

# IV. Identifying a Snapchat Account

Before sending Snap legal process seeking the preservation or disclosure of Snapchat account records (*i.e.*, Snapchat user data), law enforcement must first identify the <u>username</u> of the Snapchat account. *Note: a Snapchat account's username is often confused with an account's display name (sometimes also referred to as a "vanity name").* <u>*We cannot locate a Snapchat account by a display name.*</u>

Snapchat Username

A Snapchat username is a unique identifier associated with a specific Snapchat account. Snapchat usernames may be changed by a user once every 365 days; usernames that are no longer in use may not be reassigned to another user. Please note that the decision of a user to change their username does not impact Snap's ability to preserve or disclose available user data pursuant to valid requests specifying either the former or the new username.

Snapchat username attributes:
- Must be 3-15 characters long
- Must begin with a letter
- Can only contain letters, numbers, and the special characters hyphen ( - ), underscore ( _ ), and period ( . )
- Cannot contain more than one of the above special characters
- Cannot end with a hyphen, underscore, or period
- Cannot contain spaces
- Cannot contain emojis or other symbols such as @, $, #, etc.
- Will appear only in lower-case letters within the app

Unlike a username, a display name is not a unique identifier and it can be changed repeatedly by a Snapchatter, which changes how the display name appears to others within the app. Snapchatters can also change how friends' display names appear to them on Snapchat – *i.e.*, customizing the app by assigning a different display name to a friend – , similar to how one can customize contact names on a smartphone. Lastly, a display name can contain special characters and symbols beyond hyphen, underscore, or period, as well as spaces, emojis, and capital letters.

*Example of Snapchat username and display name:*



"Display Name" is not unique. It **cannot** be used to locate a Snapchat account.

"Username" is unique. It **can** be used to locate a Snapchat account.

(A user's profile like the example above can be accessed in Snapchat by tapping on a user's profile image on the Chat screen or in Search.)

In the example above, the username is "milliemanillie," and the display name has been set to "Millie M," which appears above the username. Note that there can be only one Snapchatter with the username "milliemanillie" but there can be multiple Snapchatters with the display name "Millie M."

If a display name has not been created, one will not appear above the username.

If you are unsure if you have identified a valid Snapchat username, type the username into the Snapchat app "Search" screen to see if it appears. If the username does not appear, then the username does not exist or the account may have been deleted. *Note: some deleted Snapchat accounts may still have certain limited account records stored depending on various factors.*

If you are unable to identify a Snapchat username, we can try to locate a Snapchat account with a current phone number (including country code) or email address if that information was provided by the user for their account. Phone numbers and email addresses can easily be changed by users, so this information is not as reliable in identifying Snapchat users. Please also note that Snapchatters are not required to maintain a verified phone number or email address on their account.

Accounts may also be identified by the account's hexadecimal User ID. If specifying a User ID, please submit with the characters in the 8-4-4-4-12 format, which is how such identifiers appear in Snap's systems.

*Note:* *We are unable to locate Snapchat accounts based on any of the following: Snapchat display name, real name, date of birth, street address, Social Security number, or similar identifiers, even if displayed as "profile information" or "profile media." Nor can we locate accounts based on content or other media, or geographic location of a user at a given time.*

# V. Required Legal Process

## Sending Legal Process to Snap

As explained on page 1 under "Contact Information for Law Enforcement," all law enforcement and governmental agencies who have access to Snap's Law Enforcement Service Site (LESS: less.snapchat.com) should submit legal process and preservation requests through LESS.

Although we currently also accept service of legal process from law enforcement via email (from an official government email domain) to lawenforcement@snapchat.com, utilizing LESS will allow law enforcement to track submissions and may result in a quicker response time.

## Legal Process Requirements Overview

Snap discloses Snapchat account records (*i.e.*, Snapchat user data) to law enforcement *on a non-emergency basis* only if we receive legal process that complies with legal requirements.

The legal process should: be submitted in a non-editable static file (such as PDF); name "Snap Inc." as the Custodian of Records; and be signed and dated. To facilitate a response when requesting records regarding more than one Snapchat account (*e.g.*, multiple usernames), such requests should be contained in a single piece of legal process (*e.g.*, one subpoena). Snap may, at its discretion, also request an explanation from law enforcement justifying the number of accounts impacted by the legal process, if a single piece of legal process implicates numerous accounts.

