# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                             Case No. 23-cr-13-KKM-CPT

MICHAEL LUCAS AMBROSE,

　　　Defendant.

_____

# **ORDER**

Based on explicit messages with a twelve-year-old girl and thousands of images and seventy videos of child pornography found on Michael Ambrose's devices, a grand jury indicted Ambrose on two counts of coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such illicit activity, one count of distributing child pornography, and one count of possessing child pornography. *See* Criminal Compl. (Doc. 1); Superseding Indictment (Doc. 63). Ambrose argues that the government violated the Fourth Amendment when it viewed, without a warrant, child pornography that Ambrose uploaded in private messages on Instagram and Snapchat. Mot. to Suppress (MTS) (Doc. 38). The government received this

material from the National Center for Missing and Exploited Children (NCMEC), which in turn received it from Snap and Instagram.[1]

Ambrose moves to suppress "(1) any evidence of his receipt or distribution of child pornography provided by social media companies to [NCMEC] and (2) any evidence derived from such evidence, including (a) admissions made by Mr. Ambrose and (b) evidence from Mr. Ambrose's electronic devices." *Id.* at 1. For the below reasons, I deny the motion.

## I.     BACKGROUND

In June 2020, an Instagram user with the screenname "lucas_aka_massive" and email address "mambrose24@gmail.com" sent a video to another user through the platform's direct message function. Stip. (Doc. 264) ¶ 1. Instagram reported this message to NCMEC as containing child pornography. *Id.* ¶ 2; *see* (Doc. 262-1); *see also* Burch Aff. (Doc. 263) ¶¶ 5–9 (describing the creation and operation of NCMEC's CyberTipline). Instagram's CyberTip to NCMEC included both a video and an image. *See* (Doc. 262-1) at 5–6. Neither the video nor the image was reviewed by a human. Instead, Instagram reported this content because it was "hash matched" to content that had previously been determined, by a human, to constitute child pornography. *See* Morgan Decl. (Doc. 267) ¶ 7; *see also id.* ¶¶ 3–6. A "hash" is a "unique string

---

[1] I use Meta and Instagram interchangeably.

of letters and numbers that reflects the content of an image or video file," which can be used to "identify exact copies, or nearly exact copies, of the image or video . . . ." *Id.* ¶ 3. No one at NCMEC viewed the video; instead, NCMEC forwarded the video to the Tampa Police Department. Stip. ¶ 3. Without a warrant, an officer watched and identified the video as child pornography. *Id.* But, despite locating photographs and videos of Ambrose after serving a search warrant for the contents of Ambrose's Instagram account, and his name, address, and phone number, the officer failed to locate the sender of the video and closed the case. *Id.*; (Doc. 38-1) at 30–33.

Over a year later, in July 2022, law enforcement in New Jersy obtained consent to search a minor's cellphone as part of a different criminal investigation. Stip. ¶ 4. In a review of the phone's contents, investigators discovered that the minor was in communication with various phone numbers, including one saved in her phone as "Michael" and another saved as "Mixheal." *Id.* ¶ 5. Both numbers, investigators later learned, belonged to Ambrose. *Id.* After obtaining a search warrant, investigators reviewed the minor victim's Snapchat account, discovering conversations of a "sexual nature" with a user named "massive_beats," whom the minor referred to as "Michael." *Id.* ¶ 6. Investigators also found "numerous videos" of child pornography that the minor made and sent to Ambrose. Creasey Aff. (Doc. 38-9) ¶ 31. Ambrose does

not seek to suppress these messages uncovered through the minor's phone and account.

In November 2022, Snap, Inc., the operator of Snapchat, sent two CyberTips concerning child pornography to NCMEC. Stip. ¶¶ 7–8. One, on November 9, concerned a file uploaded by a Snapchat user named "bastard_blob." *Id.* ¶ 7; *see* (Doc. 262-3). The other, on November 10, concerned a file uploaded by a Snapchat user named "joint_token." Stip. ¶ 8; *see* (Doc. 262-4). Both files contained only videos of child pornography. *See* Creasey Aff. ¶ 34. Ambrose describes these two videos as the "contents of [his] private messages" or as his "private messages," *see generally* MTS; Def.'s Suppl. Mem. (Doc 278), although the record is unclear whether Ambrose sent the two child pornography videos to other users, *see* Stip. ¶¶ 7–8. Regardless of any recipient, Snap reported the videos to NCMEC after they were uploaded. *Id.*

The accounts that uploaded these two video files shared an IP address: 73.91.13.184. Stip. ¶¶ 7–8. Both CyberTips indicated that Snap viewed the entire contents of the reported files. *Id.* But Snap's policies do not require a human reviewer to watch the entire video at issue once it is evident that it contains child pornography, and, when a file matches a hash value previously determined to be child pornography, no human review is required. *See* Silva Decl. (Doc. 262-2) ¶¶ 13–14. With respect to the two CyberTips, a Snap employee represented that each CyberTip "reported a previously-hashed,

illegal video of [child pornography] identified by Snap through hash-matching, proactive-detection technology." Silva Decl. ¶ 18. NCMEC reviewed both files and classified them as "Apparent Child Pornography." Stip. ¶¶ 7–8.

Later in November 2022, FBI Newark subpoenaed the subscriber information for one of the phone numbers that the minor victim communicated with and learned that Ambrose was the subscriber. *Id.* ¶ 9. A subpoena regarding the subscriber information of another phone the minor communicated with revealed that Ambrose was the subscriber and had a frequent IP address of 73.91.13.184. *Id.* ¶ 10. After learning this information, FBI agents requested from NCMEC any reports involving certain information, including Ambrose's IP address. *Id.* ¶ 11. NCMEC responded with the two November 2022 Snapchat reports, including the child pornography videos that were the subject of the reports. *Id.* After viewing the two videos without a warrant, FBI agents confirmed that each one depicted the sexual abuse of minor children. *Id.* The FBI also determined that, with the help of a subpoena sent to Comcast, Ambrose was the subscriber for IP address of 73.91.13.184 at his home in Bartow, Florida. *Id.* ¶ 12.