*Note: To facilitate the expedient and accurate handling of requests, if legal process seeks disclosure of records regarding more than 10 Snapchat accounts, please provide an additional copy of your request in an editable format (such as DOCX or TXT). Failure to provide an editable copy may delay our processing of the legal process.*

When providing legal process requesting the disclosure of Snapchat account records, please specify the following:
- Snapchat username, email address, phone number, or hexadecimal User ID (see Section IV "Identifying a Snapchat Account" above)
  - *Note: Law enforcement must include the international calling code if specifying a non-U.S. phone number.*
- The specific type of data requested (see below)
- The target date range ("month/day/year to month/day/year") and any applicable timezone
  - *Note: records disclosed by Snap are provided in Coordinated Universal Time ("UTC").*

- Response contact information (including a governmental email address)
- If you object to us notifying affected Snapchatters and the reason for your objection (see Section II "Snap User Notice Policy" above)

The required legal process varies depending on the type of Snapchat account records you are requesting, as described below. Please also see Section VI below regarding preservation requests.

Basic Subscriber Information

Basic subscriber information is collected when a user creates a new Snapchat account or alters information at a later date, among other interactions with the Snapchat app. Basic subscriber information consists of the categories of information listed at 18 U.S.C. § 2703(c)(2), which for Snap may include:

- Current and previous Snapchat usernames
- Current and previous email addresses associated with the account, and whether verified by user
- Current and previous phone numbers associated with the account, and whether verified by user
- Current and previous Snapchat display names
- Snapchat account creation date and IP address
- Timestamp and IP address of Snapchat account logins, logouts, failed login attempts, and authentication events
- Certain information about the user's use of Snapchat services and account settings

*Note: Not all information listed above is required for a user to use the Snapchat app, and Snap does not independently verify user-provided subscriber information.*

IP logs associated with Snapchat account logins, logouts, failed login attempts and authentication events are retained for a limited period of time both while an account is active and after deletion of a Snapchat account.

**Legal process required for basic subscriber information:** law enforcement can obtain basic subscriber information through a subpoena (including one issued by a grand jury); a court order issued in accordance with 18 U.S.C. § 2703(d); or a federal or state search warrant.

Communications Metadata

Logs may be available containing metadata about a user's communications..

**Legal process required for communications metadata:** law enforcement can obtain communications metadata pursuant to a court order issued in accordance with 18 U.S.C. § 2703(d) or a federal or state search warrant.

Non-Communications Metadata
Metadata not related to communications, such as Friends List or device identifier information, may also be available. Logs regarding Memories metadata may also be available.

**Legal process required for non-communications metadata:** law enforcement can obtain non-communications metadata pursuant to a court order issued in accordance with 18 U.S.C. § 2703(d) or a federal or state search warrant.


Location Data

Location data may be available for a Snapchatter who has enabled location services on their device and opted into location services in the Snapchat app settings.

Currently, Snap can provide available geolocation data for an account as a whole, or with respect to Memories metadata. Snap cannot provide geolocation data specifically requesting location associated with Snap Map posts or communications.

**Legal process required for location data:** law enforcement can obtain location data, to the extent available, pursuant to a federal or state search warrant.

Content

As explained in Section III "How Snapchat Works" above, Snap's servers are designed to automatically delete most user content by default, such as the content of communications, after a limited period of time, unless it is otherwise saved by a Snapchatter. An exception is the content contained within Memories which, when saved, may be available until deleted by a user. As noted earlier, content saved to the My Eyes Only section of Memories is encrypted, and cannot be decrypted by Snapchat.

**Legal process required for content:** law enforcement can obtain content, to the extent available, pursuant to a federal or state search warrant.

## VI. Preservation Requests

A preservation is a snapshot in time of a user's available data, including available basic subscriber information, metadata, geolocation data, and content (*e.g.*, Chats, Stories, and Memories). Because Snapchat user data is not typically retained for a long period, law enforcement may want to expeditiously request the preservation of relevant data as soon as possible after an alleged incident for which evidence is sought.

We honor formal requests from law enforcement to preserve information in accordance with 18 U.S.C. § 2703(f). Upon receiving such a request, we will attempt to preserve for the date range specified in the request any available Snapchat account records associated with any properly identified Snapchat user(s) (see Section IV "Identifying a Snapchat Account" above). We will maintain any such preserved records in an offline file for up to 90 days, and we will extend that preservation for one additional 90-day period with a formal extension request. If you require an extension, please submit a formal preservation <u>extension</u> request, indicating clearly that it is an extension request and <u>not</u> an original preservation request.

As a courtesy for non-U.S. law enforcement, Snap may, at its discretion, preserve available Snapchat account records for up to 365 days while the MLAT or letters rogatory process is undertaken. At its discretion, Snap may extend such a preservation for one additional 180-day period with a formal extension request.