In December 2022, after learning of the investigation into Ambrose, FBI Lakeland became aware of the 2020 NCMEC CyberTip from Instagram. *Id.* ¶¶ 13–14. An FBI special agent reviewed the file and confirmed that the file depicted the sexual abuse of a child. *Id.* ¶ 14. After surveilling Ambrose's

residence, FBI agents confronted and interrogated Ambrose. *Id.* ¶¶ 15–16. Ambrose incriminated himself and then consented to a search of his vehicle and residence. *Id.* ¶ 16. Through a search warrant, FBI agents discovered "17,300 images and 70 videos of child sexual abuse material" on Ambrose's devices. *Id.* ¶ 17.

A federal grand jury indicted Ambrose on one count of distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). Indictment (Doc. 14). The grand jury later returned a superseding indictment adding two counts of coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such illicit activity, in violation of 18 U.S.C. §§ 2251(a) and (e). Superseding Indictment.

Ambrose moves to suppress any evidence provided by Instagram or Snap to NCMEC and any fruit of that evidence, including Ambrose's admissions and evidence obtained from his devices. On August 27, 2025, I held an evidentiary hearing on the motion to suppress. At my invitation, the parties later filed supplemental memoranda on issues related to Ambrose's argument that the government violated his Fourth Amendment rights under the *Jones* trespass test. Gov't Suppl. Mem. (Doc. 277); Def.'s Suppl. Mem.

## II.    LEGAL STANDARDS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A search occurs in two ways: [1] when the government obtains information by physically intruding on a constitutionally protected area and [2] when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Gregory*, 128 F.4th 1228, 1240–41 (11th Cir. 2025) (citation modified). With respect to the latter method of proving a search, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *accord Rehberg v. Paulk*, 611 F.3d 828, 842–43 (11th Cir. 2010). In such cases, "the Government is typically free to obtain such information from the recipient without triggering Fourth Amendment protections." *Carpenter v. United States*, 585 U.S. 296, 308 (2018).

The Fourth Amendment's protections "extend[] to governmental action only." *United States v. Sparks*, 806 F.3d 1323, 1334 (11th Cir. 2015), *overruled on other grounds by United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) (en banc). Therefore, in cases concerning a private party's conduct, the Fourth Amendment is relevant only when the private party "acts as an 'instrument' or agent of the state." *United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985)

(per curiam) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)). In that circumstance, the "Fourth Amendment is applicable" to the private actor's conduct. *Id.* To determine whether a private actor's search implicates the Fourth Amendment, courts "look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).

Even when obtained by a private party, the government's subsequent review of the evidence may not (absent a warrant or an exigency) exceed the scope of the private search. *See United States v. Jacobsen*, 466 U.S. 109, 116–18 (1984); *Sparks*, 806 F.3d at 1334 ("[A] warrantless law-enforcement search conducted after a private search violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search.").

The defendant ordinarily has the burden in a suppression hearing, but when a defendant produces evidence "that the search and seizure took place without a search warrant, then the burden of proof shifts to the [government]" to justify the warrantless arrest or search. *See United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a

preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III.    ANALYSIS

Ambrose argues that the warrantless review of his privately uploaded child pornography videos violates the Fourth Amendment under both the reasonable-expectation-of-privacy line of cases, *see, e.g.*, *Katz v. United States*, 389 U.S. 347, 353 (1967), and the trespass line of cases, *see, e.g.*, *United States v. Jones*, 565 U.S. 400, 405 (2012). *See* MTS at 8–26. Therefore, to demonstrate the constitutionality of the warrantless searches, the government must show that the review of the videos did not violate Ambrose's reasonable expectation of privacy or constitute a trespass of his chattels.[2] For the below reasons, the government succeeds.

### A.    The Government's Warrantless Review of Ambrose's Messages Did Not Violate the Fourth Amendment Under the Reasonable-Expectation-of-Privacy Test

Ambrose's first argument requires consideration of three issues. First, whether Ambrose had a reasonable expectation of privacy in his private messages. Second, if so, whether Snap and Instagram acted as government agents in reviewing these messages. And third, if Snap and Instagram acted

---

[2] Because the government did not introduce any evidence regarding what the investigating officers would have done without the warrantless search of Ambrose's videos, I do not consider the applicability of either the inevitable disclosure or independent discovery doctrines.

as private parties, whether the government's review of Ambrose's messages exceeded the scope of the private search. I answer the first in Ambrose's favor, but the second and third in the government's.

### 1. Ambrose Likely Has a Reasonable Expectation of Privacy in the Contents of His Private Messages

Under *Katz* and its progeny, "for Fourth Amendment protections to apply, the person invoking the protection must have an objectively reasonable expectation of privacy in the place searched or item seized." *Rehberg*, 611 F.3d at 842. "To establish a reasonable expectation of privacy, the person must show (1) that he manifested 'a subjective expectation of privacy' in the item searched or seized, and (2) a willingness by society 'to recognize that expectation as legitimate.' " *Id.* (quoting *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) (per curiam)).

Ambrose contends that he had a reasonable expectation of privacy in the contents of his social media messages, which consisted only of child pornography videos. MTS at 8–10. He argues, based on the Supreme Court's decision in *Carpenter* and other decisions, that the third-party doctrine does not apply. *See id.* at 9–10; *see also United States v. Trader*, 981 F.3d 961, 967 (11th Cir. 2020) ("Ordinarily, a person lacks a reasonable expectation of privacy in information he has voluntarily disclosed to a third party."). The

government responds that the social media platforms' terms of service negated any reasonable expectation of privacy. Resp. at 14–16.

Although not settled by the Eleventh Circuit, *see Rehberg*, 611 F.3d at 842–47, Ambrose is likely right. In terms of their communicative content and intended audience, private social media messages are hard to distinguish from emails and text messages, in which users ordinarily maintain a reasonable expectation of privacy. *Cf. United States v. Maher*, 120 F.4th 297, 307 (2d Cir. 2024) ("A United States person ordinarily has a reasonable expectation in the privacy of his e-mails sufficient to trigger a Fourth Amendment reasonableness inquiry." (citation modified)); *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) ("We hold that a subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP." (citation modified)); *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 905 (9th Cir. 2008) ("[U]sers do have a reasonable expectation of privacy in the content of their text messages vis-a-vis the service provider."); *see also Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 969 (11th Cir. 2016) ("[T]he Fourth Amendment demands that the government demonstrate probable cause both to intercept real-time wire, oral, and electronic communications and to review the content of stored electronic communications."); *United States v. Davis*, 785 F.3d 498, 529 n.5 (11th Cir. 2015) (en banc) (Rosenbaum, J., concurring) ("As a result, as with the content

of paper letters and telephone conversations, a reasonable expectation of privacy exists in the subject-matter lines of emails."), *abrogated by Carpenter*, 585 U.S. at 316–17.[3] As some courts have explained, these forms of communication, especially email, are analogous to physical mail and thus should be treated the same as physical mail for the purposes of the Fourth Amendment. *See, e.g.*, *United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016) ("[I]f opening and reviewing 'physical' mail is generally a 'search'— and it is—why not 'virtual' mail too?" (citations omitted)); *Warshak*, 631 F.3d at 285–86 ("Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection.").