*Note: Since 18 U.S.C. § 2703(f) does not contemplate "serial" preservation requests or multiple extension requests beyond one additional 90-day period, we do not comply with such requests unless – in our sole discretion – we determine an exceptional circumstance exists.*

## VII. Emergency Disclosure Requests

U.S. and non-U.S. law enforcement officials seeking the emergency disclosure of Snapchat account records should complete and submit Snap's Law Enforcement Emergency Response Form via: https://less.snapchat.com/emergency .

Emergency disclosure requests must be submitted by a sworn law enforcement official and must come from an official law enforcement email domain. When submitting an emergency disclosure request, please provide the Snapchat username (see Section IV "Identifying a Snapchat Account" above) or hexadecimal User ID, associated phone number or email address; describe the nature of the emergency as specifically as possible; and specify the information that you are seeking to resolve the emergency situation and how the information will assist in addressing the emergency.

Consistent with 18 U.S.C. §§ 2702(b)(8) and 2702(c)(4), we are able to voluntarily disclose certain Snapchat account records without duly authorized legal process when we believe in good faith that an emergency posing a threat of imminent death or serious bodily injury requires the immediate disclosure of such records. As such, please be as specific as possible in describing the nature of the emergency and the way in which it relates to an imminent risk of death or serious bodily injury.

## VIII. Testimony

Records disclosures made to U.S. law enforcement will be accompanied by a signed Certificate of Authenticity, which should eliminate the need for the testimony of a Custodian of Records. Should testimony for the purpose of records authentication nevertheless be sought for trial, Snap will require that any testimonial subpoena be properly domesticated and served as required by the Uniform Act to Secure the Attendance of a Witness from Without a State in Criminal Proceedings, Cal. Penal Code § 1334, *et seq.*

Snap may not be able to accommodate subpoenas for witness testimony served less than 21 days before testimony is required. To ensure a streamlined process and that we have adequate notice, we suggest that you provide a courtesy copy of the subpoena to us via LESS or lawenforcement@snapchat.com while you seek domestication. Please note that acceptance of this courtesy copy does not waive Snap's right to object on any applicable grounds.

Snap does not provide expert witness testimony or testimony outside the United States.

# IX. Sample Language for Legal Process and Preservation Requests

This section provides tips and sample language that law enforcement may use to streamline requests for the disclosure or preservation of   records. As a reminder, legal process and preservation requests must be addressed to "Snap Inc.," and sent from an official governmental email address or submitted via LESS.

<u>Tips for Effective Identification of Accounts in Legal Process</u>
- Identify the account by Username consistent with the Snapchat naming protocols described in Section IV above.
- Do not use ambiguous language such as "and/or" in identifying an account.
- Do not identify Snapchat usernames as associated to other identifiers, such as phone numbers and email addresses, unless you are <u>certain</u> that they are in fact associated.
- Do not provide extraneous information that Snap cannot use to locate an account (*i.e.*, ip address, date of birth, given name etc.).
- Ensure that fonts have clearly distinguishable letters and numbers (for example, avoid Times New Roman in which a lower case L (l) is virtually indistinguishable from the number one (1).
- Always provide a country code for non-U.S. phone numbers when specifying a target phone number.
- It's best to avoid a date format that is ambiguous MM/DD/YYYY or DD/MM/YYYY.  It will save time if you instead spell out the month.

<u>Sample Language to Request Basic Subscriber Information</u>
"Basic subscriber information for the Snapchat username(s) _____ between month day, year and month day, year, including, the email address, phone number, account creation date, and available IP logs."

<u>Sample Language to Request Logs of Previous Communications</u>
"Logs, including sender, recipient, date, and time, concerning the communications  sent to and from the Snapchat username(s) _____ between month day, year and month day, year. "

[DATE]

Dear Snap Inc. Custodian of Records:

The below listed account(s) is(are) the subject of an ongoing criminal investigation at this agency, and it is requested pursuant to 18 U.S.C. § 2703(f) that records associated with said account(s) be preserved pending the issuance of a search warrant or other legal process seeking disclosure of such information:

*[Specify Snapchat username(s), or associated email address(es), phone number(s), or hexadecimal User ID, to be preserved (See Section IV, above). Specify also the requested date range for data preservation.]*

I understand that Snap Inc. reserves the right to delete any account that violates its Terms of Service.