Moreover, given the ubiquity of messaging on social media platforms, concluding that Ambrose lacked a reasonable expectation of privacy would allow the government warrantless access to an innumerable number of private communications, a result in tension with recent caselaw on the Fourth Amendment and technology. *See, e.g.*, *Carpenter*, 585 U.S. at 305 ("As technology has enhanced the Government's capacity to encroach upon areas

---

[3] Several circuits, though, "have concluded that a person lacks legitimate privacy expectations in Internet subscriber information and in to/from addresses in emails sent via ISPs." *Rehberg*, 611 F.3d at 843. Other circuits have also suggested that a person's reasonable expectation of privacy may be diminished once an email reaches its recipient. *See, e.g.*, *United States v. Mohamud*, 843 F.3d 420, 442 (9th Cir. 2016) (collecting cases).

normally guarded from inquisitive eyes, this Court has sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." (citation modified)); *United States v. Smith*, 110 F.4th 817, 835 (5th Cir. 2024) ("Given the ubiquity—and necessity—in the digital age of entrusting corporations like Google, Microsoft, and Apple with highly sensitive information, the notion that users voluntarily relinquish their right to privacy and assume the risk of this information being divulged to law enforcement is dubious." (citation modified)).

To be sure, the terms of service cut in the government's favor and have convinced some courts that a user lacks a reasonable expectation of privacy. *See, e.g.*, *United States v. Colbert*, No. 23-CR-40019-TC-1, 2024 WL 2091995, at *9 (D. Kan. May 9, 2024) (Snap's terms of service); *United States v. Montijo*, No. 2:21-CR-75-SPC-NPM, 2022 WL 93535, at *7 (M.D. Fla. Jan. 10, 2022) (Facebook's terms of service). Indeed, Snap's terms of service and community guidelines provide that Snap may review user content and, if necessary, send it to the government. *See* (Doc. 262-2) at 13 ("While we're not required to do so, we may access, review, screen, and delete your content at any time and for any reason."); *id.* at 16 ("If you fail to comply [with the Terms, Community Guidelines, and other policies], we reserve the right to remove any offending content, terminate or limit the visibility of your account, and notify third parties—including law enforcement—and provide those third parties with

information relating to your account."); *id.* at 27 ("We report child sexual exploitation to authorities. Never post, save, or send nude or sexually explicit content involving anyone under the age of 18 — even of yourself. Never ask a minor to send explicit imagery or chats."). Meta's Community Standards, which bind Instagram users, Morgan Decl. ¶ 2, provide that, when Meta becomes "aware of apparent child exploitation," Meta reports it to NCMEC. (Doc. 267) at 6.

Although not foreclosing the possibility that some terms of service might abrogate a reasonable expectation of privacy, *cf. Warshak,* 631 F.3d at 287 ("If the ISP expresses an intention to audit, inspect, and monitor its subscriber's emails, that might be enough to render an expectation of privacy unreasonable." (citation modified)), I find persuasive the circuit opinions that have rejected the government's arguments in cases with similar terms of service, *id.* at 287–88 (analyzing a subscriber agreement that provides "NuVox may access and use individual Subscriber information in the operation of the Service and as necessary to protect the Service," and finding a reasonable expectation of privacy (emphasis omitted)); *Maher*, 120 F.4th at 307–08 (analyzing Google's terms of service, which, among other things, advise users that Google (1) "may review content to determine whether it is illegal or violates our policies," (2) "may" report "illegal content" to "appropriate authorities," and (3) "will share" users' information with law enforcement when

necessary to comply with applicable law, and finding a reasonable expectation
of privacy); *see also United States v. Zelaya-Veliz*, 94 F.4th 321, 333 (4th Cir.
2024) ("Most federal courts to rule on the issue have agreed that Facebook and
other social media users have a reasonable expectation of privacy in content
that they exclude from public access, such as private messages."). Of course,
other company policies, such as a privacy or encryption policy, might cut in
favor of a defendant having a reasonable expectation of privacy. *Cf.* Reply (Doc.
54) at 9–11. But Snap's privacy policy in effect during the relevant time period
here did not include provisions buttressing Ambrose's expectation of privacy.
*Compare* (Doc. 271-1), *with* Reply at 9.

The government's position is also in tension with other Fourth
Amendment cases. *See* Orin S. Kerr, *Terms of Service and Fourth Amendment
Rights*, 172 U. PA. L. REV. 287, 308 (2024) ("Case law on other owner-user
agreements, such as rental car contracts, apartment leases, and hotel rental
agreements, demonstrates that owner-user agreements have little or no effect
on Fourth Amendment rights."). For example, a hotel guest ordinarily has a
reasonable expectation of privacy in his room, even if a maid may enter to
replace the towels and turn down the bed. *See United States v. Ross*, 964 F.3d
1034, 1043 (11th Cir. 2020). And, even if a car rental agreement precludes the
defendant from operating the vehicle, he might still hold a reasonable
expectation of privacy while doing so. *See Byrd v. United States*, 584 U.S. 395,

408 (2018). More, it appears that the right and ability of a third party to access and monitor communications has, in some circumstances, not extinguished a reasonable expectation of privacy. *See Warshak*, 631 F.3d at 287 ("In *Katz*, the Supreme Court found it reasonable to expect privacy during a telephone call despite the ability of an operator to listen in. . . . [A]t the time *Katz* was decided, telephone companies had a right to monitor calls in certain situations.").

For these reasons, Ambrose likely had a reasonable expectation of privacy in the content of his Snapchat and Instagram messages. I proceed on that assumption.