If you have any questions concerning this request please contact me at *[insert email address and phone contact].*

Sincerely,

(Your Signature)
(Your Name and Title Typed)

# EXHIBIT 18

# FEDERAL DEFENDER
## Middle District of Florida

**A. Fitzgerald Hall, Esq.**
*Federal Defender*

**Tampa Division**
*Adam Allen, Esq.
*Howard Anderson, Esq.
Adeel Bashir, Esq.
Tina Budzisz, Esq.
Adrian Burden, Esq.
Jessica Casciola, Esq.
Stephen Consuegra, Esq.
Laura Daines, Esq.
Jenny L Devine, Esq.
*Allison Guagliardo, Esq.
Nicole Hardin, Esq.
+Sylvia Irvin, Esq.
Samuel Landes, Esq.
Sara Mieczkowski, Esq.
Douglas Stamm, Esq.
Kathleen Sweeney, Esq.
@Raudel Vitier, Esq.
Howard Williams, Esq.

**Orlando Division**
Meghan Boyle, Esq.
#D. Todd Doss, Esq.
Melissa Fussell, Esq.
Erin Hyde, Esq.
Conrad Kahn, Esq.
+Jenna Kelly, Esq.
Joshua Lukman, Esq.
+Nicole Mouakar, Esq.
Karla M. Reyes, Esq.
Michael S. Ryan, Esq.
^*James Skuthan, Esq.
Michelle Yard, Esq.

**Jacksonville Division**
Lynn Bailey, Esq.
*Lisa Call, Esq.
+*Maurice C. Grant, II, Esq.
Waffa Hanania, Esq.
Scott Schmidt, Esq.

**Ft. Myers Division**
Yvette C. Gray, Esq.
Shehnoor Grewal, Esq.
James Lappan, Esq.
=+*Russ Rosenthal, Esq.
G. Ellis Summers, Jr., Esq.

**Ocala Division**
Christine Bird, Esq.
Joshua Woodard, Esq.

**CHU Division**
Raheela Ahmed, Esq.
Greg Brown, Esq.
+Marie Donnelly, Esq.
Brenna Egan, Esq.
Marta Jaszczolt, Esq.
Tennie Martin, Esq.
Jason Mooney, Esq
Julie Morley, Esq.
Robert Rieske, Esq.
Leor Veleanu, Esq.

^ First Assistant
= Second Assistant
* Senior Attorney
+ Division Supervisor
@Assistant Division Supervisor
# Senior Litigator

*"Representing Those Who Cannot Represent Themselves"*

May 22, 2023

Ms. Abigail King
United States Attorney's Office
400 N. Tampa Street, Suite 3200
Tampa, FL 33602

**Re:** *United States v. Michael Ambrose*
    *Case No.: 8:23-cr-13-KKM-CPT*

Dear Ms. King:

Please provide in discovery the following:

1. Notice or any record or copy of any communication made between January 2018 and the present between any government officer or employee of any government agency, or any government agent, and Snap Inc. or any agent of Snap Inc., relating to Snap's institution, continuation, or discontinuation of end-to-end encryption for any of its products, including but not limited to any oral statement, meeting minutes, text message, email, letter, or other communication.

2. The results of the warrant executed by you on the minor victim's Snapchat account, as described in the complaint. If you are interested in obtaining a protective order for this material, please contact me.

Please feel free to contact me at any time if you would like to discuss this request.

Sincerely,

| **Tampa Division** | **Orlando Division** | **Jacksonville Division** | **Ft. Myers Division** | **Ocala Division** | **Capital Habeas Unit** |
|---|---|---|---|---|---|
| Park Tower – Suite 2700 | Seaside Plaza – Suite 300 | BB&T Tower – Suite 1240 | Suite 300 | Suite 202 | Park Tower – Suite 2625 |
| 400 North Tampa Street | 201 South Orange Avenue | 200 West Forsyth Street | 2075 West First Street | 203 E. Silver Springs Blvd. | 400 North Tampa Street |
| Tampa, Florida 33602 | Orlando, Florida 32801 | Jacksonville, Florida 32202 | Ft. Myers, Florida 33901 | Ocala, Florida 34470 | Tampa, Florida 33602 |
| Telephone:813-228-2715 | Telephone:407-648-6338 | Telephone:904-232-3039 | Telephone:239-334-0397 | Telephone:352-351-9157 | Telephone:813-228-2715 |
| Facsimile:813-228-2562 | Facsimile:407-648-6095 | Facsimile:904-232-1937 | Facsimile:239-334-4109 | Facsimile:352-351-9162 | Facsimile:813-228-2562 |

*Samuel Landes*
Samuel Landes
Assistant Federal Defender