### 2.    Snap and Instagram Did Not Act as Government Agents

The Fourth Amendment regulates only government conduct. *Sparks*, 806 F.3d at 1334. Ambrose contends that both Snap and Instagram acted as agents of the government when reporting his messages to NCMEC. MTS at 11–18. Ambrose relies mainly on the reporting obligations imposed by the Protect Our Children Act, 18 U.S.C. § 2258A(a), and the Supreme Court's decision in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614–15 (1989). The government argues, in line with circuit authority, that the social media companies did not act as government agents. Resp. at 16–18. I agree with the government.

"Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *Skinner*, 489 U.S. at 614 (citation modified). The Eleventh Circuit considers "two critical factors" in determining if a private entity is "an agent of the government": "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Steiger*, 318 F.3d at 1045.

Regarding the first factor, Ambrose has demonstrated neither "that the Government had any pre-knowledge of the search nor that the agents openly encouraged or cooperated in the search."[4] *Ford*, 765 F.2d at 1090; *cf. United States v. Simpson*, 904 F.2d 607, 609–10 (11th Cir. 1990) ("No Government agent instructed the Federal Express employees to open and inspect the box in this case, and no Government agent knew of its existence until after the searches by various Federal Express employees had occurred.").

Although federal law mandates that providers report evidence of an offense involving child pornography, *see* 18 U.S.C. § 2258A(a), the Protect Our

---

[4] Pre-knowledge alone does not turn a private search into a public one. *See Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978) ("This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State.").

Children Act does not mandate that providers search for child pornography, *see id.* § 2258A(f)(3) ("Nothing in this section shall be construed to require a provider to . . . affirmatively search, screen, or scan for facts or circumstances described in sections (a) and (b)."). This distinction has proven important to circuit courts reviewing similar questions. *See, e.g., United States v. Rosenow*, 50 F.4th 715, 730 (9th Cir. 2022) ("Mandated *reporting* is different than mandated *searching.* Our caselaw is clear that a private actor does not become a government agent simply by complying with a mandatory reporting statute."); *United States v. Miller*, 982 F.3d 412, 424 (6th Cir. 2020) ("[T]his mandate compels providers only to *report* child pornography that they know of; it does not compel them to *search* for child pornography of which they are unaware. And the Supreme Court's cases tell us to focus on 'the specific conduct of which a party complains.' " (alteration in original) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999))); *United States v. Meals*, 21 F.4th 903, 907 (5th Cir. 2021); *United States v. Ringland*, 966 F.3d 731, 736 (8th Cir. 2020); *United States v. Cameron*, 699 F.3d 621, 637–38 (1st Cir. 2012).

This distinction also enjoys historical support. At common law, citizens had a duty to report felonies of which they were aware. *See Miller*, 982 F.3d at 425. But there is no indication that this duty turned private parties into public actors "whenever they do something other than disclose a crime, such as voluntarily investigate it." *Id.*

18

Ambrose falls back on *Skinner*. There, the Supreme Court was concerned with a regulatory scheme that authorized, but did not require, railroads to dictate that covered employees submit to breath or urine tests in certain circumstances. 489 U.S. at 611. The Supreme Court ultimately concluded that private railroads, in conducting tests under these regulations, implicated the Fourth Amendment. *Id.* at 615–16; *see also id.* at 615 ("The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one. Here, specific features of the regulations combine to convince us that the Government did more than adopt a passive position toward the underlying private conduct."). Among other things, the Supreme Court noted that the regulatory scheme preempted state law on the same subject and superseded any provision of a collective bargaining agreement or arbitration award construing one. *Id.* The regulatory scheme also gave the Federal Railway Administration the right to receive certain samples and tests results; forbade a railroad from divesting itself of, or otherwise compromising by contract, its testing authority; and required covered employees to submit to the breath or urine test. *Id.* Because of all these features, the Supreme Court found "clear indices of the Government's encouragement, endorsement, and participation." *Id.* at 615–16.

Ambrose's argument is not without some persuasive value, but 18 U.S.C. § 2258A lacks many of the hallmarks of the regulatory scheme at issue in

*Skinner.* Unlike the regulations in *Skinner*, § 2258A does not authorize invasive personal searches, preempt public law and private agreements on the subject, bar private companies from bargaining away or otherwise compromising their permissive authority to search, or require social media users to subject themselves to searching. Given these differences, multiple circuit courts have rejected similar attempts to extend *Skinner*, and I am convinced by their reasoning. *See, e.g.*, *Rosenow*, 50 F.4th at 729–31; *Miller*, 982 F.3d at 424; *Ringland*, 966 F.3d at 736; *see also United States v. Richardson*, 607 F.3d 357, 366–67 (4th Cir. 2010).

The second consideration—whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends—also weighs against Ambrose. Social media companies have an independent interest "in removing child sex abuse from [their] platform[s]." *Ringland*, 966 F.3d at 736; *accord, e.g.*, *Rosenow*, 50 F.4th at 734; *Miller*, 982 F.3d at 419. Representatives from both Meta and Snap spoke to those interests in declarations. *See* Morgan Decl. ¶ 2 ("Meta has a private, independent business interest in keeping its platform safe and free from harmful content and conduct, including that which sexually exploits children."); Silva Decl. ¶ 8 ("Snap has a strong business interest in enforcing its Terms of Service and Community Guidelines and strives to keep Snapchat free of illegal content, including Child Sexual Exploitation and Abuse Imagery."); *id.* ¶ 17

20

("[P]reventing, detecting, and eradicating [child pornography] on Snapchat has been, and remains, a top priority for Snap."). I credit these statements, and common sense supports that these interests (economic and moral) are legitimate business ones. The fact that these business interests intersect with the government's interests in investigating criminal activity does not render Snap and Meta government agents. *See Ringland*, 966 F.3d at 736 ("Google did not become a government agent merely because it had a mutual interest in eradicating child pornography from its platform."). The same is true even if law enforcement involvement helps achieve the business interests. *See Rosenow*, 50 F.4th at 735 ("[A] private party's otherwise legitimate, independent motivation is not rendered invalid just because law enforcement assistance may further its interests.").

For these reasons, I conclude that Instagram and Snap did not act as government agents when they identified child pornography and sent it to NCMEC. Accordingly, the Fourth Amendment does not regulate these actions. *See Ford*, 765 F.2d at 1089 ("The Fourth Amendment proscribes only governmental action and therefore a search by a private individual does not raise Fourth Amendment implications.").

### 3.    The Government's Searches Did Not Exceed the Scope of the Private Searches

Without a warrant or exigent circumstances, the government cannot exceed the scope of a previous private search. *See Sparks*, 806 F.3d at 1334. Ambrose argues that the government did that here, and the government contends the opposite. MTS at 18–21; Resp. at 20–22. Because a "hash" requires an electronic search of the message by scanning the video and "look[ing] at it frame-by-frame," Hr'g Tr. (Doc. 274) 25:4, 14–15, and the FBI agents reviewed the same video as the electronic search by the social media companies, the government search did not run afoul of the Fourth Amendment.

Both Snap and Instagram first identified the child pornography at issue through "hash-matching." Silva Decl. ¶¶ 9, 18; Morgan Decl. ¶ 7. A hash, as one witness testified, is a "digest," or a "small summary" of a "larger bit of data." Hr'g Tr. 17:22–24; *see also* Morgan Decl. ¶ 3 ("A hash is a unique string of letters and numbers that reflects the content of an image or video file."). Both Snap and Meta maintain a database of hash values that correspond to previously identified child pornography. *See* Morgan Decl. ¶¶ 3–6; Silva Decl. ¶ 11. If, after a computer algorithm "scans [a] video," Hr'g Tr. 25:4–7,[5] a file is determined to "ha[ve] a hash value that matches other file(s) that have been

---

[5] To generate the hash, the algorithm "plays the video and looks at it frame-by-frame, but not the full frame. It scales it down to really small and then compares it frame-by-frame." Hr'g Tr. 25:14–17.

reviewed and determined to be reportable to NCMEC," then that file is reported to NCMEC. Silva Decl. ¶ 14; *see* Morgan Decl. ¶¶ 3, 7; *see also* Hr'g Tr. 18:17–19:12. That process occurred here. Both Snap and Instagram identified the files through hash-matching and sent them to NCMEC. Silva Decl. ¶ 18; Morgan Decl. ¶ 7.[6]

Although Instagram "cannot precisely quantify the reliability of hash matches from June 2020, it has found its proprietary hash technology to be reliable for purposes [of] protecting its platforms from harmful content and conduct." Morgan Decl. ¶ 3. Similarly, an audit of NCMEC's child pornography Hash List revealed "that 99.99% of the images and videos reviewed were verified as containing [child pornography]." Burch Aff. ¶ 20. One of Ambrose's witnesses, Dr. Neal Krawetz, testified that, in some cases, "hash collisions," or false matches, occur. Hr'g Tr. 19:22–24. With respect to an algorithm Meta uses to hash match videos, Dr. Krawetz testified that the error rate was "somewhere between one and 10,000 to one in 50,000." *Id.* at 23:15–24:2. With respect to one algorithm used by NCMEC's database, Dr. Krawetz estimated

---

[6] Snap's NCMEC reports contain mention of a human reviewing the entire file before sending the file to NCMEC. (Doc. 262-3) at 4; (Doc. 262-4) at 4. But Snap's declaration reveals that Snap does not "generally require[]" a reviewer to view the entire video; instead, when Snap requires a reviewer to watch, they are directed only to watch "at least a sufficient portion of the video." Silva Decl. ¶ 13. Because there is no evidence regarding the extent of the human review in this case, I will consider only whether the government exceeded the scope of the hash match.

an error rate of "one in a couple million," and, with respect to another, Dr. Krawetz estimated an error rate of between "one in 10,000" and "one in 50,000." *Id.* at 30:24, 31:5–6. Finally, with respect to PhotoDNA, which Snap uses, Silva Decl. ¶ 11, Dr. Krawetz estimated a false positive rate of "somewhere around one in about 4 million," Hr'g Tr. 32:6–8.

Circuit courts are divided as to whether the government exceeds the scope of a private search when an investigator views a file after a hash match. The Fifth and Sixth Circuits say no. *See Miller*, 982 F.3d at 426–31; *United States v. Reddick*, 900 F.3d 636, 640 (5th Cir. 2018). The Second and Ninth Circuits say yes. *See Maher*, 120 F.4th at 314–20; *United States v. Wilson*, 13 F.4th 961, 971–80 (9th Cir. 2021).[7]

All four decisions apply the two Supreme Court precedents in this area. In *Walter v. United States*, packages containing boxes of pornographic materials were delivered to the wrong address. 447 U.S. 649, 651–52 (1980). Employees of the company that resided at this address opened the packages and examined the boxes, "on one side of which were suggestive drawings, and on the other were explicit descriptions of the contents." *Id.* at 652. One

---

[7] The Tenth Circuit has reserved ruling on this question. *See Ackerman*, 831 F.3d at 1306–07. In *Ackerman*, only one attachment in an email was hash matched, but the government reviewed the email and the other three attachments too. *Id.* at 1305–06. The Tenth Circuit, quite naturally, concluded that this search exceeded the scope of the private search that occurred solely through the hash matched attachment. *Id.* at 1306.

employee unsuccessfully attempted to "view portions of the film by holding it up to the light." *Id.* Employees then called the FBI, and an agent picked up the packages shortly thereafter. *Id.* Without obtaining a warrant or consent, FBI agents viewed the films. An obscenity prosecution followed, and the defendants moved to suppress the films. *Id.* A majority of the Supreme Court agreed that the test was whether the government search exceeded the bounds of the private search. *See id.* at 657–59; *id.* at 663–64 (Blackmun, J., dissenting, joined by Burger, C.J., Powell, J., and Rehnquist, J.). And a majority of the Court, although not agreeing on the reasoning, concluded that the government violated the Fourth Amendment. *See id.* at 659–660 (Stevens, J., joined by Stewart, J.); *id.* at 660 (Marshall, J., concurring in the judgment); *id.* (White, J., joined by Brennan, J., concurring in part and concurring in the judgment).

In *Jacobsen*, a FedEx employee opened a damaged package and found a ten-inch-long tube. 466 U.S. at 111. After cutting open the tube, the employee discovered a bag containing "white powder." *Id.* The employee called the DEA and put the bags back in the tube and the tube back in the box. *Id.* A DEA agent arrived, removed the white powdery substance, and tested it. *Id.* at 111–12. The test revealed that the substance was cocaine. *Id.* at 112. The Supreme Court concluded that the DEA agent's inspection of the box's contents did not exceed the scope of the private search and thus was reasonable. *Id.* at 118–21 ("Under these circumstances, the package could no longer support any

expectation of privacy."); *see id.* at 118–19 ("Even if the white powder was not itself in 'plain view' because it was still enclosed in so many containers and covered with papers, there was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told."). As for the field test of the cocaine, the Supreme Court concluded that the government search exceeded the private search but that the test was a not a "search" under the Fourth Amendment. *See id.* at 122–24 ("[T]he likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.").

Applying these Supreme Court precedents, I agree with the Fifth and Sixth Circuits' reasoning. In generating the hash, the relevant algorithm "plays the video and looks at it frame-by-frame." Hr'g Tr. 25:14–17. Like the private parties in *Jacobsen*, the algorithm "examined the package," before Snap and Instagram turned it over to the government. 466 U.S. at 119; *see Reddick*, 900 F.3d at 639. In doing so, Snap and Instagram, "using [their] digital eyes," *Miller*, 982 F.3d at 428, went beyond observing a label and "actually viewed the films," *Walter*, 447 U.S. at 657 (opinion of Stevens, J.); *see Miller*, 982 F.3d at 431 ("[T]he hash-value searches revealed much more information than [file name] descriptions. Google's technology 'opened' and

26

'inspected' the files, revealing that they had the same content as files that
Google had already found to be child pornography."). *But see Maher*, 120 F.4th
at 318 (comparing a hash match to viewing the label in *Walter*); *Wilson*, 13
F.4th at 973 (same). Put differently, "the governmental [search] was made
possible only because private parties had compromised the integrity of [the
files]" by hash matching them. *Jacobsen*, 466 U.S. at 120 n.17.

At the evidentiary hearing, much was made of error rates in hash-
matching. Past cases, relying on language from *Jacobsen*, placed an emphasis
on a low error rate as a way of demonstrating that the government has not
exceeded the scope of a private search. *See, e.g.*, *Miller*, 982 F.3d at 417–18
("Under the private-search doctrine, the government does not conduct a Fourth
Amendment search when there is a 'virtual certainty' that its search will
disclose *nothing more* than what a private party's earlier search has revealed."
(quoting *Jacobsen*, 466 U.S. at 119)). And it is true that here, unlike in *Miller*,
for example, the defendant has challenged the reliability of hash-matching. Dr.
Krawetz testified to error rates in some algorithms as high as "one [in] 10,000"
and others as low as one in 4 million. Hr'g Tr. 23:15–32:8.

These error rates do not undermine my conclusion that the government
has not exceeded the scope of a private search. Even if one error resulted every
10,000 hash matches, the government's subsequent review, in 99.99% of cases,
"would not tell [them] anything more than [they] already had been told."

27

*Jacobsen*, 466 U.S. at 119. This constitutes a "virtual certainty" that the government's search "will disclose *nothing more* than what a private party's earlier search has revealed." *Miller*, 982 F.3d at 418.

Further, regardless of whether the algorithm is sometimes in error, "the risk of a flaw" in the algorithm's perception does not change the fact that the algorithm has *searched* the file. *Jacobsen*, 466 U.S. at 119; *see Miller*, 982 F.3d at 431 ("Just because a private party turns out to be wrong about the legality of an item that the party discloses to police does not mean that the police violate the Fourth Amendment when they reexamine the item."). If a private party opened a box and confused a basketball for a bomb, the government presumably would not exceed the scope of the private search by looking into the box and observing a basketball. The same would be true if a private party views a video, mistakenly identifies it as child pornography, and shows the video to the police. *Cf. Simpson*, 904 F.2d at 610 (concluding that the government agents' "search of the box and videotapes did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough than the Federal Express agents"). Of course, theoretically, if the hash-matching was so poorly programmed that it produced false positives at an alarming rate, that might undermine the existence of an actual electronic search of the data. But to be clear, Ambrose never argued, nor did the evidence that he presented allow such

a conclusion, that the algorithms at issue produced such an egregious mismatch of identification to render the "search" a farce.

Accordingly, for these reasons, I conclude that the government's review of the files did not exceed the private searches conducted by hash matching. As a result of this conclusion, I need not consider whether NCMEC acted as a governmental entity or agent when it conducted a human review of the files from Snapchat. *See* Burch Aff. ¶¶ 36, 44. Either way, NCMEC did not exceed the scope of the hash matching and thus there is no basis for suppression. The government did not violate Ambrose's Fourth Amendment rights under the reasonable-expectation-of-privacy caselaw.

## B.    The Government's Warrantless Review of Ambrose's Messages Did Not Violate the Fourth Amendment Under the Trespass Test

Ambrose's second argument poses several issues.[8] First, a threshold question of whether merely viewing another's private communications could

---

[8] The Eleventh Circuit recently assumed without deciding that the *Jones* trespass test applied to an electronic search of a defendant's computer. *See United States v. Ewing*, 140 F.4th 1339, 1346 (11th Cir. 2025). But the court cautioned that ordinarily the reasonable expectation-of-privacy analysis governs a "search 'involv[ing] merely the transmission of electronic signals.'" *Id.* (quoting *Jones*, 565 U.S. at 411). The Eleventh Circuit, relying on *Jones*, noted that a trespass "usually involves the physical occupation of property." *Id.*; *but see Morse v. Hurd*, 17 N.H. 246, 249 (1845) (holding that an action for trespass may be maintained even when the defendant did not remove or touch the chattel as long as he had "access to it, and manifest[ed] a purpose of exercising control over it"). Like *Ewing*, I assume without deciding that the transmission of electrons that occurs when computer files, like videos, are opened constitutes a physical intrusion. *See* Def.'s Suppl. Mem. at 2–3.

constitute a trespass to chattels in 1791. Second, whether the specific videos
that the government viewed constitute chattels such that, at common law, a
trespass suit could have been maintained against the government. Third,
whether the private search doctrine applies in the trespass context. I conclude
that reviewing another's private communications likely would have sufficed for
a trespass to chattels suit before answering the second and third questions in
the government's favor.

### 1.    Viewing Another's Private Communications Likely Constituted a Trespass to Chattels at the Founding

In *Jones*, the Supreme Court revived the "property-based approach" to
the Fourth Amendment, which had fallen into disuse after *Katz*. *See* 565 U.S.
at 405–06. This theory of Fourth Amendment rights against unreasonable
searches is "tied to common-law trespass." *Id.* at 405. Thus, "the government
searches an individual when it physically trespasses on an individual's
property to obtain information." *United States v. Ewing*, 140 F.4th 1339, 1345
(11th Cir. 2025) (citing *Jones*, 565 U.S. at 404). A trespass "usually involves
the physical occupation of property," *id.* at 1346, and must be of "one of those
protected areas enumerated in the Fourth Amendment," *Jones*, 565 U.S. at
411. Technical trespasses that do not intrude on "persons, houses, papers, and
effects" are not searches for Fourth Amendment purposes. *See id.* at 411 & n.8.

Because the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted," *Jones*, 565 U.S. at 411, courts consider whether the government's actions would "have provided grounds in 1791 for a suit for trespass to chattels," *id.* at 419 (Alito, J., concurring in the judgment). "At common law, a suit for trespass to chattels could be maintained if there was a violation of 'the dignitary interest in the inviolability of chattels.'" *Id.* at 419 n.2 (quoting W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER & KEETON ON LAW OF TORTS 87 (5th ed. 1984)); *see Ackerman*, 831 F.3d at 1307–08 (holding that warrantless review of private communications sufficed for common law trespass to chattels even absent damage to the chattels); *see also Miller v. Baker*, 42 Mass. (1 Met.) 27, 31 (1840) ("It is sufficient to maintain trespass, if the party exercises an authority over the goods against the will and to the exclusion of the owner by an unlawful intermeddling, though there be no manual taking or removal."). Based on the above, I assume without deciding that viewing, without privilege or right, another's private communications would constitute a trespass to chattels at the time the Fourth Amendment was adopted.

### 2. Ambrose's Child Pornography Videos are Not Chattels

Ambrose contends that his "private communications" "in the form of image files" are chattels that the government trespassed upon when viewing them. Def.'s Suppl. Mem. at 1–4. The government responds that Ambrose could

not assert ownership over the child pornography videos, and thus they are not chattels. *See* Gov't Suppl. Mem. at 6–7. Because the communications at issue consisted only of videos containing "child sexual abuse material," *id.* at 7, Ambrose had no property right in the videos and thus they are not chattels upon which he could predicate a tort of trespass.

Chattels are "[m]ovable or transferable property; personal property." *See Chattel*, BLACK'S LAW DICTIONARY (12th ed. 2024). Historically, the term was used "to refer to any article of property excluding realty." *See id.* One must have a property right in a chattel to bring suit for trespass of the chattel. *See Trespass*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining trespass to chattels, as used in 1843, as "committing, without lawful justification, any act of direct physical interference with a chattel possessed by another"); *cf. Morse v. Hurd*, 17 N.H. 246, 249–50 (1845) ("the owner of chattels . . . may maintain an action of trespass *de bonis asportatis* against him who so disturbs it without right"). Ambrose admits that, "[a]t common law, trespass was an offense against property rights, not privacy rights." Def.'s Suppl. Mem. at 10. The problem for Ambrose: there is no right to possess child pornography. *See, e.g.*, 18 U.S.C. § 2252(a)(4)(B); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990); *New York v. Ferber*, 458 U.S. 747, 764 (1982); *United States v. Smith*, 459 F.3d 1276, 1289

(11th Cir. 2006). Child pornography is *per se* contraband,[9] "the possession of which, without more, constitutes a crime." *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965); 18 U.S.C. § 2252(a)(4)(B). "[O]ne cannot have a property right in that which is not subject to legal possession." *Cooper v. City of Greenwood*, 904 F.2d 302, 305 (5th Cir. 1990) (citing, among others, *One 1958 Plymouth Sedan*, 380 U.S. at 699–700). And there was no search beyond the review of the videos containing child pornography. *Cf. United States v. Jeffers*, 342 U.S. 48, 50–54 (1951) (holding that the defendant's lack of property rights in contraband would not prevent suppression of contraband seized by the government during an unlawful search of the defendant's hotel room).

The government's search consisted of viewing three videos that contained only child pornography and viewing "an accompanying image" that

---

[9] As opposed to derivative contraband, which are items that are "not inherently unlawful but which may become unlawful because of the use to which they are put— for example, an automobile used in a bank robbery." *Cooper v. City of Greenwood*, 904 F.2d 302, 305 (5th Cir. 1990). Property rights "in derivative contraband [are] not extinguished automatically if the item is put to unlawful use." *Id*. Thus, the *Jones* trespass inquiry would typically advance beyond this point had the government searched derivative contraband or other items of personal property that are not contraband, like personal papers or private written communications that merely evidence a defendant's participation in a crime. For example, an email with text that has the child pornography attached. *See Ackerman*, 831 F.3d at 1307–08 (holding that "warrantless opening and examination of (presumptively) private correspondence that could have contained much besides potential contraband" was "exactly the type of trespass to chattels that the framers sought to prevent").

was "a design with the word 'Massive.' "[10] *See* Creasey Affidavit (Doc. 38-9)
¶¶ 34, 39; Stipulation ¶ 14. The government did not access Ambrose's accounts
or view any private written messages to which the child pornography videos
may have been attached. Had the government done so, a harder question would
arise as to whether private electronic communications and the accounts used
to send them are chattels. *See, e.g.*, *Ackerman*, 831 F.3d at 1307–08; *cf.*
*Warshak*, 631 F.3d at 285–86. But what the government searched here was
child pornography to which Ambrose had no property rights. As such, the *Jones*
property-based theory of a Fourth Amendment search provides no support to
suppress for Ambrose. *See United States v. Jeffery*, No. 23-4264, 2024 WL
4866686, at *4 n.7 (4th Cir. Nov. 22, 2024) ("Because [the defendant] had no
right to possess child pornography, his property-based argument fails."
(internal citation omitted)); *United States v. Hicks*, 438 F. App'x 216, 219 (4th
Cir. 2011) (per curiam) ("there was no meaningful interference with [the
defendant's] possessory interests because he did not have a property right in
the images of child pornography").

---

[10] This image was Ambrose's profile picture, which was publicly viewable. (Doc. 262-
1) at 6; *see* Stipulation ¶ 2. Because "it is not a 'search' when the government accesses
electronic information revealed to third parties," there are no Fourth Amendment
concerns regarding the government's viewing it. *Ewing*, 140 F.4th at 1347. Nor do the
parties raise any issues regarding the image.

### 3.    The Private Search Doctrine Applies to Trespass

If the private search doctrine applies in the trespass context, then the government did not violate Ambrose's Fourth Amendment rights even if child pornography can be a chattel. The government argues that the private search doctrine applies, Gov't Suppl. Mem. at 9–11, and Ambrose argues that it does not, Def.'s Suppl. Mem. at 8–10, 13–14. I explain why the private search doctrine equally applies to the *Jones* trespass line of cases.

Ambrose bases his argument on first principles and contends that, while a prior search frustrates one's reasonable expectation of privacy regarding subsequent searches, a second trespass interferes with the right to exclude others from one's property to the same extent that the first trespass did. *Id.* at 10. Thus, Ambrose argues, a previous private search is irrelevant to a *Jones* trespass inquiry. Although Ambrose's argument has force, it is foreclosed by precedent.

Prior to *Katz*, the Supreme Court's "Fourth Amendment jurisprudence was tied to common-law trespass" and took an "exclusively property-based approach." *See Jones*, 565 U.S. at 405. During this pre-*Katz* period, courts applied what became known as the private search doctrine, originating in the early 1900s. *See Walter v. United States*, 447 U.S. 649, 656 (1980) ("It has, of course, been settled since *Burdeau v. McDowell*, 256 U.S. 465 (1921), that a wrongful search or seizure conducted by a private party does not violate the

Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (citation modified)). *Jacobsen*, the seminal private-search doctrine case under the *Katz* approach to the Fourth Amendment, cites *Burdeau* when stating that "[t]he agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." 466 U.S. at 119–20.

In *Burdeau*, private detectives entered a man's office, blew open two safes, pried open his desk, and took his papers. *See* 256 U.S. at 473–74. Private parties later turned over the papers to the government, which intended to present them to a grand jury to seek an indictment of the man for mail fraud. *See id.* at 470–71, 474. The man sued to prevent the use of the papers as evidence against him and claimed violations of his Fourth and Fifth Amendment rights. *See id.* at 470–71. The Supreme Court ruled that the government could use the papers:

> The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character.

*Id.* at 476.

*Burdeau* was not an anomaly. In fact, during the period of "exclusively property-based" Fourth Amendment jurisprudence, courts applied a more

robust version of what would become known as the private search doctrine.
Until the Fourth Amendment was held to apply to the States as well, courts
routinely allowed federal prosecutors to use evidence gathered through
unlawful searches and seizures by state and local officers. *See, e.g.*, *Irvine v.
California*, 347 U.S. 128, 136 (1954) ("Even this Court has not seen fit to
exclude illegally seized evidence in federal cases unless a federal officer
perpetrated the wrong. Private detectives may use methods to obtain evidence
not open to officers of the law." (citing *Burdeau*, 256 U.S. 465)); *Lustig v. United
States*, 338 U.S. 74, 78–79 (1949) ("a search is a search by a federal official if
he had a hand in it; it is not a search by a federal official if evidence secured by
state authorities is turned over to the federal authorities on a silver platter");
*Byars v. United States*, 273 U.S. 28, 33 (1927) ("We do not question the right of
the federal government to avail itself of evidence improperly seized by state
officers operating entirely upon their own account."); *McGuire v. United States*,
273 U.S. 95, 99 (1927) ("The use by prosecuting officers of evidence illegally
acquired by others does not necessarily violate the Constitution nor affect its
admissibility."); *Weeks v. United States*, 232 U.S. 383, 386, 398 (1914)
(excluding papers unlawfully seized by a United States marshal while not
excluding papers seized in a warrantless search by local police and turned over
to the marshal), *overruled by Elkins v. United States*, 364 U.S. 206 (1960).

Binding Fifth Circuit case law[11] applied the private search doctrine to pre-*Katz* cases and post-*Katz* cases sounding in trespass. *See, e.g.*, *United States v. Blanton*, 479 F.2d 327, 327–28 (5th Cir. 1973) (finding that, without invoking *Katz*'s holding or reasoning, the private search of a bag at an airport rendered the government's subsequent search of the bag lawful under the Fourth Amendment); *Barnes v. United States*, 373 F.2d 517, 518 (5th Cir. 1967) (per curiam) (affirming, prior to *Katz*, the admission of evidence obtained after a motel owner searched a bag and turned over its contents to the police); *Wagner v. United States*, 171 F.2d 354, 364 (5th Cir. 1948) (affirming the admission of the defendant's letter and stating that, even "[i]f this letter was unlawfully taken by the jailer from the [defendant]," the defendant "could not complain of such unlawful search by a state officer").

Under precedent, the private search doctrine applies to the *Jones* trespass theory.[12] Because Snap and Instagram were not government agents and the government's search of the child pornography videos did not exceed

---

[11] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[12] In reaching this conclusion, I join a handful of other courts that have answered this question. *See United States v. Phillips*, 32 F.4th 865, 873–74 (9th Cir. 2022); *Miller*, 982 F.3d at 433; *United States v. Lowers*, 715 F. Supp. 3d 741, 758 n.6 (E.D.N.C. 2024); *United States v. Hart*, No. 3:CR-20-197, 2021 WL 2412950, at *10 (M.D. Pa. June 14, 2021).

the scope of the preceding private searches, the government did not violate Ambrose's Fourth Amendment rights under *Jones*.

## IV.    CONCLUSION

The government's eventual warrantless viewing of the three child pornography videos did not violate Ambrose's Fourth Amendment rights under the *Katz* or the *Jones* lines of cases. Accordingly, the following is **ORDERED:**

1.    Defendant Michael Ambrose's Motion to Suppress (Doc. 38) is **DENIED**.

**ORDERED** in Tampa, Florida, on November 12, 2025.

Kathryn Kimball Mizelle
United States District Judge